**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES HUNT,                       ) | |
|                              ) | |
|         Plaintiff,             ) | |
|                              ) | |
|     v.                           ) | |
|                              ) | |
| CITY OF CHICAGO, a municipal    ) | **Jury Trial Demanded** |
| corporation, DAVID BROWN, in his official   ) | |
| and individual capacities, and         ) | |
| ANDREA KERSTEN, in her official and    ) | |
| individual capacities,            ) | |
|                              ) | |
|         Defendants.        ) | |

## <u>COMPLAINT</u>

Plaintiff, James Hunt, by and through his attorneys, complains of Defendants, City of Chicago, a municipal corporation, David Brown, in his official and individual capacities, and Andrea Kersten, in her official and individual capacities, as follows:

### NATURE OF THE ACTION

1.      Officer James Hunt (hereinafter referred to as "Plaintiff") began his employment with the Chicago Police Department in or around June of 2013.  He has spent his entire career as a patrol officer, in the gang unit or as a tactical officer. Officer Hunt performed his job in an excellent manner and served with only minor incidents. He received many commendations for his excellent performance. Notwithstanding his excellent work performance, over the past two years Officer Hunt has been repeatedly and unlawfully retaliated against. In March of 2021, Civilian Office of Police Accountability ("COPA") ordered that Hunt be removed from the Community Safety Team/Gangs Unit and be assigned to the equipment and supply unit.  Ostensibly, this move was for safety reasons, but neither COPA nor anyone from the Chicago Police Department

("CPD") informed Plaintiff of any threat or provided him with any paperwork. He was assigned to desk duty. This was the beginning of a laundry list of sanctions for which no justification was provided. These sanctions resulted in Officer Hunt losing overtime opportunities and forced him to work "inside," meaning he was taken off street patrol and assigned inside to a desk job. He also lost opportunities for promotion for which he was eligible.

2.      In February of 2022, he was stripped of his police powers allegedly because he arrested the driver of a car who struck another policeman with her car; however, there has been no adjudication of that allegation.

## JURISDICTION

3.      Jurisdiction is provided by 28 U.S.C. §1983, as this matter alleges that Plaintiff has been deprived of rights guaranteed to him under the Fourteenth Amendment to the Constitution of the United States of America. Pursuant to 28 USC § 1367(a), this Court has supplemental jurisdiction over the state law claim in Count II in that the claim is so related to the claim in the action within such original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

## VENUE

4.      This action properly lies in this district pursuant to 28 U.S.C. § 1391(a) because the events giving rise to this claim occurred in this judicial district.

## PARTIES

5.      Plaintiff is a citizen of the State of Illinois and is an employee of Defendant City of Chicago.

6.      Defendant City of Chicago is an Illinois municipal corporation located in Cook County, Illinois. Defendant City of Chicago is the employer and principal of the

2

individual defendant actors.

7.     Defendant David Brown (hereinafter referred to as "Brown") is the Superintendent of the Chicago Police Department and a superior to Plaintiff acting under the color of law with decision-making authority over him.  Defendant Brown is sued in his official and individual capacities.

8.     Defendant Andrea Kersten (hereinafter referred to as "Kersten") was at all relevant times hereto an employee of COPA and a superior to Plaintiff acting under the color of state law. Defendant Kersten had final or delegated final policy-making authority for the City of Chicago, specifically regarding personnel decisions within the City of Chicago Police Department, including as they applied to Plaintiff.  Defendant Kersten is sued in her official and individual capacities.

9.     Defendants Brown and Kersten are collectively referred to as "Individual Defendants."

10.    Defendant City of Chicago, at all times relevant hereto, employed Defendants Brown and Kersten and is responsible for the acts of Defendants Brown and Kersten, who were acting within the scope of their employment and pursuant to a custom, policy, and practice of violating individuals' rights to freedom of speech under the First and Fourteenth Amendments to the Constitution of the United States.  It is the pattern and practice of the Chicago Police Department to treat its officers unevenly and unfairly, invoking much harsher sanctions on some officers than on other officers who commit more serious infractions.

3

## FACTS

11.     Plaintiff began his employment with the Chicago Police Department (hereinafter "CPD") in or around June of 2013, approximately nine and a half years ago.

12.     As a beat patrol officer, Plaintiff's primary job duties consisted of patrolling the areas to which he was assigned, issuing citations and/or making arrests when appropriate, and conducting preliminary investigations.

13.     In the Fall of 2019, Plaintiff was assigned to the Gang Unit.  As a tactical officer and as a gang officer, he worked in extremely dangerous conditions.

14.     In the Summer of 2020, the Gang Unit was renamed the Community Safety Unit, to which Plaintiff was also assigned.

15.     Plaintiff has performed his job in an excellent manner and has received many commendations from the Chicago Police Department praising him for a job well done.

16.     In June of 2021, Hunt received a call from a supervisor who informed Plaintiff that he was assigned out of the Community Safety Unit back to the street. Plaintiff was a patrolman on the street for approximately three days, when he was assigned to the equipment and supply room to remain on desk duty.

17.     Upon information and belief, disciplinary actions including reassignment, are implemented and approved by COPA, with the explicit or implicit approval of the Individual Defendants.

18.     When Plaintiff was removed from his team and put on desk duty, no reason was given for this disciplinary action, and he was provided no paperwork in connection with the disciplinary action. CPD later informed Plaintiff's Fraternal Order of Police ("FOP")

representative that Plaintiff was assigned to desk duty for his own protection, but CPD never informed Plaintiff of a threat or followed a threat protocol, pursuant Special Order S04-03-011. (A copy of the Special Order S04-03-011 is attached hereto as Exhibit A.)

19.     Indeed, Commander of Labor Relations, Donna Rowling, later testified in an arbitration hearing that while Plaintiff was initially taken off the street for his own protection, he remained off the street even after the threat expired. She further testified that the threat protocol was not followed in Plaintiff's case.

20.     While assigned to the equipment and supply room, Plaintiff was denied the opportunity to work overtime, a very lucrative opportunity for CPD officers, and he was disqualified from promotions, for which he was otherwise qualified.

21.     In April of 2021 during a press conference, Defendant Brown stated that Plaintiff was removed from the gang unit (Community Safety Unit) when CPD became aware that Plaintiff was on the team through a news story.

22.     During May and April of 2021, Plaintiff was denied deployment to the street, like the rest of his unit.  This was in violation of the contract, (specifically Articles 10.1 and 10.2, Section 23.6 and Section 23.11), which CPD later acknowledged.  CPD claimed to the FOP representative that Plaintiff was on a "non-deployable" list, even though there had been no hearing or adjudication for this action.

23.     In August of 2021, COPA issued paperwork about an alleged use of force incident from May 2020, the "car window incident."

24.     During the Chicago riots in May, 2020, a woman was driving her car slowly through the crowd. She struck a police officer with the car. Plaintiff ordered the woman to stop

the car and exit the car.  She refused.

25.     Plaintiff broke the driver's window of the car and opened the door and ordered the driver out of the car.  He cuffed her and arrested her.  She was not injured or struck. It is routine for police officers to break a car window when trying to arrest someone, and the person refuses to exit the car.

26.     In February 2022, Plaintiff was promoted to "Field Training Officer (FTO)." The day before he was to start as an FTO, CPD, with the implicit or explicit approval of the Individual Defendants, stripped Plaintiff of his police powers. No reason was given, except to say it was related to the "car window incident."

27.     Plaintiff has been repeatedly harassed by defendants in that they have applied much harsher sanctions toward him than to other officers who were accused of similar or more severe conduct.

**COUNT I**
**EQUAL PROTECTION and DUE PROCESS**
**42 U.S.C. § 1983**
**(Against all Defendants)**

28.     Plaintiff re-alleges paragraphs 1-27 and incorporates them as if fully set forth herein.

29.     The Fourteenth Amendment to the United States Constitution protects persons from being subjected to violations of equal protection and due process by persons action under color of state law.

30.     Defendants were under a duty to follow the rules, statutes and plan to investigate citizen complaints against Officers.

31.     Plaintiff had a protectable interest and reasonable expectation that the Individual

6

Defendants would comply with the statutes, rules, plans, and ethics in the course of their duties by conducting full and fair investigation and impose consistent sanctions. (See Exhibit C at III, Special Order S08-01, Complaint and Disciplinary Investigators and Investigations).

32.     Plaintiff has a protectable interest in fair and impartial investigations.

33.     The Individual Defendants, under color of state law, engaged in a pattern and practice of manipulating the investigations into Plaintiff.

34.     The Individual Defendants exercised final policymaking authority for the CPD.

35.     The acts described herein were and are part of a pattern and practice that includes partial and unfair investigations.

36.     The City of Chicago was aware of the pattern and practice of partial and unfair investigations, but it chose not to remediate that practice.

37.     Defendants further failed to provide Plaintiff with an opportunity for a hearing and other procedural safeguards to contest the partial and unfair investigations.

38.     Defendants deprived Plaintiff of equal protection of the laws of the United States of America and of due process.

39.     Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants on Count I and that the Court:

a) Declare that Defendants' conduct was in violation of his rights under the United States Constitution;

b) Award Plaintiff the value of the compensation and benefits lost as a result of Defendants' unlawful conduct;

c)   Award Plaintiff the value of compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

d)   Award Plaintiff damages for emotional distress and compensatory damages;

e)   Award Plaintiff punitive damages;

f)   Award Plaintiff reasonable attorney's fees, costs and disbursements;

g)   Enjoin Defendants and all officers, agent, employees and all persons in active concert or participation with them from engaging in any unlawful employment practice, including retaliation in response to the exercise of constitutionally protected rights;

h)   Enjoin Defendants and all officers, agents, employees and all persons in active concert or participation with them to institute and carry out all policies and practices to prevent retaliation; and

i)   Award Plaintiff any and all other relief as the Court deems just in the premises.

**COUNT II**
**BREACH OF CONTRACT**
**(Against All Defendants)**

40.   Plaintiff re-alleges paragraphs 1 through 23 and incorporates them as if fully set forth herein.

41.   By their conduct as alleged herein, Defendants have violated Plaintiff's Contract (specifically Article 8.1) and deprived him of his Constitutional rights.

42.   The City of Chicago represented that COPA investigations and sanctions against police officers would be conducted in a fair and impartial manner and that the investigations would comply with the statutes, rules, plans and procedures governing such investigations (See

Exhibit C at III, Special Order S08-01, Complaint and Disciplinary Investigators and Investigations).

43.     Plaintiff has performed his obligations under the Contract.

44.     The City of Chicago breached the Contract by conducting partial and unfair investigations. The Contract is attached as Exhibit B.

45.     The Plaintiff has suffered damages as a result of these breaches.

46.     Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants on Count II and that it:

a) Declare that Defendants' conduct was in violation of his rights under the United States Constitution;

b) Award Plaintiff the value of the compensation and benefits lost as a result of Defendants' unlawful conduct;

c) Award Plaintiff the value of compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

d) Award Plaintiff damages for emotional distress and compensatory damages;

e) Award Plaintiff punitive damages;

f) Award Plaintiff reasonable attorney's fees, costs and disbursements;

g) Enjoin Defendants and all officers, agents, employees and all persons in active concert or participation with them from engaging in any unlawful employment practice, including retaliation in response to the exercise of constitutionally protected rights;

h) Enjoin Defendants and all officers, agents, employees and all persons in active concert or participation with them to institute and carry out all policies and practices to prevent retaliation; and

i) Award Plaintiff any and all other relief as the Court deems just in the premises.

**JAMES HUNT**

By: ___/s/ *Mark A. Flessner*_____
       One of His Attorneys

Mark A. Flessner (Mark.Flessner@sfbbg.com)
Adam Maxwell (Adam.Maxwell@sfbbg.com)
**Schoenberg Finkel Beederman Bell Glazer LLC**
300 S. Wacker Drive, Suite 1500
Chicago, Illinois 60606
(312) 648-2300

# EXHIBIT A

| Chicago Police Department **PROTECTION OF DEPARTMENT MEMBERS** | | **Special Order S04-03-11** | |
|---|---|---|---|

| ISSUE DATE: | 25 August 2016 | EFFECTIVE DATE: | 25 August 2016 |
|---|---|---|---|
| RESCINDS: | 25 January 2013 Version | | |
| INDEX CATEGORY: | 04 - Preliminary Investigations | | |
| CALEA: | | | |

## I. PURPOSE

A.  This directive establishes:

1.  a standardized protocol for the Department to use as a guideline whenever a Department member has been the target of retaliation by way of intimidation, in response to the member's performance of law enforcement duties.

2.  a continuum of support, communication, and reporting whenever any Department member becomes aware of an act of retaliation, by way of intimidation, taken against any Department member.

3.  a mandatory review protocol for acts of retaliation by way of intimidation against police officers and the appropriate level of response including criminal charges.

4.  *a threat assessment and protective measure protocol for officer-involved shootings and/or law-enforcement-related deaths.*

B.  Department members will refer to the Special Order on "Preliminary Investigations" for additional procedural direction and the Deployment Operations Center's *current* Informational Bulletin(s) (see Attachment No. 1) (see Attachment No. 2) on social networking security measures.

## II. RETALIATION DEFINED

A.  For the purpose of this directive, an act of retaliation by way of intimidation is any action of a damaging or threatening nature taken against a Department member directly or indirectly in response to the member's performance of official law enforcement duties.

B.  An act of retaliation:

1.  may take the form of physical conduct, oral or written communication, or communication through the internet, social networking sites, or any other electronic media.

2.  is intended to cause harm such as, but not limited to, mental distress, interference with the member's domestic life, or injury to the member's financial well-being, credit standing, employment status, reputation, or good name.

3.  taken against the Department member's immediate family will be treated as if the act was taken against the Department member.

## III. RESPONSIBILITIES

A.  Department Discovery *Incidents*

1.  When a serious threat to the safety and security of a Department member or the member's immediate family is discovered prior to the affected member's knowledge of the threat, the discovering member will:

a.  immediately notify any supervisor of:

(1)  the identity of the affected officer; and

    (2) the facts surrounding the allegation.

  b. conduct a preliminary investigation in accordance with the Department directive entitled "Preliminary Investigations."

  c. complete a preliminary case report following the procedures delineated in the Department directive entitled "Department Reports and Letters of Clearance." When no other case report applies according to the hierarchy schedule, the reporting member will use:

    (1) **Intimidation** in the primary classification box, and **Intimidation of a Law Enforcement Official** (I-UCR code 3961) as the secondary classification for incidents involving allegations of criminal conduct; or

    (2) **Intimidation** in the primary classification box, and **Law Enforcement Official: Noncriminal Offense** (I-UCR offense code 3962) as the secondary classification for incidents involving allegations of a noncriminal nature.

  d. ensure all required or appropriate notifications to investigative/command units have been entered in the appropriate "Notifications" field of the case report.

  e. submit the case report and any related document(s) to his/her immediate supervisor.

2. The supervisor will:

  a. promptly notify the Crime Prevention and Information Center (CPIC) by telephone, providing all available information pertaining to the threat and a summary of police action taken.

  b. review all completed report(s) and, if appropriate, approve the report(s).

  c. notify the station supervisor or appropriate unit supervisor of the approved report(s).

  d. ensure:

    (1) that any other appropriate notifications have been made.

    (2) that any immediate safety concerns of the affected member are immediately addressed.

3. The station supervisor or appropriate unit supervisor will:

  a. notify:

    (1) the first-level exempt commanding officer of the affected member's unit of assignment; and

    (2) when necessary, the station supervisor of the affected member's district of residence.

  b. forward a copy of the case report and related documents to the district commander of the affected officer's district of residence and the following entities **via facsimile message** :

    (1) the station supervisor of the affected member's district of residence, when appropriate;

    (2) CPIC; and

    (3) the watch supervisor of the appropriate Bureau of Detectives area.

  c. contact the Office of Emergency Management and Communication (OEMC) and provide sufficient information to ensure that the necessary field units are aware of the affected officer's residential address or any other relevant information.

**NOTE:** At no time will this information be dispatched via radio communication unless an emergency situation exists. The affected member's residential address will only be provided in secure communication not accessible to the public.

4. The first-line exempt commanding officer of the affected member's unit of assignment will:

    a. immediately notify the affected member of the alleged threat.

    b. enact security remedies depending on the seriousness and viability of the threat, such as, but not limited to:

        (1) assigning a unit as a security detail to the affected member's residence, either marked unit or covert officer.

        (2) a Special Attention in the immediate area surrounding the member's residence.

        (3) providing the officer with a take-home radio.

    c. provide CPIC with any additional information including any safety measures enacted.

    d. ensure an immediate preliminary investigation has been initiated.

    e. *ensure a Deployment Operations Center (DOC) supervisor has informed the affected member* of appropriate social networking safety and *reviewed with* the affected member the Deployment Operations Center's *current* Informational Bulletin(s).

    f. *ensure the appropriate Department assistance and support services are offered to the affected member and the member's immediate family (e.g., Peer Support, EAP, Professional Counseling Services).*

5. *Crime Prevention and Information Center (CPIC) supervisor will:*

    a. *assign a DOC member to review Deployment Operations Center's current Informational Bulletin(s) for social networking security measures with the affected member.*

    b. *coordinate with the affected member to perform a threat assessment.*

    c. *monitor open source communications and social media sites to identify threats to the affected member or the member's immediate family.*

    d. *ensure threat assessment information is provided to the first-line exempt commanding officer and the affected officer.*

B. Member Discovery *Incidents*

1. The affected member will immediately notify any supervisor of the facts surrounding the incident when:

    a. a serious threat to the safety and security of a Department member or the member's immediate family*; or*

    b. *a law enforcement related event causes a media presence and/or protests outside of a member's residence or a member's immediate family's residence.*

2. The supervisor will:

    a. notify the station supervisor or appropriate unit supervisor of the unit of assignment of the affected member.

    b. assign a Department member to conduct a preliminary investigation in accordance with the Department directive entitled "Preliminary Investigations".

c. ensure the reporting officer completes a preliminary case report in accordance with Item III-A-1-c of this directive.

3. The station supervisor or appropriate unit supervisor of the affected member's unit of assignment will:

a. notify:

(1) the first-line exempt commanding officer of the affected member's unit of assignment; and

(2) when appropriate, the station supervisor of the affected member's district of residence.

b. forward a copy of the case report and related documents to the district commander of the affected officer's district of residence and the following entities via facsimile message:

(1) the station supervisor of the affected member's district of residence, when appropriate;

(2) CPIC; and

(3) the watch supervisor of the appropriate Bureau of Detectives area.

c. contact OEMC and provide sufficient information to ensure that the necessary field units are aware of the affected officer's residential address or any other relevant information.

4. The first-line exempt commanding officer of the affected member's unit of assignment will:

a. enact security remedies depending on the seriousness and viability of the threat, such as, but not limited to:

(1) assigning a unit as a security detail to the affected member's residence, either marked unit or covert officer.

(2) a Special Attention in the immediate area surrounding the member's residence.

(3) providing the officer with a take-home radio.

b. ensure an immediate preliminary investigation has been initiated.

c. provide CPIC with any additional information including any safety measures enacted.

d. *ensure a DOC supervisor has informed the affected member of appropriate social networking safety and reviewed with the affected member the Deployment Operations Center's current Informational Bulletin(s).*

e. *ensure the appropriate Department assistance and support services are offered to the affected member and the member's family (e.g., Peer Support, EAP, Professional Counseling Services).*

5. *Crime Prevention and Information Center (CPIC) supervisor will:*

a. *assign a DOC member to review Deployment Operations Center's current Informational Bulletin(s) for social networking security measures with the affected member.*

b. *coordinate with the affected member to perform a threat assessment.*

c. *monitor open source communications and social media sites to identify threats to the affected member or the member's immediate family.*

        d. *ensure threat assessment information is provided to the first-line exempt commanding officer and the affected officer.*

C. *Threat Assessment and Protective Measures for An Officer-Involved Shooting and/or Law-Enforcement-Related Death*

    1. *The assigned supervisor will:*

        a. *promptly notify the Crime Prevention and Information Center (CPIC) by telephone, providing all available information pertaining to the incident and a summary of police action taken.*

        b. *follow the procedures outlined in the Department directive entitled "*Firearm Discharge Incidents Involving Sworn Members*," or other applicable Department directive.*

        c. *ensure:*

            (1) *any other appropriate notifications have been made.*

            (2) *any immediate safety concerns of the affected member are immediately addressed.*

            (3) *provisions under Traumatic Incident Stress Management Program are followed, in accordance with procedures outlined in the Department directive entitled "*Traumatic Incident Stress Management Program.*"*

            (4) *the CPIC Social Media Section is notified.*

    2. *Crime Prevention and Information Center (CPIC) supervisor will:*

        a. *assign a DOC member to review Deployment Operations Center's current Informational Bulletin(s) for social networking security measures with the affected member.*

        b. *coordinate with the affected member to perform a threat assessment.*

        c. *monitor open source communications and social media sites to identify threats to the affected member or the member's immediate family.*

        d. *ensure threat assessment information is provided to the first-line exempt commanding officer and the affected officer.*

## IV.   FOLLOW-UP INVESTIGATION RESPONSIBILITIES

A. The detective(s) assigned to conduct a follow-up investigation will:

    1. immediately respond to the location to conduct an on-scene interview.

    2. conduct a thorough follow-up investigation.

    3. maintain open communication with:

        a. the affected officer;

        b. the station supervisor of the district of occurrence;

        c. the affected member's first-line exempt commanding officer; and

        d. *CPIC.*

    4. consult with the Cook County State's Attorney Felony Review Unit regarding appropriate charges when an arrest is made.

B. The watch supervisor of the Bureau of Detectives will, upon the initial telephone notification:

1. conduct a threat analysis in conjunction with the Deployment Operations Center; and

2. forward security measure suggestions to the affected officer's first-line exempt commanding officer.

C. *Crime Prevention and Information Center (CPIC) commander will ensure* :

1. *a DOC member has reviewed Deployment Operations Center's current Informational Bulletin(s) for social networking security measures with the affected member.*

2. *CPIC monitors open source communications and social media sites to identify threats to the Department and/or the affected member or the members's immediate family.*

(Items indicated by *italics/double underline* have been added or revised.)

Authenticated by KC

Eddie T. Johnson
Superintendent of Police

16-022 KT

# EXHIBIT B

# AGREEMENT
# BETWEEN
# FRATERNAL ORDER OF POLICE
# CHICAGO LODGE No. 7
### AND THE
# CITY OF CHICAGO



**Fraternal Order of Police**
**Chicago Lodge No. 7**
**1412 West Washington Boulevard**
**Chicago, Illinois  60607-1821**
**Phone:  312-733-7776**
**Facsimile:  312-733-1367**

**July 1, 2012**
**to**
**June 30, 2017**

**WWW.CHICAGOFOP.ORG**

GCC/IBT 42-L

 **FRATERNAL ORDER OF POLICE**
CHICAGO LODGE #7

To the Membership of Lodge 7,

Once again, this, the 9th Agreement between the Fraternal Order of Police, Chicago Lodge 7 and the City of Chicago delineates the most recently negotiated changes to the last Contract, which ended on July 1, 2012. On October 18, 2014, 66.5% of the active Membership voted to approve this Contract, which runs through June 30, 2017. To have ratified this Agreement by such a significant margin when the Lodge was in the midst of organizational turmoil is truly a remarkable feat.

This was an extremely difficult negotiation process. For the first time in Lodge 7's collective bargaining history, the FOP was the last bargaining unit to negotiate with the City. Furthermore, what took place prior to the settlement for this Contract was one of the most unique negotiation processes that both sides had ever experienced. On a personal note, and as an individual that has written and implemented advanced public sector negotiation training sessions and contract negotiation experiments, I can attest to the unorthodox environment that existed prior to the present Board's involvement in the process. Immediately, internal roles and responsibilities needed to be re-addressed in order to advance our position.

The professionalism that was regularly demonstrated by the Lodge's labor attorneys deserve our appreciation and endless accolades as they worked seamlessly and tirelessly to deal with multiple FOP administrations and work towards presenting a new contract to the Membership.

Speaking of accolades, Chicago Lodge 7 is the largest FOP Lodge in the Country. Presently, many look upon Law Enforcement with an accusatory and suspicious eye. Despite this negative environment, we strive to make communities safe. We defend those who cannot defend themselves. We show compassion when necessary and exhibit might when we have no alternative. The over 17,000 Members of Lodge 7 have withstood many changes, some wonderfully positive and some not. Administrations of this long standing and righteous organization come and go; but it is the Lodge Membership that carries on. It is the Membership that makes this organization what it was, what it is today and what it will continue to be tomorrow. Each and every Member of Chicago Lodge 7 needs to be applauded. The Lodge will continue to move forward, but only because of the strength and tenacity of its Membership. Each and every Member has my personal appreciation, respect and admiration. You are certainly a group to be admired. I am humbled to be able to work on your behalf.

Be Safe and God Bless the Police,


Dean C. Angelo, Sr.
President
Fraternal Order of Police, Chicago Lodge 7

**THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS**

# TABLE OF CONTENTS

**ARTICLE 1 - PREAMBLE** ....................................................................................................**1**

**ARTICLE 2 - RECOGNITION** ..............................................................................................**1**

**ARTICLE 3 - LODGE SECURITY** ........................................................................................**1**
3.1 Maintenance of Membership and Agency Shop ........................................................... 1
3.2 Lodge Presentation at Orientation................................................................................. 1
3.3 Dues Deduction............................................................................................................. 2
3.4 Indemnity ...................................................................................................................... 2

**ARTICLE 4 - MANAGEMENT RIGHTS** ...........................................................................**2**

**ARTICLE 5 - NO STRIKE**.....................................................................................................**3**
5.1 No Strike Commitment ................................................................................................. 3
5.2 Resumption of Operations ............................................................................................ 3
5.3 Union Liability.............................................................................................................. 3
5.4 Discipline of Strikers .................................................................................................... 3

**ARTICLE 6 - BILL OF RIGHTS** .........................................................................................**4**
6.1 Conduct of Disciplinary Investigation ........................................................................ 4
6.2 Witness Officer's Statements in Disciplinary Investigations....................................... 6
6.3 Non-Adoption of Ordinance ......................................................................................... 7
6.4 Photo Dissemination ..................................................................................................... 7
6.5 Compulsion of Testimony ............................................................................................ 7
6.6 Auto-Residency Card.................................................................................................... 7
6.7 Polygraph ...................................................................................................................... 8
6.8 Disclosure ..................................................................................................................... 8
6.9 Media Information Restrictions .................................................................................... 8
6.10 Prohibition on Use and Disclosure of Social Security Numbers ............................... 8
6.11 Mediation .................................................................................................................... 8
6.12 Review Procedures...................................................................................................... 9

**ARTICLE 7 - SUMMARY PUNISHMENT**..........................................................................**9**
7.1 Administration of Summary Punishment...................................................................... 9
7.2 Challenge of Summary Punishment............................................................................ 10

**ARTICLE 8 - EMPLOYEE SECURITY** .............................................................................**10**
8.1 Just Cause Standard .................................................................................................... 10
8.2 File Inspection............................................................................................................. 10
8.3 Limitation on Use of File Material ............................................................................. 10
8.4 Use and Destruction of File Material .......................................................................... 10
8.5 Notification ................................................................................................................. 11
8.6 Detectives, Evidence Technicians, Police Laboratory Technicians, Forensic Investigators and Field Training Officers ................................................................................................. 11
8.7 Tactical Response Reports (TRR)............................................................................... 11
8.8 Superintendent's Authority ......................................................................................... 11

# TABLE OF CONTENTS

**ARTICLE 9 - GRIEVANCE PROCEDURE** ...................................................................**11**
9.1 Definition and Scope.......................................................................................... 11
9.2 Procedures, Steps and Time Limits for Standard Grievances.......................... 12
9.3 Arbitration of Standard Grievances ................................................................. 12
9.4 Psychological Review ....................................................................................... 13
9.5 Medical Grievances .......................................................................................... 14
9.6 Suspension Grievances ..................................................................................... 15
9.7 Authority of the Arbitrator .............................................................................. 17
9.8 Expense of the Arbitrator ................................................................................. 18
9.9 Processing and Time Limits ............................................................................. 18
9.10 Normal Operation ........................................................................................... 18
9.11 Exhaustion....................................................................................................... 18
9.12 Lodge Rights................................................................................................... 18

**ARTICLE 10 - NON-DISCRIMINATION** .......................................................**19**
10.1 Equal Employment Opportunity .................................................................... 19
10.2 Non-Discrimination ........................................................................................ 19
10.3 Political Activity or Campaigning .................................................................. 19
10.4 Religious Holiday Accommodation................................................................ 19
10.5 Americans with Disabilities Act .................................................................... 19

**ARTICLE 11 - HOLIDAYS**...............................................................................**20**
11.1 Designated Holiday......................................................................................... 20
11.2 Compensation for Holidays ............................................................................ 20
11.3 Personal Day ................................................................................................... 21
11.4 Special Compensation Time ........................................................................... 21
11.5 Holiday Declaration ........................................................................................ 21

**ARTICLE 12 - PROMOTIONS** .........................................................................**21**

**ARTICLE 13 - LAYOFFS-RE-EMPLOYMENT**...............................................**22**
13.1 Notice of Layoffs ........................................................................................... 22
13.2 Hiring During Layoffs .................................................................................... 22
13.3 Recall .............................................................................................................. 22

**ARTICLE 14 - BULLETIN BOARDS**................................................................**22**

**ARTICLE 15 - SAFETY ISSUES** ......................................................................**22**
15.1 Cooperation..................................................................................................... 22
15.2 Safety Committee............................................................................................ 22
15.3 Disabling Defects............................................................................................ 23
15.4 Notice .............................................................................................................. 23

**ARTICLE 16 - SECONDARY EMPLOYMENT AND SPECIAL EMPLOYMENT...23**
16.1 Secondary Employment .................................................................................. 23
16.2 Special Employment ....................................................................................... 23

# TABLE OF CONTENTS

**ARTICLE 17 – LODGE REPRESENTATIVES** ............................................................. **24**
17.1 Meeting Participation and Scheduling ...................................................................... 25
17.2 Leave from Duty ...................................................................................................... 25
17.3 Attendance at Lodge Meetings ............................................................................... 25
17.4 Grievance Processing .............................................................................................. 25
17.5 Attendance at State and National Conferences ...................................................... 25
17.6 Lodge Negotiation Team ......................................................................................... 26
17.7 Lodge Activity ......................................................................................................... 26

**ARTICLE 18 - DISABILITY INCOME** ....................................................................... **26**
18.1 I.O.D ........................................................................................................................ 26
18.2 Non-I.O.D ............................................................................................................... 26
18.3 Limited Duty I.O.D ................................................................................................. 26
18.4 Recognized Openings .............................................................................................. 26
18.5 Certification ............................................................................................................. 27
18.6 Return to Duty ......................................................................................................... 27
18.7 Advisory Committee ................................................................................................ 27
18.8 Injuries on Duty & Recurrence Claims .................................................................. 27
18.9 Employer Responsibility for Hospital, Medical and Prescription Costs and Pensions
   Contributions ............................................................................................................ 27
18.10 Medical Benefit Statement ..................................................................................... 27

**ARTICLE 19 - BEREAVEMENT LEAVE** ................................................................... **28**
19.1 Death in Family ....................................................................................................... 28
19.2 Definition of Family ................................................................................................ 28
19.3 Extended Bereavement Leave .................................................................................. 28

**ARTICLE 20 - HOURS AND OVERTIME** .................................................................. **28**
20.1 Work Day and Work Week ...................................................................................... 28
20.2 Compensation for Overtime .................................................................................... 28
20.3 Sixth and Seventh Day Work .................................................................................. 29
20.4 Call-Back ................................................................................................................. 29
20.5 Court Time ............................................................................................................... 29
20.6 Tour of Duty Exchange ........................................................................................... 30
20.7 Change of Schedule ................................................................................................. 30
20.8 Stand-By .................................................................................................................. 31
20.9 Day-Off Change ...................................................................................................... 31
20.10 Day-Off Group Assignment ................................................................................... 32
20.11 Accumulation of Compensatory Time ................................................................... 32
20.12 Back to Back Shifts on Change Day ...................................................................... 32
20.13 Duty Availability Allowance .................................................................................. 33

**ARTICLE 21 - UNIFORMS** ......................................................................................... **33**
21.1 Uniforms and Equipment Advisory Committee ...................................................... 33
21.2 Major Change ........................................................................................................... 33
21.3 Uniform Allowance ................................................................................................. 33
21.4 Uniform Change or Modification ............................................................................ 33
21.5 Uniform Option ....................................................................................................... 33
21.6 Lost Shields ............................................................................................................. 34

# TABLE OF CONTENTS

**ARTICLE 22 - INDEMNIFICATION**..................................................................**34**
22.1 Employer Responsibility................................................................. 34
22.2 Legal Representation ...................................................................... 34
22.3 Cooperation.................................................................................... 34
22.4 Applicability................................................................................... 34
22.5 Expedited Arbitration..................................................................... 34

**ARTICLE 23 - SENIORITY**..........................................................................**34**
23.1 Definition and Application.............................................................. 34
23.2 Furlough Scheduling ...................................................................... 35
23.3 Promotion....................................................................................... 36
23.4 Seniority List.................................................................................. 36
23.5 Priority Schedule for Use of Elective Time ................................... 36
23.6 Overtime for Pre-Planned Events ................................................. 36
23.7 Holiday Assignment........................................................................ 37
23.8 Filling Recognized Vacancies........................................................ 37
23.9 Filling Unit Duty Assignments ....................................................... 38
23.10 Non-Disciplinary Demotion.......................................................... 39
23.11 Details .......................................................................................... 40
23.12 Reassignment of Duties ............................................................... 41
23.13 Acting Desk Sergeant .................................................................. 41

**ARTICLE 24 - EDUCATIONAL REIMBURSEMENT**....................................**41**

**ARTICLE 25 - LIFE AND HEALTH INSURANCE PROVISIONS** ............................**43**
25.1 Life Insurance ............................................................................... 43
25.2 Medical and Dental Plans ............................................................. 43
25.3 Ambulance Fees............................................................................ 44
25.4 Labor Management Committee on Health Care ............................ 44

**ARTICLE 26 - WAGES** .................................................................................**44**
26.1 Salary Schedule............................................................................. 44
26.2 Bi-lingual Compensation ............................................................... 45
26.3 Work Out of Grade ........................................................................ 46
26.4 Payment of Wages ........................................................................ 46
26.5 Payment of Time ............................................................................ 46

**ARTICLE 27 - RESIDENCY** .........................................................................**47**

**ARTICLE 28 - DURATION, ENFORCEMENT AND DISPUTE RESOLUTION** ......**47**
28.1 Term of Agreement......................................................................... 47
28.2 Continuing Effect............................................................................ 47
28.3 Impasse Resolution, Ratification and Enactment.......................... 47

# TABLE OF CONTENTS

**ARTICLE 29 - BABY FURLOUGH DAYS** .................................................................**49**
**29.1** .......................................................................................................... 49
**29.2** .......................................................................................................... 49
**29.3** .......................................................................................................... 49

**ARTICLE 29A - FURLOUGHS** ...........................................................................**49**
**29A.1** ......................................................................................................... 49
**29A.2** ......................................................................................................... 50
**29A.3** ......................................................................................................... 50
**29A.4** ......................................................................................................... 50

**ARTICLE 30 - PERSONAL LEAVES OF ABSENCE** .......................................**50**
30.1 Personal Leave ...................................................................................... 50
30.2 Military Leave ....................................................................................... 50

**ARTICLE 31 - STEADY WATCH** .......................................................................**51**
31.1 Implementation ..................................................................................... 51
31.2 Alternate Response Section Bidding ..................................................... 51
31.3 Exclusions ............................................................................................. 52
31.4 Annual Selection Process ...................................................................... 52
31.5 Filling of Vacancies .............................................................................. 53
31.6 Temporary Watch Assignments ............................................................ 53
31.7 Joint Labor Management Committee ..................................................... 54
31.8 Dispute Resolution ............................................................................... 54

**ARTICLE 32 - COMPLETE AGREEMENT** ......................................................**54**

**ARTICLE 33 - SAVINGS CLAUSE** ....................................................................**54**

**APPENDICES**
A   Salary Schedules for Sworn Police Personnel ......................................... 56
B   .............................................................................................................. 64
C   Auxiliary Police Aides ........................................................................... 65
D   Dental Plan ............................................................................................. 66
E   Network Changes .................................................................................... 67
F   In-Network/Out-of-Network Care .......................................................... 68
G   Health Care Contributions for Active Officers ...................................... 69
H   Prescription Drug Costs .......................................................................... 70
I   Chemical Dependency and Mental Health Co-Insurance and Limits ....... 71
J   Behavioral Intervention System-Personnel Concerns Program .............. 72
K   High Risk Pregnancy Screening Program ............................................... 74
L   Affidavits in Disciplinary Investigations ............................................... 75
M   Expedited Arbitration Rules ................................................................... 77
N   Procedures for Injury On Duty and Recurrence Claims .......................... 78
O   Subrogation Language for City Of Chicago ............................................ 80
P   Benefits During Probationary Period ...................................................... 82
Q   Ground Rules for Arbitration of Suspension Grievances Pursuant to Section 9.6.B and 9.6.C ... 84
R   Procedures for Psychological Review ...................................................... 86

# TABLE OF CONTENTS

S  Grievance Mediation Program Ground Rules ........................................................... 89
T  Drug and Alcohol Testing ............................................................................... 91

# LETTERS AND MEMORANDA OF UNDERSTANDING

Notice to Supervisors Regarding Progressive Discipline ........................................ 94
Maintenance of Benefits ................................................................................ 95
District Unit Bid Assignments ........................................................................ 96
Bidding Procedures ...................................................................................... 97
Physical Fitness .......................................................................................... 98
Physical Fitness Incentive ............................................................................. 99
Health Care Plan ........................................................................................ 101
Alternative Medical Coverage ....................................................................... 102
Educational Reimbursement .......................................................................... 105
Negotiations / "Pattern and Practice" Litigation ............................................... 106
Negotiations / Section 8.4 ............................................................................ 107
Negotiations / Section 8.7 ............................................................................ 108
Article 18 ................................................................................................. 109
Videotaping of Witnesses Before the Police Board ............................................. 110
Disputed I.O.D. Claims ................................................................................ 111
Article 22 Indemnification ............................................................................ 112
Vehicle License Plate/City Sticker Violations .................................................... 113
One-Half Hour Lunch Period ......................................................................... 115
Furloughs from the Mounted Unit ................................................................... 116
Remittance for Health Fairs ........................................................................... 117
Vocational Training Program .......................................................................... 118
Medical Services Section/Referral Physician List ............................................... 119
Department Procured Outside Employment ....................................................... 120
55 Year Old Retiree Health Care Benefits ........................................................ 122
Joint Pension Legislation Committee ............................................................... 125
Work Day Schedules .................................................................................... 126
Amendment to Work Schedule Agreement ........................................................ 136
Change of Schedule ..................................................................................... 137
District Desk Officer Bid Positions, Work Day Schedules .................................... 138
Article 23, Seniority (defined and clarified) ...................................................... 139
Disciplinary Investigations ............................................................................ 140
Department Vehicles .................................................................................... 142
Field Training Officer Program ....................................................................... 144
Letter of Agreement on Retroactivity .............................................................. 145
Letter of Agreement Section 8.4 ..................................................................... 147
Memorandum of Understanding-Health Care Plan .............................................. 148
Memorandum of Understanding on Use of Elective Time ...................................... 151
Bomb Technician Work Schedule .................................................................... 153
Honor Guard ............................................................................................. 154
Capitalization of "Officer" ............................................................................ 155
29A.4 ...................................................................................................... 157
Wellness Benefit ........................................................................................ 158

## ARTICLE 1— PREAMBLE

This Agreement is entered into by and between the City of Chicago, an Illinois municipal corporation (hereinafter referred to as the "Employer") and the Fraternal Order of Police, Chicago Lodge No. 7 (hereinafter referred to as the "Lodge").

It is the purpose of this Agreement and it is the intent of the parties hereto to establish and promote mutual harmonious understanding and relationships between the Employer and the Lodge, to promote departmental efficiency and effectiveness, to establish wages, hours, standards and other terms and conditions of employment for **O**fficers covered by this Agreement, and to provide for the equitable and peaceful adjustment and resolution of differences which may arise from time to time over the negotiations, interpretation and application of this Agreement.

In consideration of the mutual promises, covenants and agreements contained herein, the parties hereto, by their duly authorized representative and/or agents, do mutually covenant and agree as follows:

## ARTICLE 2 — RECOGNITION

The Employer recognizes the Lodge as the sole and exclusive collective bargaining representative for all sworn Police Officers below the rank of sergeant (herein referred to as "**O**fficer") excluding probationary officers employed by the Employer in its Department of Police, provided said probationary period shall not extend beyond an eighteen (18) month period.

The normal probationary period shall consist of eighteen (18) months of actual presence during active duty. Consequently, time absent from duty or not served, for any reason, shall not apply toward satisfaction of the probationary period, except as provided in Appendix P**.** During the probationary period, an officer is not entitled to any rights, privileges or benefits under this Agreement, except as provided in Appendix P.

Officers covered by the Agreement who have completed their probationary period as defined in Article 2 of the Agreement and thereafter commence disability or approved leaves of absence but subsequently return to active duty shall not be considered probationary and shall be entitled to all rights and benefits provided for in the Agreement, including, but not limited to, the right to invoke the provisions of Article 9 of the Agreement.

## ARTICLE 3 — LODGE SECURITY

### Section 3.1 — Maintenance of Membership and Agency Shop

A. Each **O**fficer who on the effective date of this Agreement is a member of the Lodge, and each **O**fficer who becomes a member after that date, shall, as a condition of employment, maintain their membership in good standing in the Lodge during the term of this Agreement.

B. Any present **O**fficer who is not a member of the Lodge shall, as a condition of employment, be required to pay fair share (not to exceed the amount of Lodge dues) of the cost of the collective bargaining process and contract administration. All **O**fficers hired on or after the effective date of this Agreement and who have not made application for membership shall, on or after the thirtieth day following the completion of their probationary period, also be required to pay a fair share of the cost of the collective bargaining process and contract administration.

### Section 3.2 — Lodge Presentation at Orientation

**With respect to new officers, the Employer shall provide the Lodge with written notice of a class of new officers and shall, unless otherwise agreed to by the parties in writing, provide the Lodge with access to the new officers on the day when the new officers are presented with**

**benefits information, which typically occurs no later than the conclusion of the second week of classes at the Academy.** The Employer shall **also** grant the Lodge an opportunity during the orientation of new officers to present the benefits of membership in the Lodge.

### Section 3.3 — Dues Deduction

A. With respect to any **O**fficer on whose behalf the Employer receives written authorization in a form agreed upon by the Lodge and the Employer, the Employer shall deduct from the wages of the **O**fficer the dues and/or financial obligations uniformly required and shall forward the full amount to the Lodge by the tenth (10th) day of the month following the month in which the deductions are made. The amounts deducted shall be in accordance with a schedule to be submitted to the Employer by the Lodge. Authorization for such deduction shall be irrevocable unless revoked by written notice to the Employer and the Lodge during the fifteen (15) day period prior to the expiration of this contract. The Employer will not similarly deduct the dues of any other organization as to **O**fficers covered by this Agreement.

B. With respect to any **O**fficer on whose behalf the Employer has not received a written authorization as provided for in Section 3.3A above, the Employer shall deduct from the wages of the **O**fficer, the fair share financial obligation, including any retroactive amount due and owing, and shall forward said amount to the Lodge by the tenth (10th) day of the month following the month in which the deduction is made, subject only to the following:

   1. The Lodge has certified to the Employer that the affected **O**fficer has been delinquent in his or her obligation for at least sixty (60) days;

   2. The Lodge has certified to the Employer that the affected **O**fficer has been notified in writing of the obligation and the requirement of each provision of this Article;

   3. The Lodge has certified to the Employer that the affected **O**fficer has been given a reasonable opportunity to prepare and submit any objections to the payment and has been afforded an opportunity to appear before the Board of Directors of the Lodge or its designee for the purpose of being heard on said objections.

### Section 3.4 — Indemnity

The Lodge shall indemnify and save the Employer harmless against any and all claims, demands, suits or other forms of liability that shall arise out of, or by reason of, action taken by the Employer for the purpose of complying with the above provisions of this Article, or in reliance on any list, notices, certification or assignment furnished under any of such provisions.

### ARTICLE 4 — MANAGEMENT RIGHTS

The Employer has and will continue to retain the right to operate and manage its affairs in each and every respect. The rights reserved to the sole discretion of the Employer shall include, but not be limited to, rights:

A. to determine the organization and operations of the Department of Police;

B. to determine and change the purpose, composition and function of each of its constituent departments, and subdivisions;

C. to set standards for the services to be offered to the public;

D. to direct the **O**fficers of the Department of Police, including the right to assign work and overtime;

E.  to hire, examine, classify, select, promote, restore to career service positions, train, transfer, assign and schedule **O**fficers;

F.  to increase, reduce or change, modify or alter the composition and size of the work force, including the right to relieve employees from duties because of lack of work or funds or other proper reasons;

G.  to contract out work when essential in the exercise of police power;

H.  to establish work schedules and to determine the starting and quitting time, and the number of hours to be worked;

I.  to establish, modify, combine or abolish job positions and classifications;

J.  to add, delete or alter methods of operation, equipment or facilities;

K.  to determine the locations, methods, means, and personnel by which the operations are to be conducted, including the right to determine whether goods or services are to be made, provided or purchased;

L.  to establish, implement and maintain an effective internal control program;

M.  to suspend, demote, discharge, or take other disciplinary action against **O**fficers for just cause; and

N.  to add, delete or alter policies, procedures, rules and regulations.

Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provision of this Agreement are not in any way, directly or indirectly, subject to the grievance and arbitration procedures contained herein, provided that no right is exercised contrary to or inconsistent with other terms of this Agreement.

## ARTICLE 5 — NO STRIKE

### Section 5.1 — No Strike Commitment

Neither the Lodge nor any **O**fficer will call, institute, authorize, participate in, sanction, encourage, or ratify any strike, work stoppage, or other concerted refusal to perform duties by any **O**fficer or **O**fficer group, or the concerted interference with, in whole or in part, the full, faithful and proper performance of the duties of employment with the Employer. Neither the Lodge nor any **O**fficer shall refuse to cross any picket line, by whomever established.

### Section 5.2 — Resumption of Operations

In the event of action prohibited by Section 5.1 above, the Lodge immediately shall disavow such action and request the **O**fficers to return to work, and shall use its best efforts to achieve a prompt resumption of normal operations. The Lodge, including its officials and agents, shall not be liable for any damages, direct or indirect, upon complying with the requirements of this Section.

### Section 5.3 — Union Liability

Upon the failure of the Lodge to comply with the provisions of Section 5.2 above, any agent or official of the Lodge who is an **O**fficer covered by this Agreement may be subject to the provisions of Section 5.4 below.

### Section 5.4 — Discipline of Strikers

Any **O**fficer who violates the provisions of Section 5.1 of this Article shall be subject to immediate discharge. Any action taken by the Employer against any **O**fficer who participates in

action prohibited by Section 5.1 above shall not be considered as a violation of this Agreement and shall not be subject to the provisions of the grievance procedure; except that the issue whether an **O**fficer in fact participated in a prohibited action shall be subject to the grievance and arbitration procedure.

## ARTICLE 6 — BILL OF RIGHTS

### Section 6.1 — Conduct of Disciplinary Investigation

All complaints against an **O**fficer covered by this Agreement shall be processed in accordance with the procedures set forth in Appendix L.

Whenever an **O**fficer covered by this Agreement is the subject of a disciplinary investigation other than Summary Punishment, the interrogation will be conducted in the following manner:

A. The interrogation of the **O**fficer, other than in the initial stage of the investigation, shall be scheduled at a reasonable time, preferably while the **O**fficer is on duty, or if feasible, during daylight hours.

B. The interrogation, depending upon the allegation, will normally take place at the **O**fficer's unit of assignment, the Independent Police Review Authority **("IPRA")**, the Internal Affairs Division **("IAD")** or other appropriate location.

**C.** Prior to an interrogation, the **O**fficer under investigation shall be informed of the identities of: the person in charge of the investigation, the **designated primary** interrogation officer, **the designated secondary interrogation officer, if any,** and all persons present during the interrogation and shall be advised whether the interrogation will be audio recorded. When a formal statement is being taken, questions directed to the **O**fficer under interrogation shall **first** be asked by the **designated primary** interrogator. **Unless both parties agree, no more than two members of IPRA or IAD will be present in the interview room during questioning. A secondary interrogator may participate in the interrogation, provided that the secondary interrogator shall be present for the entire interrogation. The secondary interrogator will not ask any questions until the primary interrogator has finished asking questions and invites the secondary interrogator to ask questions. Generally, the secondary interrogator will ask follow-up questions for clarification purposes. The primary interrogator will not ask any questions until the secondary interrogator has finished asking questions and invites the primary interrogator to ask follow-up questions.**

D. Unless the Superintendent of Police specifically authorizes in writing, no complaint or allegation of any misconduct concerning any incident or event which occurred five (5) years prior to the date the complaint or allegation became known to the Department shall be made the subject of a Complaint Register investigation or be re-opened or re-investigated after five (5) years from the date the Compliant Register number was issued.

No anonymous complaint made against an **O**fficer shall be made the subject of a Complaint Register investigation unless the allegation is a violation of the Illinois Criminal Code, the criminal code of another state of the United States or a criminal violation of a federal statute.

No anonymous complaint regarding residency or medical roll abuse shall be made the subject of a Complaint Register investigation until verified. No ramifications will result regarding issues other than residency or medical roll abuse from information discovered during an investigation of an anonymous complaint regarding residency or medical roll abuse, unless of a criminal nature as defined in the preceding paragraph.

E. Immediately prior to the interrogation of an **O**fficer under investigation, he or she shall be informed in writing of the nature of the complaint and the names of all complainants.

F. The length of interrogation sessions will be reasonable, with reasonable interruptions permitted for personal necessities, meals, telephone calls and rest.

G. An **O**fficer under interrogation shall not be threatened with transfer, dismissal or disciplinary action or promised a reward as an inducement to provide information relating to the incident under investigation or for exercising any rights contained herein. The Department shall not retaliate in any manner against any **O**fficer covered by this Agreement who cooperates in a Department disciplinary investigation.

H. An **O**fficer under investigation will be provided with a copy of any and all statements he or she has made that are audio recorded or in writing within seventy-two (72) hours of the time the statement was made. In the event a re-interrogation of the **O**fficer is required within the seventy-two- (72-) hour period following the initial interrogation, the **O**fficer will be provided with a copy of any prior statements before the subsequent interrogation.

I. If the allegation under investigation indicates a recommendation for separation is probable against the **O**fficer, the **O**fficer will be given the statutory administrative proceedings rights, or if the allegation indicates criminal prosecution is probable against the **O**fficer, the **O**fficer will be given the constitutional rights concerning self-incrimination prior to the commencement of interrogation.

J. An **O**fficer under interrogation shall have the right to be represented by counsel of his or her own choice and to have that counsel present at all times during the interrogation, and/or at the request of the **O**fficer under interrogation, he or she shall have the right to be represented by a representative of the Lodge, who shall be either a**n O**fficer on leave to work for the Lodge or a retired **O**fficer working for the Lodge. The interrogation shall be suspended for a reasonable time until representation can be obtained.

K. The provisions of this Agreement shall be deemed to authorize the **Employer, IPRA and IAD** to require **O**fficers under interrogation to provide audio recorded statements, provided that the provisions in Section 6.1 are satisfied.

L. If an **O**fficer provides a statement during the investigation conducted promptly following a shooting incident and then is later interrogated by the **Employer, IPRA or IAD** as part of an investigation related to such incident, the **O**fficer shall be provide with a copy of the portion of any official report that purportedly summarizes his or her prior statement before the interrogation.

M. **If, prior to taking an Officer's statement, the Employer, IPRA or IAD is in possession of video or audio evidence relevant to the matter under investigation, it may, in its discretion, elect to advise or not to advise the Officer of such fact and, further, may allow or not allow the Officer an opportunity to review the video or audio evidence prior to taking the Officer's statement. An Officer who is not allowed to review the video or audio evidence prior to giving a statement shall not be charged with a Rule 14 violation unless the Officer has been presented with the video or audio evidence and given the opportunity to clarify and amend the Officer's original statement. In any event, the Employer shall not charge an Officer with a Rule 14 violation unless it has determined that: (1) the Officer willfully made a false statement; and (2) the false statement was made about a fact that was material to the incident under investigation.**

N. **When the Department relieves an Officer of police powers, except in instances involving confidential investigations, the Department shall be required to give that Officer written notification of the category of the allegations or events that have caused the Officer to be relieved of police powers. Said notification shall be given at the time that the Officer is relieved of police powers.**

## Section 6.2 — Witness Officer's Statements in Disciplinary Investigations

When an **O**fficer covered by this Agreement is required to give a statement, in the presence of an observer, as a witness in a disciplinary investigation other than Summary Punishment, or as a witness in a police-related shooting investigation, at the request of the **O**fficer the interview shall be conducted in the following manner:

A. The interview of the **O**fficer shall be scheduled at a reasonable time, preferably while the **O**fficer is on duty, or if feasible, during daylight hours.

B. The interview, depending on the nature of the investigation, will normally take place at the **O**fficer's unit of assignment, IPRA**,** IAD or other appropriate location.

C. Prior to an interview, the **O**fficer being interviewed shall be informed of the identities of: the person in charge of the investigation, the **designated primary** interviewing officer**, the designated secondary interviewing officer, if any,** and all persons present during the interview; whether the interview is being audio recorded; and the nature of the complaint, including the date, time, location and relevant R.D. number, if known. When a formal statement is being taken, questions directed to the **O**fficer being interviewed shall **be first** asked by the **designated** primary interviewer. **Unless both parties agree, no more than two members of IPRA or IAD will be present in the interview room during questioning. A secondary interviewer may participate in the interview, provided that the secondary interviewer shall be present for the entire interview. The secondary interviewer will not ask any questions until the primary interviewer has finished asking questions and invites the secondary interviewer to ask questions. Generally, the secondary interviewer will ask follow-up questions for clarification purposes. The primary interviewer will not ask any questions until the secondary interviewer has finished asking questions and invites the primary interviewer to ask follow-up questions.**

D. The **O**fficer will be provided with a copy of any and all statements he or she has made that are audio recorded or in writing within seventy-two (72) hours of the time the statement was made. In the event a re-interview of an **O**fficer is required within the seventy-two (72) hour period following the initial interview, the **O**fficer will be provided with a copy of such statements before the subsequent interview.

E. An **O**fficer being interviewed pursuant to this section shall, upon his or her request, have the right to be represented by counsel of his or her own choice and to have that counsel present at all times during the interview, or at the request of the **O**fficer being interviewed, he or she shall have the right to be represented by a representative of the Lodge who shall be either a**n O**fficer on leave to work for the Lodge or a retired **O**fficer working for the Lodge. For purposes of this paragraph E, "represented" shall mean that the **O**fficer's counsel and/or representative shall only advise the **O**fficer but shall not in any way interfere with the interview. The interview shall be postponed for a reasonable time, but in no case more than forty-eight (48) hours from the time the **O**fficer is informed of the request for an interview and the general subject matter thereof and his or her counsel or representative can be present. **Interviews in shooting cases may be postponed for no more than two hours; provided,**

**however, that if a witness Officer advances a claim that he or she is physically or emotionally unable to provide a statement within the two hour time period, then IPRA will deal with such claims on an individual basis, making a reasonable inquiry into the reasons for the Officer's claim, and accepting at face value all good faith claims of an Officer's inability to provide a statement.**

F.   This Section 6.2 shall not apply to: questions from a supervisor in the course of performing his or her normal day-to-day supervisory duties or to requests to prepare detailed reports or To-From-Subject Reports, except To-From-Subject Reports that relate to the police-related shooting.

G.   The length of interviews will be reasonable, with reasonable interruptions permitted for personal necessities, meals, telephone calls and rest.

H.   The provision of this Agreement shall be deemed to authorize **the Employer, IPRA and IAD** to require **O**fficers being interviewed to provide audio recorded statements, provided that the provision in Section 6.2 are satisfied.

I.   If an **O**fficer provides a statement during the investigation conducted promptly following a shooting incident and then is later interviewed by **the Employer, IPRA or IAD** as part of an investigation related to such incident, the **O**fficer shall be provided with a copy of the portion of any official report that purportedly summarizes his or her prior statement before the interview.

J.   **If, prior to taking an Officer's statement, the Employer, IPRA or IAD is in possession of video or audio evidence relevant to the matter under investigation, it may, in its discretion, elect to advise or not to advise the Officer of such fact and, further, may allow or not allow the Officer an opportunity to review the video or audio evidence prior to taking the Officer's statement. An Officer who is not allowed to review the video or audio evidence prior to giving a statement shall not be charged with a Rule 14 violation unless the Officer has been presented with the video or audio evidence and given the opportunity to clarify and amend the Officer's original statement. In any event, the Employer shall not charge an Officer with a Rule 14 violation unless it has determined that: (1) the Officer willfully made a false statement; and (2) the false statement was made about a fact that was material to the incident under investigation.**

### Section 6.3 — Non-Adoption of Ordinance

The City of Chicago shall not adopt any ordinance and the Department shall not adopt any regulation which prohibits the right of an **O**fficer to bring suit arising out of his or her duties as an **O**fficer.

### Section 6.4 — Photo Dissemination

No photo of an **O**fficer under investigation shall be made available to the media prior to a conviction for a criminal offense or prior to a decision being rendered by the Police Board, **except where required by law.**

### Section 6.5 — Compulsion of Testimony

The Department shall not compel an **O**fficer under investigation to speak or testify before, or to be questioned by any nongovernmental agency relating to any matter or issue under investigation.

### Section 6.6 —Auto-Residency Card.

No **O**fficer shall be required to submit the information now required in an Auto-Residency Card as it

applies to any other member of his or her family or household.

## Section 6.7 — Polygraph

No **O**fficer shall be disciplined for refusal to take a polygraph exam and the results of the polygraph exam shall not be admissible as evidence in proceedings before the Police Board or in any proceeding where the **O**fficer may appeal to the Police Board, unless by Illinois or Federal Court decision or statute, such evidence shall become admissible before the Police Board.

In the event that the results of a polygraph exam become admissible as evidence before the Police Board and the Department determines a polygraph exam is necessary, the complainant will be requested to take a polygraph exam first. If the complainant refuses to take a polygraph exam, the accused police **O**fficer will not be requested to take a polygraph exam. If the complainant takes the polygraph exam and the results indicate deception, the accused **O**fficer may be requested to take a polygraph exam covering those issues wherein the examiner determines that the complainant is truthful.

When the polygraph is used, the accused member will be advised twenty-four (24) hours prior to the administering of the test, in writing, of any questions to which the Department will request an answer.

## Section 6.8 — Disclosure

An **O**fficer shall not be required to disclose any item of his or her property, income, assets, source of income, debts, or personal or domestic expenditures (including those of any member of his or her family or household) unless such information is reasonably necessary to monitor the performance of the **O**fficer's job, violations of reasonable Employer rules, statutes, ordinances, or this Agreement. In the administration of fringe benefits applicable to all employees of the Employer, **O**fficers covered by this Agreement may be required to disclose any coverage they (including any member of their families or households) may have under health or medical insurance and the name and appropriate identification of the carrier and coverage. The parties agree that the disclosure of such personal information shall not be made available for public inspection or copying because such would be an unwarranted invasion of personal privacy of the **O**fficer, and/or is intended to otherwise be exempt from any state or local freedom of information statute, ordinance or executive order.

## Section 6.9 — Media Information Restrictions

The identity of an **O**fficer under investigation shall not be made available to the media unless there has been a criminal conviction or a decision has been rendered by the Police Board (or by the Superintendent), **except where required by law.** However, if the **O**fficer is found innocent, the **O**fficer may request and the Department shall issue a public statement.

## Section 6.10 — Prohibition on Use and Disclosure of Social Security Numbers

The Social Security Number of an **O**fficer covered by this Agreement shall not be disclosed and shall not be included on documents, except those essential for payroll or compensation purposes.

## Section 6.11 — Mediation

At any time during an investigation, the parties may agree to mediate the resolution of the Complaint Register investigation. The "parties" shall mean the accused **O**fficer, with or without his or her Lodge representative, and a representative of IAD or IPRA, as appropriate. The IAD/IPRA investigator assigned to the case will not be present at the mediation.

Prior to the mediation session, IAD/IPRA shall cause the accused **O**fficer to be served with a Notice of Administrative Rights and a Notice of Charges and Allegations, which will include the rule violation and the factual basis therefore. Neither party is required to meet.

The representatives at the meeting shall discuss the allegations and IAD's/IPRA's position regarding the finding of the case. The parties shall discuss whether they can reach accord as to a disposition. By accepting the discipline, the accused **O**fficer is waiving his or her right to grieve or appeal the decision, and the accused **O**fficer is not required to submit any statement or response. If the accused **O**fficer does not agree with IAD's/IPRA's position, the disciplinary process will continue as designated.

Statements made and information relayed at the mediation which are not included in the file will not be used against the **O**fficer or included in the file at any later date.

If IAD/IPRA and the accused **O**fficer agree on a penalty less than separation, it is binding on both parties. However, the Superintendent retains the right to seek the separation of an **O**fficer.

### Section 6.12 — Review Procedures

The procedures for the review of recommendations for discipline, such as Command Channel Review, and the procedures by which **O**fficers covered by the Agreement may challenge the recommendation and imposition of discipline which currently exist will continue to exist and be available to said **O**fficers except as expressly modified or eliminated as set forth in the Agreement.

## ARTICLE 7 — SUMMARY PUNISHMENT

### Section 7.1 —Administration of Summary Punishment

It is agreed that the provisions contained elsewhere in this Agreement shall not apply to Summary Punishment action, which action shall be considered as an alternative to formal disciplinary procedures, provided that in each such action the following shall apply:

A.  The Summary Punishment which may be administered conforms to the "Notice to Supervisors Regarding Progressive Discipline," as set forth in this Agreement, and is limited to:

  1.  reprimand;

  2.  excusing a member for a minimum of one day to a maximum of three days without pay.

  **In all instances, the Summary Punishment shall be satisfied by deducting the equivalent of day(s) off without pay from the Officer's accumulated compensatory time or, at the Officer's sole discretion, by deducting the equivalent of day(s) off without pay from the Officer's furlough, personal days, or baby furlough days. In all instances, eight hours of accumulated elective time, including compensatory time, furlough, personal days, and baby furlough days, shall be equal to one day off without pay. If the Officer does not have sufficient accumulated compensatory time, then the days off shall be satisfied by means of days off without pay, unless the Officer elects to use his furlough, personal days, or baby furlough days.**

B.  The Department shall promulgate, maintain and publicize reasonable guidelines which will specify those acts, omissions or transgressions, the violation of which will subject an **O**fficer to Summary Punishment action, and the penalties for each such violation, which shall be uniformly applied.

### Section 7.2 — Challenge of Summary Punishment

After Summary Punishment has been administered three (3) times within a twelve (12) month period, an **O**fficer who wishes to contest the application of Summary Punishment on a fourth occasion within the last twelve (12) months may contest the fourth and/or succeeding applications of Summary Punishment by timely challenge through the Complaint Register process or the grievance procedure.

## ARTICLE 8 — EMPLOYEE SECURITY

### Section 8.1 — Just Cause Standard

No **O**fficer covered by this Agreement shall be suspended, relieved from duty or otherwise disciplined in any manner without just cause.

### Section 8.2 — File Inspection

The Employer's personnel files, disciplinary history files and completed inactive investigative files, except for information which the Employer deems to be confidential, shall be open and available for inspection by the affected **O**fficer during regular business hours.

### Section 8.3 — Limitation on Use of File Material

It is agreed that any material and/or matter not available for inspection, such as provided in Section 8.2 above, shall not be used in any manner or any forum adverse to the **O**fficer's interests.

### Section 8.4 — Use and Destruction of File Material

All disciplinary investigation files, disciplinary history card entries, IPRA and IAD disciplinary records, and any other disciplinary record or summary of such record other than records related to Police Board cases, will be destroyed five (5) years after the date of the incident or the date upon which the violation is discovered, whichever is longer, except that not sustained files alleging criminal conduct or excessive force shall be retained for a period of seven (7) years after the date of the incident or the date upon which the violation is discovered, whichever is longer, and thereafter, cannot be used against the **O**fficer in any future proceedings in any other forum, except as specified below, unless the investigation relates to a matter which has been subject to either civil or criminal court litigation or arbitration prior to the expiration of the five- (5-) year period. In such instances, the Complaint Register case files normally will be destroyed immediately after the date of the final arbitration award or the final court adjudication, unless a pattern of sustained infractions exists.

Any information of an adverse employment nature which may be contained in any unfounded, exonerated, or otherwise not sustained file, shall not be used against the **O**fficer in any future proceedings. Information contained in files alleging excessive force or criminal conduct which are not sustained may be used in future disciplinary proceedings to determine credibility and notice.

A finding of "Sustained — Violation Noted, No Disciplinary Action" entered upon a member's disciplinary record or any record of Summary Punishment may be used for a period of time not to exceed one (1) year and shall thereafter be removed from the **O**fficer's disciplinary record and not used to support or as evidence of adverse employment action. The Department's finding of "Sustained — Violation Noted, No Disciplinary Action" is not subject to the grievance procedure.

**Reprimands and suspensions of one (1) to five (5) days will stay on the Officer's disciplinary history for a period of three (3) years from the last date of suspension or date of reprimand, or five (5) years from the date of the incident, whichever is earlier.**

Information relating to a preventable traffic accident involving a Department Vehicle may be used and/or considered in determining future discipline for a period of time not to exceed two (2) years from the date of such preventable traffic accident and shall thereafter not be used and/or considered in any employment action provided there is no intervening preventable traffic accident involving a Department Vehicle and if there is, the two-year period shall continue to run from the date of the most recent preventable traffic accident and any prior incidents may be used and/or considered in employment actions. In no event shall any prior incident five (5) or more years old be used and/or considered.

## Section 8.5 — Notification

In the event the Employer receives subpoena or other legal process requiring the inspection, tender or submission of personnel, disciplinary or investigative records and/or files (other than Grand Jury subpoena or other subpoena or process which would preclude disclosure), the Employer will promptly send a copy of such subpoena or process to the **O**fficer whose records have been requested and to the Lodge. However, failure to furnish such notice shall not in any way affect the validity of any disciplinary action or personnel action taken by the Employer, provided that the Lodge will not be barred from asserting and does not waive any right(s) an **O**fficer may have to inspect or to otherwise challenge the use of files under applicable rules, statutes or this Agreement including Article 8.

## Section 8.6 — Detectives, Evidence Technicians, Police Laboratory Technicians, Forensic Investigators and Field Training Officers

The Employer agrees not to remove **O**fficers in the position of Detective except for just cause.

During this Agreement, the Employer agrees that the ranks of Detective, Evidence Technician, Police Laboratory Technician, Forensic Investigator and Field Training Officer will not be eliminated from the budget.

## Section 8.7 — Tactical Response Reports (TRR)

The number of Tactical Response Reports (TRR), in and of itself, will not be used for disciplinary purposes.

## Section 8.8 — Superintendent's Authority

The Superintendent's authority to suspend an **O**fficer, as set forth in section 2-84030 of the Municipal Code of Chicago, shall be increased from the current limit not to exceed thirty (30) days, to a limit not to exceed three hundred and sixty-five (365) days.

In cases where the Superintendent seeks an **O**fficer's separation from the Department, the Superintendent's current and past practice of suspending **O**fficers for thirty (30) days and filing charges with the Police Board seeking the **O**fficer's separation will not change.

## ARTICLE 9 — GRIEVANCE PROCEDURE

### Section 9.1 — Definition and Scope

A grievance is defined as a dispute or difference between the parties to this Agreement concerning interpretation and/or application of this Agreement or its provisions. Summary Punishment shall be excluded from this procedure, except as provided in Article 7.2. The separation of an **O**fficer from service is cognizable only before the Police Board and shall not be cognizable under this procedure, provided, however, that the provisions of Article 17 shall be applicable to separations.

## Section 9.2 — Procedures, Steps and Time Limits for Standard Grievances

A grievance may be initiated by the Lodge or an aggrieved **O**fficer. Any **O**fficer shall have the right to present a grievance at any time, although it is understood that the **O**fficer should attempt to satisfy his or her concerns on an informal basis before invoking the procedure. In the event an informal resolution proves to be unsatisfactory, a grievance may be filed in a form to be agreed upon between the Lodge and Employer and shall be processed in accordance with this Agreement. Upon request, the grievant shall be represented by an appropriate Lodge representative, provided, however, the grievant **O**fficer may have the grievance adjusted without a Lodge representative, so long as such adjustment is not inconsistent with the provisions of this Agreement.

Step One: Initiating a Grievance. The grievant will first submit his or her grievance in writing to his or her immediate supervisor in his or her unit of assignment within seven (7) of the **O**fficer's working days following the events or circumstances giving rise to the grievance or where first known by the grievant, or thirty-five (35) days, whichever period is shorter. The grievance will be reduced to writing on a pre-printed, standard grievance form set agreed upon between the Lodge and Employer.

Step Two: Supervisory Responses. Within seven (7) days of receipt of the member's grievance, the supervisor will respond to the grievance on the grievance form set and then immediately present the grievance form set to the Commanding Officer of the unit of assignment. Following the submission of the written grievance, the Commanding Officer shall render a decision in writing within fourteen (14) days of receiving the grievance. The response shall be written on the bottom portion of the pre-printed, standard grievance form set. The Commanding Officer must forward one (1) copy of his or her decision to the grievant, one (1) copy to the Lodge's unit representative, and three (3) copies to Management and Labor Affairs Section (MLAS). MLAS will then forward to the Lodge a copy of the Commanding Officer's decision within fourteen (14) days of its receipt. If the grievant is directed by the Employer to meet concerning his or her grievance at a time when the **O**fficer is not scheduled to work, he or she shall be compensated for such time at the applicable rate provided for in this Agreement, including the provisions of Article 20.

Step Three: Mediation. If the response at Step Two is not satisfactory to the grievant and the Lodge, the Lodge and MLAS will meet for the purpose of mediation of the grievance. Either party may request the presence of a Mediator at such meeting, the selection of whom shall be mutually agreed upon. The mediation meeting shall be conducted no less than once each month between the Lodge Grievance Chairman, Lodge President or his or her designee and a Department representative having authority to resolve the grievance. The parties shall split evenly the cost of the Mediator's expenses and fees.

Step Four: Arbitration. If the parties cannot resolve the grievance at Step Three, either party may at any time demand arbitration.

## Section 9.3 — Arbitration of Standard Grievances

If either party proceeds to arbitration, the following procedure shall apply:

A. Within ten (10) days, the Employer and the Lodge shall attempt to mutually agree upon an Arbitrator. If they fail to agree, a list of seven (7) qualified neutrals shall be requested from the American Arbitration Association. Within five (5) days after receipt of the list, the parties shall select an Arbitrator. Both the Employer and Lodge each shall alternately strike names from the list. The remaining person shall be the Arbitrator.

B. The Employer or the Lodge, by mutual agreement, may submit **a grievance involving an issue not otherwise covered under Section 9.6 of this Agreement** to expedited arbitration

**pursuant to the rules set forth in Appendix M or** under rules to be determined by the parties **by mutual agreement**.

C. The parties shall avoid continuances. Requests for continuances are disfavored and shall be granted only upon showing good cause.

## Section 9.4 — Psychological Review

Grievances concerning involuntary removal from active duty due to psychological or psychiatric reasons will comply with the following procedures:

Step One: An **O**fficer who wants to challenge the Employer's decision to place him **or her** involuntarily on the medical roll will file a grievance with the Medical Services Section within ten (10) calendar days of being placed on the medical roll, or if the member was on full authorized furlough during his or her involuntary placement, within thirty-five (35) calendar days of being placed on the medical roll.

If the Employer's psychiatrist/psychologist recommends that the **O**fficer is fit for full duty and also was fit when he or she was involuntarily placed on the medical roll due to psychological or psychiatric reasons, the **O**fficer shall have any paid medical time used during such period of being involuntarily placed on the medical roll restored and will be made whole for lost pay and other benefits to which he or she is entitled.

Step Two: For a member who has filed a timely grievance at Step One, and/or when the Employer's psychiatrist/psychologist recommends that the **O**fficer is unfit for full duty and was also unfit when he or she was involuntarily placed on the medical roll due to psychological or psychiatric reasons, then upon written request made by the Lodge within ten (10) calendar days of notice to the member that he or she is unfit for duty, the Lodge may file a grievance at Step Two and may request review of that decision by a three-member psychological review panel **("Panel")**. The **O**fficer shall, as promptly as feasible, be evaluated by a panel of three psychiatrists or psychologists, one appointed by the Lodge, one appointed by the Employer and a third appointed by mutual agreement of the Employer's and the Lodge's psychiatrist or psychologist knowledgeable about police duties. This **P**anel shall have the authority to examine and evaluate the **O**fficer, and recommend whether or not the **O**fficer is fit for duty. In making its recommendations, the primary considerations of the **P**anel shall be the protection and safety of, and need for effective service to, the public. These considerations shall prevail over all others in any case of conflict of interests between the **O**fficer and the Employer.

If the **P**anel recommends that the **O**fficer is fit for duty, and was also fit when he or she was placed involuntarily on the medical roll due to psychological or psychiatric reasons, then the **O**fficer shall have any paid medical time used during such involuntary period on the medical roll restored, and will be made whole for lost pay and other benefits to which he or she is entitled.

If the Panel determines that the member was unfit for duty at the time he or she was involuntarily placed on the medical roll, but became fit for duty sometime thereafter, the **P**anel shall identify the point at which the member was fit for duty and the member will be made whole for lost pay and benefits from the date that the panel determined he or she was fit for duty.

Each party shall bear the full cost of the **P**anel member appointed by it, with the cost of the mutually-appointed **P**anel member to be split equally between the parties. The recommendations of the **P**anel shall be binding upon the Employer, the Lodge and the **O**fficer.

The Lodge and the Employer acknowledge that procedural disputes which prevent the Panel from going forward with the review process set forth above may arise. The Lodge and the Employer acknowledge that it is in the best interests of all persons involved in the Psychological Review

process to have these procedural disputes resolved as promptly and as fairly as possible. Once such a procedural dispute arises, the parties will have seven (7) working days to resolve the dispute. If they cannot resolve the dispute, either party may initiate the Summary Arbitration Process if the dispute involves the timeliness of the grievance or the period of time which the **P**anel is to consider when determining when the **O**fficer became fit. Any other procedural dispute may be submitted to the Summary Arbitration process only by mutual agreement of the parties. The Lodge and the Employer will maintain a group of three (3) arbitrators for the Summary Arbitration Process. One arbitrator will be selected from this group to decide the dispute. The parties will share equally the cost of the arbitrator. At the earliest possible time, representatives of the Lodge and the Employer will appear before the arbitrator. Either party may call witnesses, provided notice is given to the other party before the hearing date is selected. No written briefs will be permitted. No court reporter will be allowed. The arbitrator will issue a decision within ten (10) working days following the hearing. The decision of the arbitrator will be binding on the Lodge, the Employer, and the members of the review **P**anel. The decision will not set a binding precedent on subsequent procedural disputes.

### Section 9.5 — Medical Grievances

Grievances concerning medical issues (excluding issues covered under Section 9.4) shall follow the procedure below. Medical issues are defined as grievances involving medical issues, including but not limited to the nonpayment of I.O.D. bills; removal of an **O**fficer from duty for medical reasons; refusal to return an **O**fficer to duty from medical roll; classification of an injury as non-I.O.D. and the Benefits Management Office's denial of payment of medical and hospital bills of an **O**fficer or his or her covered dependent under the Employer's self-funded health care plan.

Step One: Initiating a Medical Grievance. Grievances concerning the Benefits Management Office's denial of payment of medical and hospital bills will be filed with the Management and Labor Affairs Section within ten (10) working days following the events or circumstances giving rise to the grievance or where first known by the grievant, but in no event later than thirty-five (35) calendar days following the events or circumstances giving rise to the grievance.

All other grievances concerning medical issues will be filed with the Medical Services Section within ten (10) working days following the events or circumstances giving rise to the grievance or where first known by the grievant, but in no event later than thirty-five (35) calendar days following the events or circumstances giving rise to the grievance. If the determination at Step One is not satisfactory, the Lodge may by written request made within fifteen (15) days of the Step One response, or the expiration of the period for said response submit the matter for mediation.

Step Two: Mediation of Medical Grievances. At mediation, representatives of the Lodge, the Police Department, the Benefits Management Office and the Finance Committee of the City Council, shall participate, as needed. Any settlements reached in the mediation proceedings shall be binding upon the parties. Medical mediation sessions shall occur each thirty (30) days. The parties shall split evenly the cost of the Mediator's fees and expenses.

The grievant shall be provided with the relevant medical records within the possession of the Medical Section, the Committee on Finance, Benefits Management Office and Management & Labor Affairs Section. A release shall be required for production of medical records. The relevant medical records shall include the Medical Services Section's determination of the grievant's status and the response to the grievance. The above records shall be submitted to the Lodge by the Department within forty-five (45) days of the Department's receipt of the Lodge's releases and mediation agenda, setting forth the grievants' names. Relevant records from the Medical Section,

14

the Committee on Finance, the Benefits Management Office and Management and Labor Affairs Section shall be provided as stated above and throughout the grievance process until the grievance is fully resolved.

Relevant documents to be produced by the Benefits Management Office in mediation are limited to medical records, claim forms, medical bills, explanation of benefits, and recommendation to and decision of the Benefits Committee regarding the claim. This definition of relevant records to be produced by the Benefits Management Office does not preclude the Lodge from subpoenaing additional relevant documentation in response to the scheduling of an arbitration of a grievance.

Step Three: Arbitration. If the grievance is not resolved at Step Two, the Lodge upon written request within thirty (30) days of the date of mediation, may demand arbitration. The Mediator shall not be selected as the Arbitrator for the same case. The arbitration hearing shall be scheduled to commence within thirty (30) days of the selection of the Arbitrator unless the parties agree otherwise. Within ten (10) days of the Lodge's demand for arbitration, the Employer and Lodge shall attempt to mutually agree upon an Arbitrator. If they fail to agree, a list of seven qualified neutrals shall be requested from the American Arbitration Association. Within five (5) days after receipt of the list, the parties shall select an Arbitrator. Both the Employer and the Lodge shall alternately strike names from the list. The remaining person shall be the Arbitrator.

## Section 9.6 — Suspension Grievances

Grievances challenging **reprimands and** recommendations for suspension (excluding Summary Punishment except as specified in Section 7.2 and suspensions accompanied by a recommendation for separation) will comply with the following procedures:

A. **Reprimands and Suspensions from One (1) to Ten (10) Days**

**Officers who receive a reprimand or a recommendation for suspension from one (1) to ten (10) days as a result of a sustained Complaint Register investigation (CR#) shall have one of two (2) options. Within ten (10) working days of receiving the reprimand or recommendation for discipline, the Officer shall elect one of the following options:**

1. **Submission of a grievance to the Summary Opinion process challenging the reprimand or recommendation for discipline. An Arbitrator designated by the parties shall issue a Summary Opinion, in accordance with the standard procedures employed by the parties and their mutual past practices, which shall be final and binding on the parties and there shall be no further review of the reprimand or suspension under this Agreement. The Officer will not be required to serve the recommended suspension, nor will the reprimand or suspension be entered on the Officer's disciplinary record, until the Summary Opinion Arbitrator rules on the merits of the grievance. At least ten (10) days prior to the Summary Opinion hearing, the Officer, or the Lodge acting on his or her behalf, may submit a written statement of no more than three (3) pages in length, setting forth the position of the Officer and the reasons why the Officer believes the reprimand should be set aside or the suspension should be set aside or reduced, to which the Department may submit a rebuttal of not more than two (2) pages. In addition, the Officer, provided he or she previously submitted the written statement referenced in the preceding paragraph, may appear in person before the Summary Opinion Arbitrator and make an oral**

presentation, of no more than fifteen (15) minutes in length, setting forth the reasons why the suspension should be set aside or reduced. The–Department representative, in turn, shall have the–option of presenting an oral rebuttal. For good cause shown, either party may be granted leave by the Summary Opinion Arbitrator to submit a written rebuttal within ten (10) days.

**2. Accept the recommendation.**

**In the event the Officer does not make an election within ten (10) working days, the recommendation for suspension will be deemed accepted, absent a written agreement between the Lodge and the Department to extend the election period.**

## B. Suspensions from Eleven (11) to Thirty (30) Days

Officers who receive a recommendation for discipline from **eleven (11)** to thirty (30) days as a result of a sustained Complaint Register investigation (CR#) shall have one of **three** options, **the selection of which shall preclude the Officer, or the Lodge acting on his or her behalf, from selecting any of the other options listed below, except that the Officer is permitted to accept the recommendation at any time.** Within ten (10) working days of receiving the recommendation for discipline the **O**fficer shall elect one of the following options:

1. The filing of a grievance challenging the recommendation for discipline; or

2. **Submission of a grievance to, and in accordance with the provisions of, the Summary Opinion process set forth in Paragraph A(1) above; or**

3. Accept the recommendation.

In the event an **O**fficer does not make an election within ten (10) working days, the recommendation for suspension will be **deemed accepted, absent a written agreement between the Lodge and the Department to extend the election period.**

When an **O**fficer elects to file a grievance, the Lodge will have **sixty (60)** days from receipt of the investigative file to inform the Department whether the Lodge will advance the grievance to arbitration, and if so, whether the grievance will be advanced to arbitration, **unless the parties mutually agree otherwise.**

In the event the Lodge decides not to advance the grievance to arbitration, the **O**fficer will have ten (10) working days to elect review of the recommendation for suspension **by the Police Board** as set forth in **the Police Board's Rules of Procedure, Article IV, Section B, paragraphs 3 through 9 (published November 1, 1975). In the event the Officer elects review of the recommendation for suspension by the Police Board, the Officer will not be required to serve the recommended suspension, nor will the suspension be entered on the Officer's disciplinary record, until the Police Board rules on the merits of the recommended suspension.**

**Arbitration of suspension grievances pursuant to this Paragraph B shall be conducted in accordance with the provisions of Appendix Q.**

## C. Suspensions from Thirty-One (31) to Three Hundred Sixty-Five (365) Days

**O**fficers who receive a recommendation for discipline from thirty-one (31) to three hundred sixty-five (365) days as a result of a sustained CR# shall have one of **three** options, **the selection of which shall preclude the Officer, or the Lodge acting on his or her behalf, from selecting any of the other options listed below, except that the Officer is permitted**

**to accept the recommendation at any time**. Within ten (10) working days of receiving the recommendation for discipline the **O**fficer(s) shall elect one of the following options:

1. A review by the Police Board as set forth in the Police Board's Rules of Procedure, Article I, II and III (published November 1, 1975); or

2. The filing of a grievance challenging the recommendation for discipline; or

3. Accept the recommended discipline.

In the event an **O**fficer does not make an election within ten (10) working days, the recommendation for suspension will be reviewed by the Police Board.

When an **O**fficer files a grievance, the Lodge will have **sixty (60)** days from the receipt of the investigative file to inform the Department whether the Lodge will advance the grievance to arbitration. **Arbitration of suspension grievances pursuant to this Paragraph C shall be conducted in accordance with the provisions of Appendix Q.** The parties will cooperate in the scheduling of all arbitration hearings.

In the event the Lodge decides not to advance the grievance to arbitration, the **O**fficer will have ten (10) working days to elect review of the recommendation for suspension **by the Police Board** as set forth in paragraphs 9.6.C.1 above. **In the event the Officer elects review of the recommendation for suspension by the Police Board, the Officer will not be required to serve the recommended suspension, nor will the suspension be entered on the Officer's disciplinary record, until the Police Board rules on the merits of the recommended suspension.**

In the event an **O**fficer does not make an election within ten (10) working days, the recommendation for suspension will be **deemed accepted, absent a written agreement between the Lodge and the Department to extend the election period.**

**D. When an Officer exercises his or her right to contest a disciplinary recommendation, whether by filing a grievance or electing review by the Police Board, Complaint Register files shall be provided to the Lodge promptly upon written request.**

## Section 9.7 —Authority of the Arbitrator

A. Except as specified in Subsection C below, the Arbitrator shall have no right to amend, modify, nullify, disregard, add to, or subtract from the provisions of this Agreement. The Arbitrator shall only consider and make a decision with respect to the specific issue or issues presented to the Arbitrator and shall have no authority to make a decision on any other issues not so submitted. The Arbitrator shall submit in writing his or her decision to the Employer and to the Lodge within thirty (30) days following the close of hearing unless the parties agree to an extension thereof. The decision shall be based upon the Arbitrator's interpretation of the meaning or application of the terms of this Agreement to the facts of the grievance presented, and shall be final and binding upon the parties.

B. In the case of a sustained finding that is subject to the parties' grievance procedure, the Arbitrator has the authority to review whether IPRA or IAD made a good faith effort to secure an affidavit from the complainant and whether the affidavit of the head of IPRA or IAD was based upon objective evidence of the type specified in Appendix L, in addition to the issues of just cause and the appropriateness of the penalty in determining whether to grant the grievance.

C. Any **O**fficer who is a member of and adheres to the established and traditional tenets or teachings of a bona fide religion, body or sect which has historically held conscientious objections to financially supporting organizations such as the Lodge, upon proof

thereof, may be excused from the obligations set forth in Section 3.1 Article 3; and the Arbitrator may require, in lieu of such obligations, the payment by such **O**fficer of a sum equal to the fair share agency fee to a non-religious charitable fund exempt from taxation under Section 501(c)(3) of Title 26 chosen by such **O**fficer from a list of at least three such funds to be submitted by the Lodge. The Employer shall not participate in but shall be bound by such an arbitration.

If an **O**fficer who holds conscientious objections pursuant to this section requests the Lodge to use the grievance-arbitration procedure on the **O**fficer's behalf, the Lodge may charge the **O**fficer the reasonable costs of using the procedure.

### Section 9.8 — Expense of the Arbitrator

The fee and expenses of the Arbitrator shall be borne by the party whose position is not sustained by the Arbitrator. The Arbitrator in the event of a decision not wholly sustaining the position of either party, shall determine the appropriate allocation of his or her fees and expenses. Each party shall be responsible for compensating its own representative(s) and witness(es). The cost of a transcript, where requested by either party, shall be paid by the party so requesting it.

The party requesting a cancellation, rescheduling or other postponement of a set hearing date shall pay the Arbitrator's cancellation fee.

### Section 9.9 — Processing and Time Limits

The resolution of a grievance satisfactory to the Lodge at any step shall be deemed a final settlement, and any grievance not initiated or taken to the next step within the time limit specified herein will be considered settled on the basis of the last answer by management. The time limits specified in this Article may be extended or waived by mutual agreement. Grievances may be initiated at any appropriate step corresponding with the nature of the grievance and the manner in which it arose.

### Section 9.10 — Normal Operation

Grievance meetings shall be scheduled at reasonable times and in a manner which does not unreasonably interfere with the Employer's operations. Reasonable duty time shall be allowed the grievant **O**fficer(s) and the watch representative or unit representative under this Article, for the pre-arbitral steps under Section 9.2.

### Section 9.11 — Exhaustion

It is the intent of the parties to this Agreement that the procedures set forth in this Article shall be mandatory as to any grievance unless expressly and specifically excluded by the terms of this Agreement.

### Section 9.12 – Lodge Rights

**This Agreement does not create or convey to any member of the bargaining unit a right to determine whether any grievance shall be advanced to arbitration. The right to evaluate any grievance and determine whether that grievance is withdrawn, settled or advanced to any form of arbitration remains solely the right of the Lodge. In the event the Lodge determines it will not advance any grievance(s) to arbitration, the Officer(s) who filed the grievance(s) will be afforded the existing procedures for the review and/or challenge of reprimands or recommendations of discipline, to the extent provided for herein.**

## ARTICLE 10 — NON-DISCRIMINATION

### Section 10.1 — Equal Employment Opportunity

The Employer will continue to provide equal employment opportunity for all **O**fficers, and develop and apply equal employment practices.

### Section 10.2 — Non-Discrimination

In the application of the terms and conditions of this Agreement, the Employer shall not discriminate against **O**fficers, and employment-related decisions will be based on qualifications and predicted performance in a given position without regard to race, color, sex, religion, age (40-63), sexual orientation or national origin of the **O**fficer nor shall the Employer discriminate against **O**fficers as a result of membership in the Lodge. Nothing contained in this Agreement shall be deemed to preclude the mandatory retirement of any **O**fficer upon or after the attainment of age 63. Officers shall not be transferred, assigned or reassigned for reasons prohibited by this Section 10.2.

### Section 10.3 — Political Activity or Campaigning

The Employer shall not prohibit a**n** **O**fficer from, or discriminate against, his or her engaging in political activities or campaigning while off duty, provided that the **O**fficer does not:

A.   wear a uniform or any part thereof which would identify the individual as a police officer, or use property (including documents or records) of the Chicago Police Department:

B.   display or otherwise lead others to believe he or she is carrying a badge, baton or gun;

C.   hold himself/herself out as a police officer, except that a truthful response to a legitimate question shall not be a violation of this section;

D.   engage in such activities in a District(s) where he or she is assigned unless the **O**fficer lives in the District except that the Employer shall not transfer an **O**fficer into a District for the purpose of preventing him from engaging in such activities.

An **O**fficer who runs for political office may, but need not, take a leave of absence; provided that if the **O**fficer does not choose to take a leave of absence, he or she shall first fully exhaust all accumulated paid time off and any time off thereafter shall be subject to meeting the operational needs of the **Chicago** Police Department.

### Section 10.4 — Religious Holiday Accommodation

The obligation to accommodate the religious beliefs of **O**fficers covered by the Agreement is fulfilled if those **O**fficers whose religious beliefs require that they not work but who are scheduled to work on a recognized religious holiday are permitted at the **O**fficer's option one of the following choices in order to be excused from their regular tour of duty: (a) the use of a personal day; (b) the use of compensatory time; (c) voluntary change of regular day off (as permitted in Section 20.3 of the Agreement); or (d) excused from duty non-disciplinary (Code 89). This option may be applied for certain recognized religious holidays of faiths whose tenets require abstinence from work subject to the determination of the Commanding Officer that this accommodation does not unduly interfere with operational needs.

### Section 10.5 —Americans with Disabilities Act

In the event the Employer shall be required to make reasonable accommodation under the Americans with Disabilities Act to the disability of an applicant or incumbent **O**fficer that may

be in conflict with the right of an **O**fficer under this Agreement, the Employer shall bring this matter to the attention of the Lodge. In the event the parties cannot reach an agreement on such accommodation, the provisions of Article 9 shall be available and the Arbitrator shall consider the Employer's and the Lodge's (if any exists) obligations under the Americans with Disabilities Act and this Agreement, provided that no **O**fficer shall be displaced by such decision.

## ARTICLE 11— HOLIDAYS

### Section 11.1 — Designated Holiday

The Employer agrees that the following days shall be considered holidays:

| | |
|---|---|
| New Year's Day | 1 January |
| M. L. King, Jr.'s Birthday | 3rd Monday in Jan. |
| Lincoln's Birthday | 12 February |
| Washington's Birthday | 3rd Monday in Feb. |
| Pulaski Day | 1st Monday in Mar. |
| **Police Memorial Day** | **Last Saturday in** April |
| Memorial Day | Last Monday in May |
| Independence Day | 4 July |
| Labor Day | 1st Monday in Sept. |
| Columbus Day | 2nd Monday in Oct. |
| Veteran's Day | 11 November |
| Thanksgiving Day | 4th Thursday in November |
| Christmas Day | 25 December |

### Section 11.2 — Compensation for Holidays

Compensation for the holidays listed in Section 11.1 is granted as follows:

A.  Employees who are required to work a regular tour of duty (eight hours) on a holiday will be credited with eight (8) hours of compensatory time and four (4) hours of compensatory time or additional pay, as the **O**fficer elects.

B.  Employees whose regular day-off coincides with an established holiday will be credited with eight (8) hours of compensatory time.

C.  Employees whose regular day off coincides with an established holiday, and who are required to work a regular tour of duty (eight hours) on that holiday, will be credited with twenty (20) hours of compensatory time and four (4) hours of compensatory time or additional pay, as the **O**fficer elects.

In the event that an **O**fficer covered by this Agreement is required to attend court on his or her regular day off and that day is also a holiday, the **O**fficer will be compensated at the rate of double-time for the minimum set forth in 20.5 or double-time for the actual hours worked, whichever is greater, plus eight (8) hours of compensatory time or additional pay, as the **O**fficer elects.

D.  All hours in excess of a regular tour of duty on a holiday will be compensated in accordance with the provisions of Article 20, Hours and Overtime.

E.  Compensatory time will not be credited to an employee on a holiday if he or she is on the medical roll (excluding I.O.D.), absent due to sickness, or death in family, on military leave, suspended, excused non-disciplinary, or on a leave of absence.

### Section 11.3 — Personal Day

For each calendar year, **O**fficers shall be entitled to receive, in addition to the days specified in Section 11.1, four (4) personal days. Officers shall not be required to work on a personal day provided that written notice of the personal day is given to the appropriate supervisor no later than ten (10) days prior to the personal day and that the granting of the personal day does not adversely affect Department operations. A holiday specified in Section 11.1 may not be selected as a personal day. Officers covered by this Agreement may elect to be paid for all unused personal days each year in lieu of taking the time off. Where **O**fficers elect such payment, the payment shall be made by April 1 of the following year. Officers may carry over up to four (4) unused personal days for use in the following year. Any dispute within a unit as to the selection of a personal day shall be resolved by x as defined in Section 23.5.

### Section 11.4 — Special Compensation Time

If, as a result of a declaration by the Mayor, all employees of the City of Chicago except for police and fire department employees are given a day off or portion thereof with pay, then all **O**fficers who are required to work during such excused time shall be given compensatory time off at straight time rate equivalent to the hours worked during such excused time.

### Section 11.5 — Holiday Declaration

To the extent that any additional holiday is declared by federal, state or municipal authority during the term of this Agreement, and such holiday is granted to any employee of the Employer, then said holiday shall be added and incorporated into Section 11.1 above and compensated for as provided in Section 11.2 above.

### ARTICLE 12 — PROMOTIONS

For positions within the bargaining unit for which there is an appointment, selection and promotion process, the Employer will provide the Lodge with copies of any department level directives announcing an appointment and selection process, if any are issued, prior to the time the process is initiated. The Employer will provide the Lodge with the names of **O**fficers appointed to those positions. At the Lodge's request, the Employer will provide the Lodge with material regarding the selection and appointment process.

**F**or BIS D-2A examinations which include a written qualifying test, each applicant who takes the written qualifying test shall be given a copy of his or her answer sheet prior to the departure from the test site. Applicants will be allowed to review a copy of the written qualifying test and to challenge items on that test, in writing, during an announced challenge period.

After the BIS D-2A selection process is complete and the promotional list has been finalized, the City shall provide the Lodge with a copy of the list, a copy of the written qualifying test and the correct answer key.

The Employer will announce BIS D-2A examinations sixty (60) days before the examination is administered, whenever possible.

## ARTICLE 13 — LAYOFFS — RE-EMPLOYMENT

### Section 13.1 — Notice of Layoffs

When there is an impending layoff with respect to any **O**fficers in the bargaining unit, the Employer shall inform the Lodge in writing no later than thirty (30) days prior to such layoff. The Employer will provide the Lodge the names of all **Officers** to be laid off prior to the layoff. Probationary officers shall be laid off first, then **O**fficers shall be laid off in accordance with their seniority. The **O**fficers with the least amount of seniority in the Police Department shall be laid off first, unless special qualifications dictate retention. All **O**fficers shall receive notice in writing of the layoff at least thirty (30) days in advance of the effective date of such layoffs.

### Section 13.2 — Hiring During Layoffs

No employees may be hired to perform or permitted to perform those duties normally performed by an **O**fficer while any **O**fficer is in layoff status. In the event special qualifications requiring expert skills of a technical or professional nature are unavailable in the bargaining unit, but essential to the operation of the Department, the parties shall meet to resolve such issue. If a mutual resolution is not reached, the Employer may invoke the grievance procedure.

### Section 13.3 — Recall

Any **O**fficer who has been laid off shall be placed on the appropriate reinstatement list and shall be recalled on the basis of seniority in the Police Department, as provided in this Agreement prior to any new officers being hired.

## ARTICLE 14 — BULLETIN BOARDS

The Employer shall provide the Lodge with designated space on available bulletin boards, or provide bulletin boards on a reasonable basis, where none are available, upon which the Lodge may post its notices.

## ARTICLE 15 — SAFETY ISSUES

### Section 15.1 — Cooperation

The Employer and the Lodge agree to cooperate to the fullest extent reasonably possible to promote the use of safe equipment and facilities.

### Section 15.2 — Safety Committee

Up to a maximum of five (5) **O**fficers designated by the Lodge and five (5) persons designated by the Employer shall comprise a Safety Committee for the purpose of discussing and investigating safety and health issues relating to **O**fficers and to recommend reasonable safety and health criteria relating to equipment and facilities. The Committee shall meet at least once each calendar quarter or more frequently by mutual agreement. Formal recommendations of the Committee shall be submitted in writing to the Superintendent of Police with a copy to the Lodge, but such recommendations shall not be binding upon the Employer or the Lodge. In addition to Committee recommendations, the Lodge may submit additional written recommendations to the

Superintendent.

For purposes of this section, the term "investigating" shall be limited to the right of the Lodge Committee members to obtain information upon request and observe conditions regarding identified safety and health hazards and to discuss such matters with **O**fficers and members of management provided such discussions do not unduly interfere with the performance of duty by any **O**fficer or Committee member.

In the event the Employer agrees in writing to adopt the recommendation of the Committee or the Lodge, the recommendation shall be implemented within a reasonable period of time, unless the failure to implement in a timely fashion was beyond the reasonable control of the Employer. However, no monetary relief shall result from the failure to implement any such recommendation.

If the Superintendent disagrees with the recommendation of the Committee or the Lodge, he or she shall so notify the Committee or the Lodge in writing. Within ten (10) calendar days of such notice, the Lodge may request arbitration of any such dispute if such dispute raises a good faith issue regarding the use of equipment or materials which are alleged to present a serious risk to the health or safety of an **O**fficer beyond that which is inherent in the normal performance of police duties. The decision of the Arbitrator under this section shall be advisory only and shall not be binding upon the Employer; provided that this procedure shall not be exclusive and shall not affect the right of an **O**fficer or the Lodge to invoke Article 9, where otherwise appropriate. No such advisory opinion shall constitute a determination of the existence of any safety or health hazard under this Agreement, nor shall any such advisory opinion be introduced in any proceeding under Article 9 of this Agreement.

### Section 15.3 — Disabling Defects

No employee shall be required to use any equipment that has been designated by both the Lodge and the Employer as being defective because of a disabling condition unless the disabling condition has been corrected. When an assigned department vehicle is found to have a disabling defect or is in violation of the law, the police **O**fficer will notify his or her supervisor, complete required reports, and follow the supervisor's direction relative to requesting repair, replacement or the continued operation of said vehicle.

### Section 15.4 — Notice

The Employer shall post in conspicuous places where notices to **O**fficers are customarily posted, all safety and health notices required by law.

### ARTICLE 16 — SECONDARY EMPLOYMENT AND SPECIAL EMPLOYMENT

### Section 16.1 — Secondary Employment

The Employer reserves the right to restrict secondary employment when it has reasonable cause to believe that the number of hours which the **O**fficer spends on secondary employment is adversely affecting his or her performance as a police officer. The Employer retains the existing right to limit, restrict or prohibit the nature or type of secondary employment that an **O**fficer undertakes.

### Section 16.2 — Special Employment

A. The special employment program is a voluntary program that allows non-probationary full-duty **O**fficers to work on their days off for the Chicago Housing Authority, the Chicago Transit Authority, Chicago Midway Airport or Chicago O'Hare International Airport, subject to the terms and conditions set forth below.

B. An **O**fficer's eligibility for special employment is governed by the following terms and conditions:

1. An **O**fficer is not eligible to work any special employment assignment under the following circumstances:

   a.      The **O**fficer's most recent overall performance rating was "requires improvement" or "unacceptable."

   b.      The **O**fficer is serving a suspension or has been relieved from regular duty as a result of **S**ummary **P**unishment.

   c.      The **O**fficer is on the medical roll or has been released from the medical roll for furlough.

   d.      During the thirty-(30-) day period prior to the date of the **O**fficer's application, the **O**fficer was absent from duty for five (5) or more days as a result of a non-duty-related injury or illness.

   e.      The **O**fficer's disciplinary record contains three (3) or more **S**ummary **P**unishment actions within the prior twelve-(12-) month period.

   f.      The **O**fficer has been disqualified from participating in the program based on his or her performance while working a special employment or Department-procured outside employment assignment.

2. An **O**fficer will be suspended from working a special employment assignment for a period of thirty (30) calendar days if the **O**fficer was scheduled for a special employment assignment and failed to work such assignment without reasonable cause for such absence acceptable to the Employer (e.g., a death in the family, an injury on duty or a change in the **O**fficer's regular duty schedule).

3. An **O**fficer will be suspended from working a special employment assignment for a period of ninety (90) calendar days if the **O**fficer was scheduled for a special employment assignment and failed to work such assignment without advance notice to the Employer of his or her absence (i.e., a "no call/no show").

C.   If an **O**fficer believes that he or she has been wrongfully declared ineligible to work special employment, the **O**fficer shall submit a "To-From-Subject Report" to the coordinator of the special employment program no later than four (4) calendar days following his or her receipt of notification of ineligibility. If the program coordinator's response is unsatisfactory to the **O**fficer, then the **O**fficer may initiate a grievance at Step One of the grievance procedure set forth in Section 9.2 no later than seven (7) of the **O**fficer's working days following his or her receipt of such response.

D.   The Employer shall assign special employment opportunities to eligible **O**fficers based on seniority.

E.   The Employer shall publish any limitations it establishes on the number of hours, tours or assignments that may be worked by **O**fficers in the program.

F.   The exclusive remedy for any incorrect assignment of special employment shall be the assignment of future special employment opportunities in a manner that corrects the error in assignment (e.g., the opportunity to work an additional special employment assignment) or the grant of four (4) hours of compensation or compensatory time off at the **O**fficer's election.

## ARTICLE 17 — LODGE REPRESENTATIVES

For the purposes of administering and enforcing the provisions of this Agreement, the Employer

agrees as follows:

## Section 17.1 — Meeting Participation and Scheduling.

The Employer recognizes and agrees to meet with **Lodge** representatives, including Watch and Unit representatives relating to matters covered by this Agreement. Meetings shall occur at reasonable times by mutual agreement. The names of designated representatives shall be certified to the Employer in writing by the Lodge.

## Section 17.2 — Leave from Duty

In addition to the Lodge President, six (6) **O**fficers covered by this Agreement shall, upon written request, be granted leave from their duties for the Employer for the purpose of performing full time duties for the Lodge. During such a leave, the Employer will continue to pay said **O**fficers all salary and maintain all benefits, including pension contributions and seniority accruals, as if the **O**fficers were on full duty with the Employer, provided that, effective July 1, 2001, the Lodge reimburses the Employer an amount equal to the salary and benefits and provided that the Employer shall remain responsible for its portion of the pension contribution. The duration of such a leave shall not exceed three (3) years, but shall be renewable in the same duration. Such leaves may be revoked only by written notice to the Employer from the President of the Lodge. Up to two (2) additional **O**fficers covered by this Agreement who shall be elected to a State Lodge and/or the National Office of the Fraternal Order of Police shall, upon written request, be granted leave from duties for the Employer under the same terms and conditions previously set out in this Section.

## Section 17.3 —Attendance at Lodge Meetings

Subject to the need for orderly scheduling and emergencies, the Employer agrees that elected officials and members of the Board of Directors of the Lodge shall be permitted reasonable time off, without loss of pay, to attend general, board or special meetings of the Lodge, provided that at least forty-eight (48) hours' notice of such meetings shall be given in writing to the Employer, and provided further that the names of all such officials and **O**fficers shall be certified in writing to the Employer. Unit representatives shall also be included within the provisions of the preceding sentence, provided that such time off for such Unit representatives shall be without pay, unless the Unit representative has compensatory time available and elects to use it.

## Section 17.4 — Grievance Processing

Reasonable time while on duty shall be permitted Lodge representatives for the purpose of aiding or assisting or otherwise representing **O**fficers in the handling and processing of grievances or exercising other rights set forth in this Agreement, and such reasonable time shall be without loss of pay.

## Section 17.5 —Attendance at State and National Conferences

A. Subject to staffing needs, a reasonable number of appointed or elected delegates will be permitted to attend state and national conferences of the **Lodge**. Such conference time shall be equal to the duration of the conference plus reasonable travel time to and from such conference.

B. A maximum of twenty-two (22) members of the **Lodge** Board of Directors will be permitted to attend state and national conventions of the **Lodge** with pay. Such convention time shall be equal to the duration of the convention plus reasonable travel time to and from such convention, up to a maximum of seven (7) days every two (2) years.

### Section 17.6 — Lodge Negotiating Team

Members designated as being on the Lodge negotiating team who are scheduled to work on a day on which negotiations will occur, shall, for the purpose of attending scheduled negotiations, be excused from their regular duties without loss of pay. If a designated Lodge negotiating team member is in regular day-off status on the day of negotiations, he or she will not be compensated for attending the session.

### Section 17.7 — Lodge Activity

The Employer shall not prohibit discussion, solicitation, or distribution of literature, among **O**fficers covered by this Agreement with respect to matters concerning Lodge affairs, unless such activity interferes with the performance of the duties of any employee or with the orderly and efficient operations of the Employer, or unless it interferes with the transaction of business by the public with the City government.

### ARTICLE 18 — DISABILITY INCOME

### Section 18.1 — I.O.D

Any **O**fficer absent from work on account of injury on duty (I.O.D.) for any period of time not exceeding twelve (12) months shall receive for each such I.O.D. full pay and benefits for the period of absence, provided such injury or illness is certified by the Medical Services Section. Such certification shall not be unreasonably withheld.

Officers who have exhausted said twelve (12) month paid I.O.D. leave shall be given the option to voluntarily go on non-paid medical leave instead of disability pension, provided:

A.   The **O**fficer must exhaust all furlough, personal days, baby furlough days, and accumulated compensatory time;

B.   Such non-paid leave shall continue for no more than three months, plus an extension of no more than three months, and shall not be granted or extended unless the Employer determines that the **O**fficer is likely to return to duty within the period of the leave or extension thereof; and

C.   Such non-paid leave shall be subject to Section 23.1.B herein below, and shall not be deemed duty disability leave.

### Section 18.2 — Non-I.O.D

Any **O**fficer absent from work on account of non-I.O.D. injury or illness for any period of time not exceeding twelve (12) months in any twenty-four (24) consecutive month period, shall receive full pay and benefits for the period of absence, provided such injury or illness is certified by the Medical Services Section. Such certification shall not be unreasonably withheld.

### Section 18.3 — Limited Duty I.O.D

Officers injured in the line of duty, who are certified by the Medical Services Section as being able to perform limited duty assignments, shall be given limited duty assignments until they can perform regular duty assignments, or until they are mandatorily retired, whichever occurs first.

### Section 18.4 — Recognized Openings

Any **O**fficer who is certified by the Medical Services Section as being able to perform a limited duty assignment may be placed by the Employer in a recognized opening, as defined in Section 23.9, notwithstanding anything in Section 23.9 to the contrary.

### Section 18.5 — Certification

Certification that an **O**fficer has been injured in the line of duty shall not be unreasonably withheld.

### Section 18.6 — Return to Duty

In order to enable **O**fficers applying to return from leave for injury or illness to be processed back to duty as soon as possible, the Employer shall advise such **O**fficers in advance of the records needed and other requirements they must meet in order to permit such return. The Employer must consider medical records and reports from legally-qualified practitioners of the healing arts acting within the scope of his or her license, including, but not limited to, chiropractors, in its determination of whether an **O**fficer is fit to return to duty.

If the Employer requires and specifies certain additional medical tests to be performed and passed as a condition of the **O**fficer's return and said tests were not, and are not normally, performed in the normal course of appropriate medical treatment for the illness or injury involved, then the Employer shall, at its option, either provide the test, or reimburse the **O**fficer for the cost of both the test and any required record thereof to the extent that such cost is not covered by insurance.

The Employer shall not require a physician's certificate as a condition of return to duty from medical leave lasting three days or less, except for good cause.

### Section 18.7 —Advisory Committee

The Employer and the Lodge shall establish a joint Committee to develop solutions to problems of medical leave cost and abuse. The Committee shall be advisory only.

### Section 18.8 — Injuries on Duty and Recurrence Claims

The Employer and the Lodge have agreed upon procedures which will be followed by the Medical Services Section when an **O**fficer reports an injury on duty or a recurrence of an injury on duty. Those procedures are set forth in Appendix N of this Agreement.

### Section 18.9 — Employer Responsibility for Hospital, Medical and Prescription Costs and Pension Contributions

Pending the final determination of benefits by the **Policemen's Annuity and Benefit** Fund, **O**fficers covered by this Agreement who apply for duty, ordinary or occupational disability benefits will be required to contribute the same amount as active **O**fficers for health care benefits; and the Employer will continue to provide the same health care benefits.

Officers who receive duty or occupational disability benefits will continue to receive those benefits at no cost without any refund of their previous contributions. Officers who are awarded ordinary disability benefits will be required to contribute at the Public Health Services Act (PHSA) rate reduced by the administrative fee of 2%, as of the first day of the month following the Fund's final determination of the **O**fficer's claim.

The Employer agrees to pay all hospital, medical and prescription costs of an **O**fficer who is on a leave of absence for duty or occupational disability purposes, all at no cost to the employee. The Employer shall make pension contributions on behalf of the employee as if the employee had remained in active service.

### Section 18.10 — Medical Benefit Statement

Upon the written request of an **O**fficer who is injured or becomes ill in the performance of his or her duties, the Employer will provide a written statement showing the period of absence and the amount

of salary received during the period of absence due to such injury or illness. Upon the written request of an **O**fficer on a leave of absence for ordinary, occupational or duty disability pension, the Employer will provide a statement covering the period of absence prior to retirement and the amount of the disability benefit received by the **O**fficer during said period.

Any statements for any calendar year required of the Employer under this Section will be provided only once.

## ARTICLE 19 — BEREAVEMENT LEAVE

### Section 19.1 — Death in Family

The Employer agrees to provide to **O**fficers leave without loss of pay, not to exceed three (3) consecutive days any time within the seven (7) calendar days immediately following the death of a member of the immediate family, except for the death of a brother-in-law or sister-in-law which shall be for the day of the funeral only.

Annual and time-due furlough will not be extended as a result of death occurring in the **O**fficer's immediate family during such furlough unless the death occurs during the last three (3) days of the furlough period, at which time the procedure outlined above will be followed.

### Section 19.2 — Definition of Family

A member of the immediate family shall be defined to be any **O**fficer's mother or father (including step), **spouse**, domestic partner, daughter or son (including step or adopted), sister or brother (including half or step), father-in-law, mother-in-law, daughter-in-law, son-in-law, sister-in-law, brother-in-law, grandparent or grandchild.

In the event of the death of a domestic partner, the employee shall be granted three (3) consecutive days of leave any time within seven (7) calendar days immediately following the death provided that the employee has registered the name of the employee's domestic partner with the Department of Personnel.

Domestic partners are defined as two persons, regardless of their gender, who have a close personal relationship, sharing the same regular and permanent residence for at least six months, are eighteen years of age or older, not married to anyone, not related by blood closer than would bar marriage in the State of Illinois, and are each other's sole domestic partner, responsible for each other's common welfare and jointly sharing their financial responsibilities.

### Section 19.3 — Extended Bereavement Leave

Where an **O**fficer is entitled to bereavement leave pursuant to Section 19.1 above, and where death occurs and the funeral is to be held out of Illinois and beyond the states contiguous thereto, the **O**fficer shall be entitled to a maximum of five consecutive days. For purposes of this Section, those states contiguous to the State of Illinois are: Missouri, Iowa, Wisconsin, Indiana, Kentucky and Michigan.

## ARTICLE 20 — HOURS AND OVERTIME

### Section 20.1 — Work Day and Work Week.

All time in excess of the hours worked in the **Officer's** normal work day and the normal work week shall be compensated as provided in Section 20.2.

### Section 20.2 — Compensation for Overtime

All approved overtime in excess of the hours required of an **O**fficer by reason of the **O**fficer's

regular duty, whether of an emergency nature or of a non-emergency nature, shall be compensated for at the rate of time-and-one-half. Such time shall be computed on the basis of completed fifteen (15)-minute segments.

An **O**fficer who earns overtime pursuant to the federal Fair Labor Standards Act (FLSA) shall be paid overtime compensation at the FLSA rate agreed upon by the parties. An **O**fficer who earns non-FLSA overtime shall have the option of electing pay or compensatory time consistent with the provisions of this Agreement.

### Section 20.3 — Sixth and Seventh Day Work

An **O**fficer who is in pay status for six (6) or seven (7) consecutive days within the pay period Sunday through Saturday will be compensated at the rate of time-and-one-half for work performed on the sixth (6th) day and seventh (7th) day. An **O**fficer who performs work on a regular day off which has been cancelled, will receive a minimum of eight (8) hours compensation or compensation at the rate of time-and-one-half times the actual hours worked, whichever is greater. Voluntary schedule changes will be exempt from this provision.

### Section 20.4 — Call-Back

A call-back is defined as an official assignment of work which does not continuously precede or continuously follow an **O**fficer's regularly-scheduled working hours. Officers who are directed to report to any of the Employer's premises or other specified location or are authorized to attend a beat meeting at a specified time on a regular scheduled work day or required to report to the Medical Section or are authorized to attend a beat meeting at a specified time on the **O**fficer's regular day off, shall be compensated for two (2) hours at the appropriate overtime rate or be compensated for the actual time worked, whichever is greater, at the overtime rate.

### Section 20.5 — Court Time

Officers required to attend court outside their regularly scheduled work hours shall be compensated at the overtime rate with a minimum of two (2) hours, except (1) if the court time is during the **O**fficer's compensatory time and the **O**fficer knew of the court date before his or her request for compensatory time was approved, (2) while the **O**fficer is on paid medical leave, or (3) if the **O**fficer is compensated for such time by a secondary employer.

Officers required to attend authorized court or authorized pretrial conferences within one (1) hour immediately preceding their normal tour of duty will be compensated at the overtime rate for one (1) hour. Officers required to attend authorized court or authorized pretrial conferences commencing during their tour of duty and extending beyond the normal end of the tour of duty will be compensated at the overtime rate on the basis of completed fifteen (15)-minute segments. This overtime will be computed from the end of the normal tour of duty to the sign-out time at court or at conclusion of the pretrial conference.

Court appearances during off-duty hours will be credited at the rate of time-and-one-half with a minimum of two (2) hours when the actual time spent in court is two (2) hours or less. When the actual time spent in court exceeds two (2) hours, overtime will be computed on the basis of completed fifteen (15)-minute segments. Appearances at more than one court on the same day will be computed at the rate of time-and-one-half in the following manner:

A.  When the time between court appearances exceeds two (2) hours (sign-out time from the first court to sign-in time at the next court), a minimum of two (2) hours will be credited for each court appearance.

B. When the time between court appearances is two (2) hours or less, overtime will be computed on the basis of completed fifteen (15)-minute segments for the total time between sign-in at first court and sign-out time at the last court.

A minimum of two (2) hours will be credited when this total time is two (2) hours or less.

## Section 20.6 — Tour of Duty Exchange

Eligible **O**fficers may participate in the tour of duty exchange program. Any disputes arising out of this program shall be resolved through the expedited dispute resolution procedure applicable to this program.

## Section 20.7 — Change of Schedule

The Employer's right to assign **O**fficers for duty at any time and at different times during each twenty-eight (28)-day police period remains unrestricted and unchallenged. Watch assignments and designated starting times shall be established and posted for each police period. Watch assignments and designated starting times shall remain in effect for the duration of the twenty-eight (28)-day police period, except for:

A. in-service training (including individualized training) with a maximum of six (6) programs per year for a maximum of eighteen (18) days per year and with seven (7) days' notice to the **O**fficer; or

B. elective training (elective training are job-related programs the Department makes available to **O**fficers and in which the **O**fficer elects to participate); or

C. mandatory proficiency training for employees receiving D-2 or D-2A pay or otherwise receiving specialist or premium pay because of the position or assignment held, with a maximum of six (6) programs per year, for a maximum of thirty (30) days per year and with seven (7) days' notice to the **O**fficer; or

D. pre-service training for promotions; or

E. court appearances in excess of two (2) consecutive days; or

F. initial assignment when detailed to the Alternate Response Section.

However, starting times may be adjusted by the Employer: (1) plus or minus two (2) hours from the designated starting times; or (2) for up to seven (7) hours within an **O**fficer's assigned watch for circumstances not known to the Department 48 hours prior to the start of the police period. Provided that where an **O**fficer who has been scheduled to attend in-service training and does not attend because of circumstances beyond the reasonable control of the Employer, the Employer may reschedule said **O**fficer for said in-service training without payment of premium time hereunder.

Any adjustment inconsistent with the above provision, made after the start of the twenty-eight (28)-day police period, will result in payment in accordance with Section 20.2 for the hours worked outside of the **O**fficer's tour of duty scheduled at the beginning of the **O**fficer's twenty-eight (28)-day police period for that period. Shift changes during a police period made voluntarily at the request of an **O**fficer and upon approval of the Employer shall not require additional compensation.

This Section does not apply in the following situations:

A. The Superintendent and the Mayor have determined in writing that a serious emergency condition exists;

B. When **O**fficers are assigned to duties that by their very nature require changes in starting times, including personnel assigned to the following Offices, Bureaus, Divisions or Units:

1. Office of the Superintendent (Administration, Office of Legal Affairs, Management and Labor Affairs Section, News Affairs, CAPS Implementation Office, CAPS Project Office, Special Events and Liaison Section, Preventive Programs and Neighborhood Relations);

2. Office of the Assistant Superintendent (Administration and Detached Services Unit);

3. Bureau of Professional Standards (Administration, Inspections Division, Internal Affairs Division, Education and Training Division, Office of Management Accountability);

4. Bureau of Patrol (Administration, First and Eighteenth District Foot Patrol Units, District Tactical and Gang Teams, Community Policing Office, Detail Unit, Troubled Building Section and Area Deputy Chief Office);

5. Bureau of Strategic Deployment (Administration, Mounted Patrol Unit, Special Functions Section, Marine and Helicopter Unit);

6. Bureau of Administrative Services (Administration, Personnel Investigators in Human Resources Division, Information Services Division, Finance Division and Reproduction and Graphic Arts Division);

7. Bureau of Investigative Services [Administration, Organized Crime Division, Counterterrorism and Intelligence Division (Excluding Bomb and Arson, Public Transportation and Airport Law Enforcement Sections), Special Investigations Unit, Central Investigations Unit and Detective Division Mission Teams];

8. Officers assigned to dignitary protection as part of their regular duties, including temporary replacements; and

9. No more than two (2) members of the immediate staff of each exempt Commanding Officer.

## Section 20.8 — Stand-By

Where the Employer requires an **O**fficer to remain on standby, available for work, and the **O**fficer is not able to come and go as he or she pleases, such time shall be paid as time worked.

## Section 20.9 — Day-Off Change

Days off assigned on "change day" shall remain unchanged for the duration of each 28-day police period except for:

A. in-service training (including individualized training) with a maximum of seven (7) programs per year for a maximum of twenty-eight (28) days per year and with seven (7) days' notice to the **O**fficer; or

B. elective training (elective training are job-related programs the Department makes available to **O**fficers and in which the **O**fficer elects to participate); or

C. mandatory proficiency training for employees receiving D-2 or D-2A pay or otherwise receiving specialist or premium pay because of the position or assignment held, with a maximum of twelve (12) programs per year, for a maximum of thirty (30) days per year and with seven (7) days' notice to the **O**fficer; or

D. pre-service training for promotions.

The Employer's right to assign **O**fficers for duty while on regular day-off status is unrestricted and unchallenged. The Employer agrees, however, that in each such event it will pay the **O**fficer so assigned the optional premium time under Article 20 of the Agreement. No such optional premium

time shall be paid, however, for **O**fficers assigned to School Patrol Unit for any change occurring during any police period which includes the start of the school year, or the end of the school year nor shall any such optional premium time be paid for in-service training program, with a maximum of three programs per year, for a maximum of nine days per year, provided the **O**fficer is given seven (7) days' notice of such change, and pre-service training for promotion, provided, that where an **O**fficer who has been scheduled to attend in-service training does not attend for any reason beyond the reasonable control of the Employer, the Employer may reschedule said **O**fficer for said in-service training without payment of premium time hereunder.

Day off changes made voluntarily at the request of an **O**fficer, and upon approval of the Employer, shall not require premium pay pursuant to Section 20.3. Changes required to implement the provisions of Section 23.2 controlling scheduled days off for members of the bargaining unit going on or returning from furlough, also shall not require premium compensation.

The Lodge acknowledges that willingness to restrict summer furlough and days off on Saturdays, Sundays and holidays and accept varied days off each week are conditions of assignment among Mounted Patrol Unit **O**fficers covered by the collective bargaining agreement.

The mounted unit is a recognized exception to this Section, and a change of regular day-off status for personnel assigned to the mounted unit may be made on a day other than "change day" without payment of premium time under Article 20 of the Agreement, provided that affected personnel shall receive at least ten (10) days' notice of such change.

Those **O**fficers assigned to events known as the Taste of Chicago, Mexican Independence Festival and Puerto Rican Independence Festival shall not have their day-off group changed for the purpose of avoiding the payment of overtime pay. In the event that days off must be canceled to supplement the personnel assigned to said events, the opportunity to earn overtime pay will first be offered to the **O**fficers assigned to said events. If there are not sufficient volunteers, said overtime pay opportunities will be offered to **O**fficers who are in regular day-off status in the District where the event occurs. In the event the City permits an event known as Octoberfest, said event shall be added to the three above listed events.

### Section 20.10 — Day-Off Group Assignment

In the event the Employer determines to change an **O**fficer's day-off group assignment, the Employer shall seek volunteers to satisfy its needs; provided, however, (1) if there are more volunteers than required, the volunteers with the greatest seniority on the watch in the day-off group affected shall be changed, and (2) if there are not sufficient volunteers, the **O**fficers with the lowest seniority on the watch in the day-off group affected shall be changed; provided further, said **O**fficers meet the Employer's needs.

### Section 20.11 — Accumulation of Compensatory Time

The Employer will not restrict an accumulation of compensatory time except as provided in Section 20.2**.** The number of hours of compensatory time which an **O**fficer has on record shall not be the controlling factor in determining whether an **O**fficer will be allowed to take time due.

### Section 20.12 — Back to Back Shifts on Change Day

An **O**fficer shall normally not be required to work more than four hours on the first watch on change day if he or she has worked a full tour of duty on the third watch on the proceeding day. If he or she is required to work more than four hours on a change day on the first watch, he or she shall be paid at the rate of time-and-one-half for the hours worked on the first watch on change day.

**Section 20.13 — Duty Availability Allowance**

A.  Effective on each of the following effective dates, all **O**fficers shall be paid the
    following quarterly amounts:

| Effective Date | Per Quarter |
|---|---|
| January 1, 2012 | $805.00 |
| **January 1, 2014** | **$855.00** |
| **January 1, 2016** | **$870.00** |
| **January 1, 2017** | **$900.00** |

B.  In accord with applicable law, the Employer shall treat duty availability allowance payments
    as pensionable.

C.  Entitlement to duty availability pay is not dependent on an **O**fficer being present for duty for
    an entire pay period.

D.  **Notwithstanding anything to the contrary in (A) above, Officers hired on or after
    January 1, 2015, shall receive duty availability pay commencing at Step 5 (after 42
    months) of the Salary Schedule.**

**ARTICLE 21— UNIFORMS**

**Section 21.1 — Uniforms and Equipment Advisory Committee**

The Lodge shall establish a three (3) member Uniforms and Equipment Advisory Committee. The
Committee's function will be to offer recommendations relative to additions or deletions in the
Departments Uniforms and Personal Equipment Program. The recommendations will be channeled
through the Research and Development Division to the Department's Uniforms and Personal
Equipment Policy Committee. Any and all recommendations made by the Uniform and Equipment
Advisory Committee will be advisory only.

**Section 21.2 — Major Change**

The Department will apprise the Uniform and Equipment Advisory Committee of the Lodge
whenever major changes to the Uniform and Personal Equipment Program are anticipated.

**Section 21.3 — Uniform Allowance**

Each **O**fficer shall receive a uniform allowance of $1,800.00 per year, payable in three (3)
installments of $600.00 on February 1, August 1, and December 1.

**Section 21.4 — Uniform Change or Modification**

The Employer shall pay for the first issue of any change in, or modification of, the prescribed
uniform announced and effective after November 15, 1981.

**Section 21.5 — Uniform Option**

Subject to seasonal uniform requirements, the prescribed dress uniform may be worn at any time
at the **O**fficer's option. The current optional winter leather jacket is reclassified as an alternative
to the prescribed long cloth coat, but an **O**fficer shall not be required to own both. When
performing administrative/clerical duties inside a facility, the prescribed uniform short sleeved

shirt may be worn irrespective of seasonal uniform requirements.

### Section 21.6 — Lost Shields

In cases where discipline is warranted, the maximum suspension for the first offense of loss of shield shall be one-half day to be implemented by reducing the **O**fficer's compensatory time by four (4) hours or one actual one-half day suspension without pay if the **O**fficer does not have available compensatory time.

## ARTICLE 22 — INDEMNIFICATION

### Section 22.1 — Employer Responsibility

The Employer shall be responsible for, hold **O**fficers harmless from and pay for damages or monies which may be adjudged, assessed, or otherwise levied against any **O**fficer covered by this Agreement, subject to the conditions set forth in Section 22.4.

### Section 22.2 — Legal Representation

Officers shall have legal representation by the Employer in any civil cause of action brought against an **O**fficer resulting from or arising out of the performance of duties.

### Section 22.3 — Cooperation

Officers shall be required to cooperate with the Employer during the course of the investigation, administration or litigation of any claim arising under this Article.

### Section 22.4 — Applicability

The Employer will provide the protections set forth in Sections 22.1 and 22.2 above so long as the **O**fficer is acting within the scope of his or her employment and where the **O**fficer cooperates, as defined in Section 22.3, with the City of Chicago in defense of the action or actions or claims.

### Section 22.5 — Expedited Arbitration

Grievances alleging a violation of Article 22 may be initiated at Step Four of the grievance procedure. In arbitrations thereunder, unless the parties agree otherwise, said hearing shall commence within thirty (30) days of the selection of the Arbitrator, and the Arbitrator shall issue his or her award in writing within fifteen (15) days following the close of the hearing; the full written decision of the Arbitrator may be issued within thirty (30) days of the close of the hearing.

## ARTICLE 23 — SENIORITY

### Section 23.1 — Definition and Application

A.  Seniority shall be defined as an **O**fficer's continuous length of service from the date of last hire as a police officer, subject to subsection B below.

The seniority of an **O**fficer retained beyond the eighteen (18) month probationary period shall date back to the last date of hire as a police **O**fficer and be subject to the deductions provided in subsection B**.**

In the event two or more **O**fficers have the same seniority date, the older **O**fficer, as determined by referring to the **O**fficers' date of birth as recorded on their employment application, shall receive the higher seniority status.

There shall be only one seniority for **O**fficers covered by this Agreement and that seniority shall control for the purpose of determining rights, benefits, and other conditions of employment affected by seniority under this Agreement.

B.  All absence from the Department's service without pay as a result of leaves for more than thirty (30) days (other than military, duty, occupational or ordinary disability), suspensions of more than thirty (30) days and all unexcused absences shall be deducted in computing continuous length of service for purposes of determining advancement within the salary schedule, amount of furlough, and seniority for other purposes covered by this Agreement.

C.  The seniority of an **O**fficer and the employment relationship shall be terminated in the following circumstances:

1.  Resignation;

2.  Separation (discharge);

3.  Retirement;

4.  Unauthorized absence for four (4) consecutive working days without notice to the Employer;

5.  If laid off, failure to report fit for duty within seven (7) days of delivery of written notification of recall to the **O**fficer's last known address which notification shall be simultaneously provided to the Lodge;

6.  Failure to report fit for duty upon termination of an authorized leave of absence; and

7.  Laid off for a period of time as set forth in the City of Chicago Personnel Rules as in effect on December 31, 1983.

### Section 23.2 — Furlough Scheduling

An **O**fficer shall select his or her furlough within the unit of assignment, or if detailed for 28 days or more prior to the date selection begins, within the unit of detail on the basis of seniority **among the Officers on the Officer's assigned watch**. Officers may elect to take their full furlough or split the furlough to which they are entitled into two equal segments. Both furloughs, if split, shall be determined in one process and on the basis of seniority. A full furlough will commence on the 1st day of a police period. A split furlough will commence on either the 1st or 15th day of a police period.

Compensatory time furloughs will not be scheduled for **O**fficers who split their annual furloughs; however, such **O**fficers shall be allowed to take a compensatory time furlough by utilizing elective days between regularly-scheduled weekends off, subject to manpower requirements.

Furlough schedules may be adjusted to accommodate seasonal operations, significant revision in organization, work assignments or the number of personnel in particular ranks.

The day-off group of an **O**fficer on furlough (full or split) will not be changed during the remainder of the week in which the **O**fficer is scheduled to return, unless an **O**fficer who is required to work on his or her scheduled day(s) off during that week is compensated by the payment of premium benefits under Article 20 for all hours worked on his or her scheduled day off.

Officers who elect to either split their annual furloughs into two segments or take a full annual furlough will be returned to the day-off group they were in at the time their furlough or furlough segments were selected. Affected **O**fficers will notify their unit commanding officer two (2) weeks prior to the beginning of the furlough segment if their day-off group must be changed to match the

original group. The change in day-off group should take place on the Sunday preceding the first day of the furlough segment.

## Section 23.3 — Promotion

Seniority shall be considered in the promotion of **O**fficers covered by this Agreement. In considering **O**fficers for promotion, seniority shall**,** in competitive testing, be utilized as a tie-breaker.

## Section 23.4 — Seniority List

The Employer shall prepare a seniority list. The list shall be made available to **O**fficers in each unit **and to the Lodge on the Department's computerized database, in a format that may be sorted in seniority and/or alphabetical order.**

## Section 23.5 — Priority Schedule for Use of Elective Time

Any dispute within a unit as to the selection of a personal day provided for in Section 11.3 shall be resolved by seniority.

Elective time used for an authorized furlough extension as defined in Section 29.A.4 shall receive first priority provided that a written request is submitted at least fourteen (14) days prior to the beginning of a furlough or furlough segment.

## Section 23.6 — Overtime for Pre-Planned Events

The following procedures will apply in case of events which will require the cancellation of days off and for which the Department has received a minimum of 21 days' prior notice.

In those units which have been designated to provide personnel, seniority will be the dominant factor in the selection of **O**fficers required to work their regular days off, provided that the **Officer** to be selected possesses the necessary skill or special qualifications to perform the duties required. The Employer shall seek volunteers on the basis of seniority from among those qualified **O**fficers in said unit. If there are insufficient qualified volunteers, the Employer shall select **O**fficers on the basis of reverse seniority, provided that the Employer may assign probationary officers without regard to seniority.

The Employer will post a notice of such events **in the CO** book and **O**fficers desiring to exercise the option to work will notify their unit commanding officer within seven days of the date the notice was posted.

For the purpose of pre-planned overtime assignments, a unit may be defined as a bureau, division, district, watch, tactical team, etc.

For duty on election or primary days, seniority will be the dominant factor in the selection of **Officers** required to work their regular day off in the polling place. Those **O**fficers who work overtime will be compensated in accordance with Sections 20.1 and 20.2. For purposes of this paragraph, **O**fficers in tactical teams on their regular day off shall be treated the same as other **O**fficers on the same watch in the same district, subject to operational needs.

For purposes of this paragraph, the Employer will select **O**fficers to work a four- (4) hour extended tour of duty on election or primary days on the basis of seniority from among those qualified **O**fficers working the affected watch who volunteer for the extended tour. If and to the extent that there are insufficient volunteers, the Employer shall select **O**fficers from the affected watch on the basis of reverse seniority.

## Section 23.7 — Holiday Assignment

When operational considerations require that some **O**fficers of a unit work on a holiday, as defined in Section 11.1 of this Agreement, the most senior **O**fficers will be given the option to work, provided that the holiday is not an **O**fficer's regular day off or a part of an **O**fficer's approved furlough extension and that the **O**fficer possesses the necessary skill or special qualifications to perform the duties required. **When operational considerations require limitations on the number of Officers who may be given the holiday as a day off, the most senior Officer(s) will be given the option to take the holiday as a day off, provided the request is submitted seven (7) days before the holiday.**

For the purpose of holiday assignments, a unit may be defined as bureau, division, section, group, watch, district, etc.

## Section 23.8 — Filling Recognized Vacancies

This Section shall apply only to the Public Transportation Section including the Public Transportation Canine Unit, Public Housing Sections North and South, the Special Activity Section, Traffic Section/Detail Unit, Traffic Enforcement Unit, Traffic Court/Records Unit, Traffic Safety & Training Unit, Major Accident Investigation Unit, Loop Traffic, District Law Enforcement, Airport Law Enforcement North and South, Mounted Unit, Marine Unit, Gun Registration Section, Records Inquiry Section, Field Inquiry Section, Evidence & Recovered Property Section, Police Document Services Section, Central Detention Section, Auto Pound Section (D-1 Officers), Electronics and Motor Maintenance Division (D-1 Officers), Office of Emergency Communications (excluding the Alternate Response Section), Area Criminal Investigations, Missing Persons Section, Juvenile Court Liaison Section, Youth Investigation Group Areas (excluding Youth Investigation Group Special Investigation Unit and Youth Investigation Group Administration), Auto Theft Section, Bomb and Arson Section (except bomb technicians), excluding the immediate staff of each exempt commanding officer not to exceed two (2) staff members.

A vacancy for purposes of this Section ("recognized vacancy") exists when an **O**fficer is transferred, resigns, retires, dies, is discharged, when there are new units created, or when the Department increases the number of employees in a unit, except for details for not more than three (3) months and the Summer Lakefront Bike Detail**.** The Employer shall determine at any time before said vacancy is filled whether or not a recognized vacancy shall be filled. If and when the Employer determines to fill a recognized vacancy, this Section shall apply.

In order to avoid the inefficiency of chain-effect bidding, the vacancy created by the reassignment of a successful bidder shall be a recognized vacancy herein; however, subsequent vacancies created thereby shall be filled within the Department's discretion. Further, there is no recognized vacancy created as a result of emergencies, or when an **O**fficer is removed for disciplinary reasons for up to 30 days. When an **O**fficer is removed for disciplinary reasons for more than 30 days, a recognized vacancy is created.

The Employer shall post a list of recognized vacancies, if any, stating the requirements needed to fill the opening, at least 14 days before the start of the 28-day police period. A copy of such postings shall be given to the Lodge. Non-probationary **O**fficers within the same D-1 salary grade or D-2 job classification, within 72 hours of the time the list has been posted, may bid on a recognized vacancy in writing on a form to be supplied by the Employer. One copy of the bid shall be presented to the Employer; one copy shall be forwarded to the Lodge; and one copy shall be retained by the **O**fficer. Bidding under this Section 23.8 may only be for a recognized vacancy in a specific unit without regard to shift, day off, unit duty assignments, etc. The Employer shall

respond to the successful bidder and the Lodge no later than 3 days prior to the change day for the new 28-day police period. During the bidding and selection process, the Employer may temporarily fill a recognized vacancy by assigning an **O**fficer to said vacancy until the recognized vacancy is filled.

An eligible bidder shall be an **O**fficer who is able to perform in the recognized vacancy to the satisfaction of the Employer after orientation without further training. The Employer shall select the most senior qualified bidder when the qualifications of the **O**fficers involved are equal. In determining qualifications, the Employer shall not be arbitrary or capricious, but shall consider training, education, experience, skills, ability, demeanor and performance, except that the parties recognize that the unique operational needs of the Employer require flexibility in the delivery of public service and to meet this need the Employer may fill 20% of the recognized vacancies within its discretion, provided that, if the Employer does not utilize any or all of its 20% exception in any personnel order, the remainder of the unused exception may be carried forward and used to fill future recognized vacancies within a twelve (12)-month period.

**A**n exception to the above paragraph will apply to Airport Law Enforcement North and South, and the Traffic Section/ Detail Unit, fifty percent (50%) of all recognized vacancies in each of these units shall be filled by bid.

Bidding procedures will be done in conformance with the Memorandum of Understanding in this Agreement. The successful bidder may not bid for another recognized vacancy for one (1) year unless reassigned by the Employer during that year. A successful bidder may not be reassigned except for (1) emergencies for the duration of the emergency, (2) for just cause or (3) where the Superintendent determines that the **O**fficer's continued assignment would interfere with the **O**fficer's effectiveness in that assignment. When there are no qualified bidders, the Employer may fill the recognized vacancy within its discretion.

### Section 23.9 — Filling Unit Duty Assignments

This Section shall apply only to the following jobs within the units set forth in Section 23.8: Warrant Clerk, Summary Investigation Detective, Review Investigation Detective, Review Officers, Detective Division Administrative Desk Duty Assignment, District Desk, District Watch Relief, or Lockup only as specifically set forth below. The Employer agrees not to eliminate any Unit Duty Assignments listed in this Section for the duration of this Agreement.

An opening in a unit duty assignment for purposes of this Section ("recognized opening") exists when an **O**fficer performing the above unit duty assignments is to be transferred, resigns, retires, dies, is discharged, when there are new unit duty assignments created, or when the Department increases the number of employees in a unit, except for details for not more than three (3) months. A recognized opening will be created when an **O**fficer is voluntarily detailed and remains absent from his or her Unit duty assignment for more than three (3) months**.** An **O**fficer's assignment to a detail shall not be rolled over solely for the purpose of avoiding the effect of this Section. The Employer shall determine at any time before said opening is filled whether or not a recognized opening shall be filled. If the Employer decides to fill a recognized opening utilizing Section 18.4, the Employer must provide the Lodge with the name of the limited duty **O**fficer within ten (10) days of filling the recognized opening. If and when the Employer determines to fill a recognized opening other than utilizing Section 18.4, this Section shall apply. Further, there is no recognized opening created as a result of emergencies, or when an **O**fficer is removed for disciplinary reasons for up to thirty (30) days. When an **O**fficer is removed for disciplinary reasons for more than thirty (30) days or when an **O**fficer is relieved of his or her police powers for more than ninety (90) days for reasons other than placement on the medical roll, a recognized opening is created.

In the event a recognized opening is to be bid under this Section, the Employer shall post within the unit on the first Wednesday of the next police period a list of recognized openings therein, if any, stating the requirements needed to fill the opening. This list will remain posted for seven (7) calendar days. A copy of such postings shall be given to the Lodge at the time of the bid posting. Non-probationary **O**fficers within the same unit and within the same D-1, D-2 or D-2A job classification, may bid on a recognized opening in writing on a form to be supplied by the Employer. One copy of the bid shall be presented to the Employer, one copy shall be forwarded to the Lodge, and one copy shall be retained by the **O**fficer. The Employer shall respond to the successful bidder and the Lodge no later than three (3) days prior to the change day for the new 28-day police period. During the bidding and selection process, the Employer may temporarily fill a recognized opening by assigning an officer to said opening until the recognized opening is filled by bid; however, the Employer may not assign **O**fficers to a vacated position to avoid bidding the recognized opening.

An eligible bidder shall be an **O**fficer who is able to perform in the recognized opening to the satisfaction of the Employer after orientation. The Employer shall select the most senior qualified bidder when the qualifications of the **O**fficers involved are equal. In determining qualifications, the Employer shall not be arbitrary or capricious, but shall consider training, education, experience, skills, ability, demeanor and performance.

The successful bidder may not bid for another recognized unit duty assignment opening for one (1) police period year. A successful bidder may not be reassigned except for (1) emergencies for the duration of the emergency, (2) for just cause, (3) where the Superintendent determines that the **O**fficer's continued assignment would interfere with the **O**fficer's effectiveness in that assignment, or (4) temporary unit duty assignments for operational needs, provided the Employer shall not fill the vacated unit duty assignment. When there are no qualified bidders, the Employer may fill the recognized opening within its discretion. Unit duty assignments in District Desk, District Watch Relief, or Lock-up shall be treated in accordance with this Section 23.9 in all respects except the following: (1) only non-probationary **O**fficers within the same watch and within the same D-1 salary grade shall be eligible to bid for recognized openings in such assignments.

The District Watch Secretary position may be filled at the Employer's discretion. These positions are limited to one (1) position per watch in each district. If the Employer decides to fill the District Watch Secretary position, the daily unit duty assignment sheets will identify the **O**fficer assigned to the District Watch Secretary position. The duties and responsibilities of the District Watch Secretary are to be determined by the Employer provided that the lockup, review and the desk **O**fficer bid positions as set forth in the Agreement shall be filled by either the bid **O**fficer or District Watch Relief personnel prior to filling these positions with the District Watch Secretary.

If the Employer violates this Section by improperly filling a recognized opening by not placing the opening up for bid, the affected **O**fficer(s) will be compensated at the rate of time and one-half in quarter hour increments until the violation is remedied. The Employer is granted the ability to remedy the violation without waiting until the next police period.

If the Employer violates this section by improperly selecting a bidder or improperly determining qualifications for a recognized opening, the affected **O**fficer(s) will be compensated at the rate of time and one-half in quarter hour increments up to a maximum of fifty (50) hours of compensatory time.

### Section 23.10 — Non-Disciplinary Demotion

In the event of non-disciplinary demotions for economic reasons, the Employer shall select the most junior **O**fficer when the qualifications of the **O**fficers involved are equal. In determining

39

qualifications, the Employer shall not be arbitrary and capricious, but shall consider training, education, experience, skills, ability, demeanor and performance.

## Section 23.11 — Details

Officers assigned to units designated to provide personnel to the Summer Mobile Force, Expressway Detail, Auto Snow Tow Detail, and the Winter Holiday Season Traffic Detail will be permitted to bid for this detail on the basis of seniority. If and to the extent that there are insufficient qualified bidders from a designated unit to meet that unit's allocation, the Employer will select **O**fficers who are deemed qualified by reverse seniority from the designated unit to fill that unit's allocation.

If the Employer decides to assign an **O**fficer to a detail outside the area, district, or unit, to a sports event, parade, festival, or labor dispute; or to another event detail which constitutes a tour of duty, the Employer shall announce the detail at a roll call preceding the event, which roll call is for the same roll call on the same watch in the same unit from which **O**fficers are to be assigned to the detail. If notification at roll call is not feasible or appropriate, the Employer shall determine the method of notification. The Employer shall select **O**fficers to work the detail on the basis of seniority from among those qualified **O**fficers on said watch who are not in bid jobs and who volunteer for the detail. If and to the extent that there are insufficient qualified volunteers, the Employer shall select **O**fficers on the basis of reverse seniority. The Employer may assign probationary officers during their initial twelve (12) month period of probation without regard to seniority.

When the Employer decides to assign an **O**fficer to a detail outside the **O**fficer's unit of assignment for more than ten (10) days to a unit listed in Section 23.8 to provide relief for a temporary manpower shortage due to furlough, medical, or suspension, the Employer shall select **O**fficers to work the detail on the basis of seniority from among those qualified **O**fficers who volunteer for the detail. If and to the extent that there are insufficient volunteers, the Employer shall select **O**fficers on the basis of reverse seniority, provided that the Employer may assign probationary officers during their initial twelve (12) month period of probation without regard to seniority.

When the Employer decides to assign an **O**fficer to a detail outside the **O**fficer's unit of assignment for more than thirty (30) days to a unit listed in Section 23.8 to provide relief for a temporary manpower shortage due to the actual strength being more than ten (10%) percent below authorized strength, the Employer shall select **O**fficers to work the detail on the basis of seniority from among those qualified **O**fficers who volunteer for the detail. If and to the extent that there are insufficient volunteers, the Employer shall select **O**fficers on the basis of reverse seniority, provided that the Employer may assign probationary officers during their initial twelve (12) month period of probation without regard to seniority.

The Employer's right to assign Tactical Teams, Mission Teams, District Gang Tactical Teams, or other specialized units shall not be restricted in any way by this Section. In emergency situations, or situations where the Employer reasonably anticipates civil disorder will occur, or does occur, this Section shall not apply.

For purposes of bidding, the Employer may disregard seniority if and to the extent necessary to achieve the balance of experience and qualifications the Employer determines to be desirable in the detail and unit involved.

For purposes of selecting **O**fficers on the basis of reverse seniority, the Employer may retain a junior **O**fficer if and to the extent necessary to fulfill operational needs.

If the Employer assigns an **O**fficer to a detail or denies an **O**fficer(s) assignment to a detail in any manner contrary to the provisions of this Agreement, the affected **O**fficer(s) will be entitled to compensation at the rate of time and one-half in quarter hour increments for the duration of the detail.

**Any time the Employer designates a unit to provide personnel to fill any detail by reverse seniority, all Officers that have been detailed into that unit for more than ninety (90) days shall be included as though they were assigned to the unit providing the detail.**

### Section 23.12 — Reassignment of Duties

No provision in this Agreement shall be deemed to prohibit the Employer from hiring or assigning any non-bargaining unit personnel to perform any unit duties as described in Appendix B and/or C, provided that no **O**fficer covered by this Agreement shall be laid off either as a result thereof or if his or her non-bargaining unit replacement, if any, has not been laid off.

Any **O**fficer who is to be displaced by a non-bargaining unit person shall be given 60 days' prior notice of said displacement. The Employer shall designate the positions and duties to which displaced **O**fficers shall be assigned. Displaced **O**fficers may be assigned to other job duties within the same unit without regard to Section 23.8 and 23.9. If the Employer decides to assign displaced **O**fficers to different units, such displaced **O**fficers shall be permitted to bid for such assignments which the Employer decides to fill with such **O**fficers on the basis of seniority and qualifications in accordance with Section 23.8. If **O**fficers other than those displaced are permitted by the Employer to bid for such assignments, then all the displaced **O**fficers shall be deemed to be more senior than all of the non-displaced bidders for purposes of said bid.

An **O**fficer who has been given a limited duty assignment pursuant to Section 18.3 shall not be displaced from limited duty under Section 23.12 for the duration of his or her eligibility for limited duty.

### Section 23.13 —Acting Desk Sergeant

Officers regularly assigned to District Desk duties by virtue of successful bid under the provisions of Section 23.9 shall be given the option by seniority for the assignment as Acting District Desk Sergeant.

### ARTICLE 24 — EDUCATIONAL REIMBURSEMENT

Employer agrees to provide tuition reimbursement to **O**fficers for extra-departmental education subject to the following conditions:

A. To be eligible for reimbursement:
   1. Each course taken must be job-related or necessary for a degree.
   2. Proof of acceptance for a degree program must be presented upon request.
   3. Each course taken must grant college level credit.
   4. Each course must be taken through an accredited college or university.

B. Employees must file applications for reimbursement on the appropriate forms no later than thirty (30) days after the beginning of the course of study.

C. Reimbursement will be granted on the following basis:
   1. Grade "A"      100%
   2. Grade "B"      75%

and other grades classified by the school as passing.

**Effective for Officers first enrolled in graduate programs (including but not limited to any advanced or any professional degree programs) on or after September 1, 2016, reimbursement will be granted on the following basis:**

**1. Grade "A"        75%**

**2. Grade "B"        50%**

**and other grades classified by the school as passing**

**D.  Effective for Officers first enrolled in graduate programs (including but not limited to any advanced or professional degree programs) on or after September 1, 2016, the Employer shall grant reimbursement based on the full cost of tuition, exclusive of any scholarships, grants, reduced tuition, discounts, or other funds; provided, however, that any scholarships, grants, reduced tuition, discounts, or other funds must not be of general applicability to all other students in the program, but must be specific to the Officer's unique achievements or qualities or applicable only to police Officers or public safety employees.**

E.  Reimbursement may be denied if an **O**fficer's work performance is deemed inadequate or if an **O**fficer has a record of sustained infractions of Department orders, directives or procedures.

F.  Reimbursement will not be granted if:

1.  Tuition costs are covered by Veteran's Administration or other funds, or

2.  The program in which the **O**fficer is enrolled is reimbursable through a federal grant-in-aid program for which the **O**fficer is eligible.

G.  Reimbursement will be made for a maximum of two (2) courses per school term.

H.  Reimbursement will be granted when an **O**fficer is required by the Superintendent of Police to attend an educational or training program.

I.  **If an Officer** obtains an undergraduate or graduate degree with the assistance of the tuition reimbursement program, and the **O**fficer, within one (1) year of obtaining such degree, voluntarily resigns from the Department, all tuition costs (100%) reimbursed to the **O**fficer by the Employer for obtaining such a degree shall be repaid to the Employer. If the **O**fficer voluntarily resigns after one (1) year but less than two (2) years after obtaining the degree, the **O**fficer shall repay one-half (50%) of the tuition reimbursement to the Employer. If the **O**fficer does not complete the degree program and voluntarily resigns from the Department, the **O**fficer shall repay 100% of all tuition reimbursement received for any course completed within two (2) years of such resignation. Officers receiving tuition reimbursement for such degrees shall, as a condition of receiving such reimbursement, execute an appropriate form consistent with this paragraph.

The provision shall not apply to reimbursement under Subsection H of this Article, nor shall this provision apply to **O**fficers who resign from the Department for the purpose of accepting employment within another City of Chicago Department.

## ARTICLE 25 — LIFE AND HEALTH INSURANCE PROVISIONS

### Section 25.1 — Life Insurance

The Employer agrees to provide a **$75,000** life insurance benefit at no cost to the **O**fficer; and AD&D **shall be** $5,000.

The Employer agrees to provide procedures for **O**fficers to purchase optional Group Term Life Insurance and Universal Life Insurance in addition to basic Group Term Life Insurance coverage provided above, **for which the** cost to the **O**fficer **shall not exceed the current cost negotiated by the Employer.** Officers will be permitted to purchase any amount of optional insurance coverage in multiples of up to **ten times the Officer's annual salary, rounded up to the next $1,000.00, not to exceed $1,500,000.**

### Section 25.2 — Medical and Dental Plans

The Employer's medical, dental, and prescription drug plans are incorporated by reference into this Agreement. All newly hired employees shall be required to participate in the PPO plan for the first eighteen (18) months of their employment. These employees shall be eligible to participate in the first open enrollment period following the eighteen (18) month anniversary of their dates of hire.

The Employer shall provide Officers with the opportunity to enroll in a Flexible Spending Account ("FSA") plan**,** which will permit **O**fficers to fund, on a pre-tax basis, an individual account that the **O**fficer may use to pay for qualified unreimbursed medical expenses, as provided under Section 213 of the Internal Revenue Code. Subject to IRS regulations, the FSA will allow participants to pay the following qualified expenses on a pre-tax basis: dental expenses; vision expenses; health plan contributions, deductibles, and co-payments; prescription drug co-payments and payments for over-the-counter drugs; and other unreimbursed medical expenses. Participation is voluntary and participants may contribute up to $5,000 annually on a pre-tax basis, which will be deducted pro-rata each payroll period. Officers may enroll in the FSA or change the amount of their election once per year during open enrollment or when they have a change in family status. As mandated by the Internal Revenue Code, a "use it or lose it" rule applies to Section 125 plans. Any amount that remains in the participant's account at the end of the year will be forfeited. During open enrollment, the parties will engage in a joint educational campaign to inform **O**fficers of the benefits of the FSA plan and otherwise increase employee participation in such plan.

The Employer shall make available to **O**fficers covered under this Agreement and their eligible dependents summaries of the benefits provided by the Employer's health care plan either electronically or in print. The cost of such coverage to be borne by the Employer.

The plans for medical, dental, and prescription drug benefits, including the provisions on eligibility and self-contribution rules in effect as of the date of this Agreement, may not be changed by the Employer without the agreement of the Lodge.

The medical plan (health insurance plan) shall consist of two (2) separate alternative coverages — a PPO plan ("PPO"); and an HMO plan ("HMO"). In the event that a new health care plan becomes available to the City during a Plan year, the Employer shall have the right to include that new plan in the Plan alternatives upon reasonable prior notice to and discussion with the Lodge.

The Employer agrees to make available to the following other persons the above-described hospitalization and medical program and the dental plan: **O**fficers covered by this Agreement who retire on or after age 60 and their eligible dependents; surviving spouse and children of **O**fficers

covered by this Agreement killed in the line of duty; **O**fficers covered by this Agreement on a leave of absence for disability (both duty and occupational) and their eligible dependents; and the surviving spouse and children of deceased **O**fficers covered by this Agreement who were formerly on pension disability (both duty and occupational.) The Employer will contribute the full cost of coverage for any of the above-enumerated **O**fficers covered by this Agreement who elect coverage under any plan or plans. However, coverage under a plan for **O**fficers covered by this Agreement shall terminate when an **O**fficer covered by this Agreement either reaches the age for full Medicare eligibility under federal law or ceases to be a dependent as defined in a plan, whichever occurs first. After an **O**fficer covered by this Agreement reaches the age for full Medicare eligibility, that **O**fficer shall be covered under the medical program for annuitants, provided the person pays the applicable contributions.

### Section 25.3 —Ambulance Fees

Officers and their eligible dependents **and retirees and their spouses** will be exempt from fees for emergency medical services performed by the Chicago Fire Department.

### Section 25.4 — Labor Management Committee on Health Care

The City of Chicago and the Lodge hereby establish the "Labor Management Committee on Health Care." The Committee shall consist of four representatives selected by the Fraternal Order of Police, Chicago Lodge No. 7 and four representatives elected by the City, plus the City Comptroller or his or her designee, who shall serve as Committee Chair. The Committee shall meet not less than once each calendar quarter.

The purpose of the Committee shall be to monitor the performance of the City's health care plan and to discuss ways to improve plan operation and administration on an on-going basis, including such items as:

— the prescription drug plan, provider network and the mail order program,

— carve-outs for administrative efficiency and benefit efficiency,

— revisions to the list of providers participating in the hospital PPO,

— revision to the list of providers participating in the physician PPO.

This Committee is advisory only. It is intended to promote collaboration and discussion over the efficient and cost-effective operation of the benefit plan. It in no way diminishes the right regarding the benefit plan contained in any collective bargaining agreement nor does it in any way diminish the responsibilities, right and prerogatives of the City regarding the administration of the plan.

The size and composition of this Committee may be increased upon agreement of the parties.

## ARTICLE 26 —WAGES

### Section 26.1 — Salary Schedule

A.  Effective **July 1, 2012,** the basic salary of all **O**fficers covered by this Agreement shall be increased as follows: effective **July 1, 2012, two percent (2%); effective January 1, 2013, two percent (2%); effective January 1, 2014, two percent (2%); effective January 1, 2015, one percent (1%); effective January 1, 2016, one percent (1%); effective July 1, 2016, two percent (2%); effective January 1, 2017, one percent (1%).**

The salary schedule for employees with more than thirty (30) years of service prior to January 1, 2006 is set forth in Appendix A, "Salary Schedule for Officers on Step 11 Prior to January

1, 2006."

B.   Officers covered by this Agreement who are assigned as Armorer, Canine Handler, Evidence Technician, Explosives Detection Canine Handler, Extradition Officer, Fingerprint Examiner, Field Training Officer, Marine Unit Officer, Mounted Patrol Unit Officer, Police Agent, Police Technician or Traffic Specialist shall receive D-2 pay as base salary. **Effective January 1, 2015, Officers covered by this Agreement who are assigned as Helicopter Pilots shall receive D-2 as base salary and shall not forfeit their grade and pay status if such status is higher than D-2 pay.**

C.   Officers covered by this Agreement who hold the position of Detective shall receive D-2A pay as base salary.

D.   Officers covered by this Agreement who are assigned as a Field Training Officer shall continue to be allowed to work up to an additional one-half (1/2) hour per day prior to or at the conclusion of his or her tour of duty which time is to be compensated in accord with Article 20-Overtime.

E.   Officers covered by this Agreement who are assigned as Explosive Technician I, Firearms Identification Technician I, Legal Officer I, Police Forensic Investigator I, Security Specialist, or Supervising Substance Abuse Counselor shall receive D-3 pay as base salary.

F.   **During the term of this Agreement, should there be enacted into law legislation pursuant to which Officers covered by this Agreement are required to increase their contributions to the Policemen's Annuity and Benefit Fund of the Illinois Pension Code (40 ILCS 5/5-101 et seq.) or any successor pension fund in an amount above the amount of the current annual contribution of 9% of salary, the Lodge may reopen this Agreement solely on the issues of base salary and percentage increases ("Salary") and Duty Availability Pay for the purpose of renegotiating the Salary and Duty Availability Pay increases which shall be paid to Officers. The Lodge shall have thirty (30) days from the date it receives notice that the contributions will increase to notify the Employer, in writing, by certified mail, of its intent to reopen this Agreement. The notice referred to shall be considered to have been given as of the date shown on the postmark. Written notice may be tendered in person, in which case the date of notice shall be the written date of receipt. In the event this Agreement is reopened pursuant to this provision, the Salary and Duty Availability Pay increases set forth in this Agreement will not be changed or reduced without the written consent of the Lodge. The Employer and the Lodge shall have ninety (90) days to renegotiate the Salary and Duty Availability Pay increases set forth in this Agreement. In the event the parties are unable to resolve these issues during the ninety (90)-day negotiation period, or within any mutually agreed to extension, the dispute shall be submitted to the impasse resolution procedure set forth in Section 28.3(B).**

## Section 26.2 — Bi-lingual Compensation

All **O**fficers covered by the terms of this Agreement who are capable of reading, writing and translating a language other than English into the English language and English into a language other than English who are directed to perform such services by a supervisor outside of his or her unit shall be entitled to compensation for the time spent performing such services at the rate of time and one-half

Officers who are directed to report to duty or remain on duty to perform such services at a time other than their regularly-assigned duty hours or perform such services during their regularly-scheduled

duty hours will receive a minimum of two hours of compensation and such compensation will be at the rate of time and one-half.

In order to be eligible for the benefits of this section, an **O**fficer must be certified by the Department and placed on an eligibility list. The Department may promulgate rules to determine who is capable to perform such services. Subject to the above criteria and the ability to perform the assigned task, opportunities to provide such services will be rotated on the basis of the **O**fficer's seniority.

## Section 26.3 — Work Out of Grade

A.  Any **O**fficer covered by this Agreement being paid D-1 salary who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a Field Training Officer for two (2) or more hours within a single eight (8)-hour tour of duty, shall be paid at a D-2 rate consistent with his or her own tenure for an eight (8) hour tour of duty, or for the time spent, whichever is greater.

Any **O**fficer covered by this Agreement being paid D-1 or D-2 salary who is directed to perform substantially all the duties and assumes substantially all the responsibilities of Sergeant (other than in the Internal Affairs Division, Training Division, or Research and Development Division) or a Forensic Investigator for more than two (2) hours within a single eight (8)-hour tour of duty, shall be paid at a D-3 rate consistent with his or her own tenure for an eight (8)-hour tour of duty, or for the time spent, whichever is greater.

B**.**  Any **O**fficer covered by this Agreement regularly assigned to a position which is paid at a D-2 or D-2A rate, who is temporarily detailed to perform the work of a lower rated employee, which work is normally paid at the D-1 or D-2 rate, shall continue to be paid at the D-2 or D-2A rate for such work. This paragraph B does not apply to demotions or reassignments.

## Section 26.4 — Payment of Wages

Except for delays caused by payroll changes, data processing or other breakdowns, or other causes outside the Employer's control, the Employer shall continue its practice with regard to the payment of wages, which generally is: (1) payment of wages provided herein shall be due and payable to an **O**fficer no later than the 1st and 16th of each month, (2) holiday premium pay shall be due and payable to the **O**fficer no later than the 22nd day of the month following the month in which the holiday premium was earned, (3) other premium pay shall be payable to the **O**fficer no later than the last day of the period following the period in which the premium work was performed. The Employer shall not change said pay days except after notice to, and, if requested by the Lodge, negotiating with the Lodge. "Negotiating," for the purposes of this Section, shall mean as it is defined in Section 8(d) of the National Labor Relations Act.

**Effective no later than July 1, 2015, printed check stubs given to Officers on each payday shall include the Officer's PC number and no personal identifiers and Officers shall have the option of receiving check stubs online.**

## Section 26.5 — Payment of Time

An **O**fficer covered by this Agreement who resigns, retires or dies, shall be entitled to and shall receive all unused compensatory time accumulated by said **O**fficer including furlough time, baby furlough days, personal days, and holidays. An **O**fficer who is separated for cause shall be entitled to receive only unused compensatory time accumulated as a result of earned overtime for hours worked in excess of 171 per 28-day period.

## ARTICLE 27 — RESIDENCY

All **O**fficers covered by this Agreement shall be actual residents of the City of Chicago.

## ARTICLE 28 — DURATION, ENFORCEMENT AND DISPUTE RESOLUTION

### Section 28.1 — Term of Agreement

This Agreement shall be effective from **July 1, 2012** and shall remain in full force and effect until **June 30, 2017.** It shall continue in effect from year to year thereafter unless notice of termination is given, in writing, by certified mail, by either party no earlier than February 1, **2017** and no later than March 1, **2017.** The notices referred to shall be considered to have been given as of the date shown on the postmark. Written notice may be tendered in person, in which case the date of notice shall be the written date of receipt. It is mutually agreed that the Articles and Sections shall constitute the Agreement between the parties for the period defined in this Section.

### Section 28.2 — Continuing Effect

Notwithstanding any provision of this Article or Agreement to the contrary, this Agreement shall remain in full force and effect after any expiration date while negotiations or Resolution of Impasse Procedure are continuing for a new Agreement or part thereof between the Parties.

### Section 28.3 — Impasse Resolution, Ratification and Enactment

A.  If the parties reach a complete agreement as to the items for negotiation at the end of any negotiating period, the following procedure shall apply:

  1.  The agreement will first be presented to the Lodge membership with the recommendation of the Executive Board for ratification.

  2.  Within ten (10) days after such ratification by the Lodge membership, the agreement will be submitted to the City Council of the City of Chicago, with the Superintendent of Police and the Mayor's recommendation for ratification and concurrent adoption in ordinance form pursuant to the City's Home Rule authority. The Employer and Lodge shall cooperate to secure this legislative approval.

  3.  In the event the City Council should reject the recommended agreement, the parties shall meet again within ten (10) days of the Council's vote to discuss the reasons for the Council's rejection and to determine whether any modifications can be made to deal with the problems; but either party may thereafter invoke arbitration in accordance with Section 28.3(B) of this Article upon ten (10) days' written notice to the other party.

      For purposes of this Article, rejection by the City Council means affirmative rejection by a three-fifths (3/5) vote of the members of the City Council within thirty (30) days of the date the contract is submitted to it.

B.  If complete agreement is not reached between the parties as to the items for negotiation at the end of any negotiating period, the following procedure shall apply:

  1.  In the event that disputed items cannot be resolved during the negotiation period, all disputed items shall be referred to a three person Arbitration Board, one member to be selected by each of the parties and the third member to be jointly agreed upon by the parties.

  2.  A Dispute Resolution Board shall be convened and shall be composed of three (3) persons: one appointed by the Employer, one appointed by the Lodge and one impartial member to be mutually selected and agreed upon by the Employer and the Lodge. If, after

a period of five (5) days from the date of the appointment of the two representatives of the parties, the remaining Board member has not been selected or otherwise agreed upon, then either representative may request the American Arbitration Association, or its successor in function, to furnish a list of seven members of said service from which the remaining Board member shall be selected. The Association shall be advised that the eligibility for names to be placed upon the list shall include the following: membership in the National Academy of Arbitrators; at least five (5) years' experience in labor relations dispute resolutions in either the private or public sector; United States citizenship; and a commitment by any such individual that, if appointed or selected, said individual agrees to comply with the time limits set forth in subsection 28.3(B)5, below. Upon mutual written agreement of the Employer and the Lodge, the parties' right to appoint any Board members other than the impartial member may be mutually waived.

3. The list shall be immediately published and the representative appointed by the Employer shall within five (5) days after publication of said list eliminate three (3) names from the list. Within two (2) days after such elimination, the representative appointed by the Lodge shall eliminate three (3) names from the list. The remaining individual, plus the individual appointed by the Employer and the individual appointed by the Lodge, shall compose the Dispute Resolution Board.

4. The member of the Dispute Resolution Board selected, pursuant to subsection 28.3(B)3, above, shall act as Chairman. He or she shall be an impartial, competent and reputable individual and shall be administered and subscribe to the constitutional oath or affirmation of office. The Employer and the Lodge shall each pay half of the fees and expenses of the impartial member.

5. The Chairman shall have the authority to convene and adjourn proceedings, administer oaths, compel testimony and/or documents, and employ such clerical or research assistance as in his or her judgment and discretion are deemed warranted. He or she shall convene proceedings on the issues presented to the Dispute Resolution Board within ten (10) days after his or her appointment and/or selection; and the Board shall make its determination within thirty (30) days after it has convened. The time limits set forth herein may be extended only upon written mutual agreement of both the Board member appointed by the Lodge and the Board member appointed by the Employer.

6. The Employer and the Lodge shall attempt to agree upon a written statement of the issue or issues to be presented to the Board. In lieu of, or in addition to, such mutual statement of issues, each party may also present its own list or statement of issues, provided only that any such issue not mutually agreed upon shall have been an issue previously the subject of negotiations or presentation at negotiations. During the course of proceedings, the Chairman of the Board shall have the authority as necessary to maintain decorum and order and may direct, (absent mutual agreement) the order of procedure; the rules of evidence or procedure in any court shall not apply or be binding. The actual proceedings shall not be open to the public and the parties understand and agree that the provisions of 5 ILCS 120/1 et seq. are not applicable. If, in the opinion of the impartial member of the Board, it would be appropriate in his or her discretion to meet with either the Employer or Lodge for mediation or conciliation functions, the Board may do so, provided only that notice of such meetings shall be communicated to the other party.

7. The compensation, if any, of the representatives appointed by the Lodge shall be paid by the Lodge. The compensation of the representative appointed by the Employer shall be paid by the Employer.

8. The terms decided upon by the Board shall be included in an agreement to be submitted to the City Council for adoption. The terms of this Agreement shall continue to bind both parties hereto during all negotiations and impasse resolution procedures.

9. If the City Council should reject the arbitrated agreement, the parties shall meet again within ten (10) days of the Council's vote to discuss the reasons for the Council's rejection and to determine whether any modifications can be made to deal with the problems; but either party may thereafter terminate this Agreement upon ten (10) days' written notice to the other.

10. There shall be no implementation of any provisions of a successor agreement without Council ratification and adoption in ordinance form of the agreement; except, however, that the terms of this Agreement shall remain in full force and effective until a successor agreement is adopted in ordinance form or this Agreement is terminated pursuant to subparagraph 28.3(B)9.

11. As permitted by 5 ILCS 315/14(p), the impasse resolution procedure set forth herein above shall govern in lieu of the statutory impasse resolution procedure provided under 5 ILCS 315/14, except that the following portions of said 315/14 shall nevertheless apply; Subsections (h),(i), (k) and (m).

## ARTICLE 29 — BABY FURLOUGH DAYS

### Section 29.1

Officers with the following years of service as determined by the **O**fficer's seniority date shall receive the following number of Baby Furlough Days (BFD) (eight (8) hours for each BFD) for each calendar year:

| Years of Service | Baby Furlough Days |
|---|---|
| 15 or more | 6 |
| 10 but less than 15 | 5 |
| 5 but less than 10 | 4 |
| 1 but less than 5 | 3 |

### Section 29.2

An **O**fficer's BFD shall be granted pursuant to and in accordance with the Department's policy of granting compensatory time off, except if an **O**fficer elects not to use or is denied all his or her BFD in a calendar year, he or she may, at his or her option, carry over for use as days off in the next year four (4) of his or her BFD to the next succeeding calendar year.

### Section 29.3

Any BFD not used in a calendar year shall be paid to the eligible **O**fficer in the following calendar year, except as provided for in Section 29.2 above. Payment shall be based upon the salary schedule in effect at the time of payment. Payment shall be made by April 1 for BFD not used in the preceding calendar year.

## ARTICLE 29A — FURLOUGHS

### Section 29A.1

Furlough shall be granted to **O**fficers for each calendar year of this Agreement.

**Section 29A.2**

Officers with the following years of service shall receive the following number of furlough (vacation) days:

| Years of Service | Furlough Days |
|---|---|
| 1 but less than 5 years | 20 Straight Days |
| 5 but less than 10 years | 24 Straight Days |
| 10 but less than 15 years | 22 Working Days |
| 15 years or more | 25 Working Days |

**Effective January 1, 2016, and thereafter, Officers with the following years of service shall receive the following number of furlough (vacation) days:**

| Years of Service | Furlough Days |
|---|---|
| **1 but less than 4 years** | **20 Straight Days** |
| **4 but less than 9 years** | **24 Straight Days** |
| **9 but less than 14 years** | **22 Working Days** |
| **14 years or more** | **25 Working Days** |

**Section 29A.3**

Furlough shall be selected in accordance with this Agreement and procedure subject to operational needs, and approved individual furlough days may be taken by **O**fficers so requesting at the discretion of the Department.

**Section 29A.4**

Furlough may be extended at the request of an **O**fficer with the approval of the Department by the use of any accumulated compensatory time, baby furlough days, personal days and individual furlough days. A furlough extension is defined as the Sunday through Wednesday prior to the start of a furlough or the Thursday through Saturday at the completion of the furlough.

**ARTICLE 30 — PERSONAL LEAVES OF ABSENCE**

**Section 30.1 — Personal Leave**

Applications for personal leaves of absence shall be governed by the applicable provisions of the City of Chicago Personnel Rules as in effect on December 31, 1983, provided that the Lodge shall be promptly notified of all personal leaves of absence and extensions thereof taken by **O**fficers covered by this Agreement.

**Section 30.2 — Military Leave**

Any **O**fficer who is a member of a reserve force or a national guard of the United States or of the State of Illinois, and who is ordered by appropriate authorities to attend a training program or to perform other duties under the supervision of the United States or the State of Illinois, shall be granted paid leave of absence during the period of such activity, not to exceed fourteen (14) calendar days in any calendar year, in the case of a member of a reserve force, and not to exceed fifteen (15) calendar days in the case of the National Guard. Employees hired after 1 January 1997 shall deposit their military pay with the City Comptroller for all days compensated by the City of Chicago.

Effective January 1, 2005, **O**fficers who are deployed for military service in excess of fifteen (15) calendar days in a combat zone (as designated pursuant to the Executive Orders of the President of the United States) shall not be required to reimburse the Employer the amount of military pay they receive. The Employer will continue to make its pension contributions for such **O**fficers.

**The Employer acknowledges and agrees that in the event local, Illinois or Federal law, as such laws may be amended from time to time, mandates greater benefits than as set forth in this Section, it will apply the provisions of such law(s) to Officers.**

## ARTICLE 31 — STEADY WATCH

### Section 31.1 — Implementation

A.  1. District and units in which assigned **O**fficers have selected a steady watch will continue to select a steady watch each year. These units include the following**:**

District Law Enforcement

Airport Law Enforcement (O'Hare and Midway)

Bomb and Arson Unit

Central Detention

Crime Lab (including Mobile Crime Unit)

Detective Division

Evidence & Recovered Property

Marine Unit

Major Accident Investigation

Mounted Unit

Office of Emergency Communications (COS)

Public Transportation (including Canine)

Traffic Enforcement

2. The Employer will not expand excluded units or assign **O**fficers to excluded units for the purpose of avoiding the provisions of this Article.

B.  **I**t is the intention that the above units will continue on steady watch. In the event that there is a dispute as to whether a newly created unit is susceptible to steady watches, the dispute shall first be subject to procedures set forth at Section 31.7 hereof, then Section 31.8, if available, or the dispute resolution as set forth in Article 28.

### Section 31.2 —Alternate Response Section Bidding

Officers who are detailed to the Alternate Response Section will be allowed to bid by seniority for a steady watch subject to the following provisions:

A.  Fifty percent, up to a maximum of thirty-one (31), of the most senior **O**fficers who are in a convalescent duty status or limited duty status and have been detailed to the Alternate Response Section for a minimum of two (2) years will be allowed to bid for a steady watch.

B.  The Employer will calculate the number of eligible bidders and identify the number of positions on each watch that will be put to bid.

C. This bidding procedure is to be done on an annual basis prior to the Annual Furlough Selection. The Filling of Vacancies provision of Section 31.5 and the Temporary Watch Assignments provision of Section 31.6 do not apply to the Alternate Response Section. Vacancies that occur after the annual bidding process will be filled at the Employer's discretion.

D. Successful bidders may be removed at any time from their bidded watch by the Employer if: 1) it can be demonstrated that the **O**fficer's continued assignment to the watch would interfere with the **O**fficer's effectiveness in that assignment; 2) there are emergencies, for the duration of the emergency; or 3) there is just cause for removal.

## Section 31.3 — Exclusions

The following **O**fficers are not subject to the bid process for steady watch assignments: **O**fficers voluntarily assigned as Tactical Officers, **O**fficers voluntarily assigned to Foot Patrol in the 1st and 18th Districts, the immediate staff of each commanding officer and the District Law Enforcement Community Policing Officers (including Senior Services Officers) are not subject to the bid process for steady watch assignments. The Employer will not expand the excluded assignments or assign **O**fficers to the excluded assignments for the purpose of avoiding the provisions of this Article.

For the purposes of this Section, the number of excluded staff positions is limited to two (2) staff members. For the purposes of this Section, the number of excluded Community Policing Officers is limited to seven (7); five (5) on the second watch and two (2) on the third watch. In the event that the staff members or Community Policing Officers are removed from that assignment, said **O**fficers shall not be involuntarily removed from their assigned watch for the remainder of the calendar year unless they are affected by reverse seniority required movements.

In the event that a tactical **O**fficer is involuntarily removed from the tactical team, said **O**fficer will be given the opportunity to submit a bid for a steady watch assignment. The **O**fficer's bid will be honored and the **O**fficer will be granted a bid position and be added to the watch the **O**fficer would have been eligible to bid for if he or she would have bid during the annual selection process.

## Section 31.4 —Annual Selection Process

**Prior to** the Annual Furlough Selection, steady watch assignments shall be made in the following manner:

The Employer shall determine and post the number of positions to be assigned to each watch. Eighty (80%) percent of the positions on each watch included in this Article shall first be selected by seniority, and such seniority bid assignments shall be made before any discretionary assignments are filled by the Employer. The biddable opening on each watch shall be awarded to the most senior qualified bidder within that district or unit who has the present ability to perform all of the available duties to the reasonable satisfaction of the Employer. Any **O**fficer performing a duty assignment anywhere in the Department shall be presumptively considered able to perform to the satisfaction of the Department. The remaining twenty (20%) percent of those positions shall be filled at the discretion of the Employer.

Within ten (10) days of the date of the annual selection of watch assignments, the Employer shall provide the Lodge with documentation of the number of allocated personnel by watch, a list of successful bidders by watch, and a list of **O**fficers assigned by the Department's discretionary percentage by watch.

The annual furlough selection by seniority **on the watch** shall continue to be made in accordance

with the historic practices and procedures of the Department.

## Section 31.5 — Filling of Vacancies

Except for those exclusions set forth in Section 31.2 and Section 31.3 above, vacancies in steady watch assignments occurring after the Annual Selection Process shall be filled in the manner provided for in this Section. A vacancy exists when an **O**fficer performing the assignment is permanently transferred, permanently reassigned, resigns, retires, dies, is separated, or when the Department increases the number of **O**fficers in a unit on a specific watch.

Vacancies shall be filled as follows: if the vacancy is a bid vacancy, i.e., the previous incumbent held the position by bid, then the vacancy shall be filled by bid. If the previous incumbent had been appointed at the discretion of the Employer, then the vacancy shall be filled at the discretion of the Employer.

If and when the Employer decides to fill a recognized watch vacancy by bid, such vacancy to be bid shall be posted on the seventh calendar day (Wednesday) of the Third, Sixth, and Ninth Police Periods and shall remain posted for seven (7) calendar days from the day of posting. The vacancy shall be filled by the most senior qualified **O**fficer bidding for the vacancy. If no such qualified **O**fficer within the unit bids for such vacancy, the Employer may fill the watch vacancy by reverse seniority. Any **O**fficer performing the duty assignment anywhere in the unit shall be presumptively considered able to perform to the satisfaction of the Employer.

**Officers** who are newly assigned to a unit may be placed on a watch at the Employer's discretion until such time as the **Officer** accepts a management position or is able to bid on a vacancy at the next regularly-scheduled vacancy posting during the Third, Sixth, or Ninth Police Period.

Within ten (10) days of the date of the watch vacancy filling, the Employer shall provide the Lodge with documentation of the number of vacancies filled by watch, the number of additional allocated personnel by watch, a list of successful bidders by watch, and a list of **O**fficers assigned by the Department's discretionary percentage by watch.

## Section 31.6 — Temporary Watch Assignments

For the purpose of filling a temporary vacancy in order to provide relief (i.e., vacation, medical, suspension, detail, etc.) for a police period, the Employer shall first designate the watch(es) to provide the relief and shall seek volunteers to satisfy its needs from the specific watch(es). If there are more volunteers than required, the volunteer with the greatest seniority from the designated watch(es) shall be selected. If there are not sufficient volunteers, the **O**fficer with the lowest seniority from the designated watch(es) shall be selected.

Once watch assignments are made, changes will not be made except for: (1) **O**fficers identified as Personnel Concerns, (2) **O**fficers in a limited or convalescent duty for the duration of that status, (3) **O**fficers on restricted duty, (4) **O**fficers who have been relieved of their police powers, (5) to fill a temporary vacancy not to exceed three periods (for example, furlough, suspension, medical, detail), initially filled by volunteers, then by reverse seniority, or (6) upon mutual agreement of the **O**fficer seeking the change and the Department (provided no such agreement shall involuntarily displace any other **O**fficer's selected watch assignment). These changes in watch assignments shall be made only for the duration of the circumstances giving rise to the change, after which the **O**fficer will return to his or her previous watch assignment and will be made only for operational needs.

When watch assignments are changed in accordance with the provisions of this Section, the provisions of Article 20 shall not apply. Changes in watch assignment not in accordance with the provision of this Section shall require compensation of the **O**fficer in accordance with Article 20 (i.e., time and one-half for all hours worked outside of the **O**fficer's selected watch).

## Section 31.7 — Joint Labor Management Committee

Upon the effective date of this Agreement, there shall be a Joint Watch Selection Committee established to promptly address errors and omissions in the bidding of steady watch assignments. The parties agree that such a Committee is necessary as a means by which complaints and/or grievances can be resolved without the delay inherent in the arbitration process. The Committee will consist of the Commanding Officer of the Management & Labor Affairs Section and the Lodge's Grievance Committee Chairperson, or their designees. The Committee will meet within five (5) working days of a request by either party for the purpose of resolving the dispute. A decision by the Joint Committee will be binding on the Employer and the Lodge. A mediator may be used if either party requests. The cost of the mediator will be split evenly between the parties. In the event the Joint Committee cannot agree on a resolution of the dispute, then either party may invoke the provisions of Section 31.8.

### Section 31.8 — Dispute Resolution

In the event the parties are unable to resolve disputes regarding the application of the terms of this Article, then either party may invoke expedited arbitration in accordance with the following procedure and the arbitration hearing shall commence within thirty (30) days of the demand for expedited arbitration unless the parties otherwise agree:

A. The parties shall mutually select an Arbitrator from among the following 3 names:_____    _____    _____

If the parties cannot mutually agree, the Arbitrator selected shall be the one who will provide the parties with the earliest available hearing date for an expedited arbitration hearing;

B. Recognizing that the parties have agreed to the steady watch concept and the selection process therefore, the jurisdiction of the Arbitrator is for the purpose of addressing problems that may arise which unreasonably interfere with the effective performance of the Department's mission;

C. The Arbitrator shall render his or her decision within 72 hours of the close of the hearing, or such other time upon which the parties mutually agree.

## ARTICLE 32 — COMPLETE AGREEMENT

The parties acknowledge that during the negotiations which preceded this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining. The understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Except as may be stated in this Agreement, each party voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated and signed this Agreement.

## ARTICLE 33 — SAVINGS CLAUSE

If any provisions of this Agreement or any application thereof should be rendered or declared unlawful, invalid or unenforceable by virtue of any judicial action, or by any existing or subsequently enacted Federal or State legislation, or by Executive Order or other competent authority, the remaining provisions of this Agreement shall remain in full force and effect. In such event, upon the request of either party, the parties shall meet promptly and negotiate with

respect to substitute provisions for those provisions rendered or declared unlawful, invalid, or unenforceable.

This Agreement became effective on __November 18__, **2014.**


In witness whereof, the parties hereto affix their signatures this __18__ day of **November, 2014.**

For the City of Chicago, an
Illinois Municipal Corporation

Rahm Emanuel
Mayor

Garry F. McCarthy
Superintendent of Police

For the Fraternal Order of Police,
Chicago Lodge No. 7

Dean C. Angelo, Sr.
President

**APPENDIX A**

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

**2% INCREASE EFFECTIVE JULY 1, 2012**
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

| GRADE | First 12 Months | After 12 Months | After 18 Months | After 30 Months | After 42 Months | After 54 Months | After 10 Years | After 15 Years | After 20 Years | After 25 Years |
|---|---|---|---|---|---|---|---|---|---|---|
| | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
| D-1 Annual | 43,968 | 62,760 | 66,318 | 69,750 | 73,182 | 76,878 | 79,572 | 82,338 | 85,380 | 87,852 |
| D-1 Monthly | 3,664 | 5,230 | 5,526.50 | 5,812.50 | 6,098.50 | 6,406.50 | 6,631 | 6,861.50 | 7,115 | 7,321 |
| D-2 Annual | 62,760 | 66,318 | 69,750 | 73,182 | 76,878 | 80,754 | 83,538 | 86,454 | 89,676 | 92,352 |
| D-2 Monthly | 5,230 | 5,526.50 | 5,812.50 | 6,098.50 | 6,406.50 | 6,729.50 | 6,961.50 | 7,204.50 | 7,473 | 7,696 |
| D-2A Annual | 64,914 | 68,598 | 72,066 | 75,564 | 79,338 | 83,304 | 86,082 | 89,118 | 92,352 | 95,058 |
| D-2A Monthly | 5,409.50 | 5,716.50 | 6,005.50 | 6,297 | 6,611.50 | 6,942 | 7,173.50 | 7,426.50 | 7,696 | 7,921.50 |
| D-3 Annual | 72,486 | 76,080 | 79,956 | 84,018 | 88,140 | 92,514 | 95,580 | 98,580 | 101,754 | 105,036 |
| D-3 Monthly | 6,040.50 | 6,340 | 6,663 | 7,001.50 | 7,345 | 7,709.50 | 7,965 | 8,215 | 8,479.50 | 8,753 |

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

**2% INCREASE EFFECTIVE January 1, 2013**
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

| | First 12 Months | After 12 Months | After 18 Months | After 30 Months | After 42 Months | After 54 Months | After 10 Years | After 15 Years | After 20 Years | After 25 Years |
|---|---|---|---|---|---|---|---|---|---|---|
| GRADE | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
| D-1 Annual | 44,850 | 64,014 | 67,644 | 71,148 | 74,646 | 78,414 | 81,162 | 83,982 | 87,090 | 89,610 |
| D-1 Monthly | 3,737.50 | 5,334.50 | 5,637 | 5,929 | 6,220.50 | 6,534.50 | 6,763.50 | 6,998.50 | 7,257.50 | 7,467.50 |
| D-2 Annual | 64,014 | 67,644 | 71,148 | 74,646 | 78,414 | 82,368 | 85,206 | 88,182 | 91,470 | 94,200 |
| D-2 Monthly | 5,334.50 | 5,637 | 5,929 | 6,220.50 | 6,534.50 | 6,864 | 7,100.50 | 7,348.50 | 7,622.50 | 7,850 |
| D-2A Annual | 66,210 | 69,972 | 73,506 | 77,076 | 80,922 | 84,972 | 87,804 | 90,900 | 94,200 | 96,960 |
| D-2A Monthly | 5,517.50 | 5,831 | 6,125.50 | 6,423 | 6,743.50 | 7,081 | 7,317 | 7,575 | 7,850 | 8,080 |
| D-3 Annual | 73,938 | 77,604 | 81,558 | 85,698 | 89,904 | 94,362 | 97,494 | 100,554 | 103,788 | 107,136 |
| D-3 Monthly | 6,161.50 | 6,467 | 6,796.50 | 7,141.50 | 7,492 | 7,863.50 | 8,124.50 | 8,379.50 | 8,649 | 8,928 |

APPENDIX A *(continued)*

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

**2% INCREASE EFFECTIVE January 1, 2014**
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

| GRADE | First 12 Months Step 1 | After 12 Months Step 2 | After 18 Months Step 3 | After 30 Months Step 4 | After 42 Months Step 5 | After 54 Months Step 6 | After 10 Years Step 7 | After 15 Years Step 8 | After 20 Years Step 9 | After 25 Years Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **D-1 Annual** | 45,750 | 65,292 | 68,994 | 72,570 | 76,140 | 79,980 | 82,788 | 85,662 | 88,830 | 91,404 |
| **D-1 Monthly** | 3,812.50 | 5,441 | 5,749.50 | 6,047.50 | 6,345 | 6,665 | 6,899 | 7,138.50 | 7,402.50 | 7,617 |
| **D-2 Annual** | 65,292 | 68,994 | 72,570 | 76,140 | 79,980 | 84,018 | 86,910 | 89,946 | 93,300 | 96,084 |
| **D-2 Monthly** | 5,441 | 5,749.50 | 6,047.50 | 6,345 | 6,665 | 7,001.50 | 7,242.50 | 7,495.50 | 7,775 | 8,007 |
| **D-2A Annual** | 67,536 | 71,370 | 74,976 | 78,618 | 82,542 | 86,670 | 89,562 | 92,718 | 96,084 | 98,898 |
| **D-2A Monthly** | 5,628 | 5,947.50 | 6,248 | 6,551.50 | 6,878.50 | 7,222.50 | 7,463.50 | 7,726.50 | 8,007 | 8,241.50 |
| **D-3 Annual** | 75,414 | 79,158 | 83,190 | 87,414 | 91,704 | 96,252 | 99,444 | 102,564 | 105,864 | 109,278 |
| **D-3 Monthly** | 6,284.50 | 6,596.50 | 6,932.50 | 7,284.50 | 7,642 | 8,021 | 8,287 | 8,547 | 8,822 | 9,106.50 |

**APPENDIX A** *(continued)*

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

**1% INCREASE EFFECTIVE January 1, 2015**
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

| GRADE | First 12 Months Step 1 | After 12 Months Step 2 | After 18 Months Step 3 | After 30 Months Step 4 | After 42 Months Step 5 | After 54 Months Step 6 | After 10 Years Step 7 | After 15 Years Step 8 | After 20 Years Step 9 | After 25 Years Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| D-1 Annual | 46,206 | 65,946 | 69,684 | 73,296 | 76,902 | 80,778 | 83,616 | 86,520 | 89,718 | 92,316 |
| D-1 Monthly | 3,850.50 | 5,495.50 | 5,807 | 6,108 | 6,408.50 | 6,731.50 | 6,968 | 7,210 | 7,476.50 | 7,693 |
| D-2 Annual | 65,946 | 69,684 | 73,296 | 76,902 | 80,778 | 84,858 | 87,780 | 90,846 | 94,236 | 97,044 |
| D-2 Monthly | 5,495.50 | 5,807 | 6,108 | 6,408.50 | 6,731.50 | 7,071.50 | 7,315 | 7,570.50 | 7,853 | 8,087 |
| D-2A Annual | 68,214 | 72,084 | 75,726 | 79,404 | 83,370 | 87,534 | 90,456 | 93,648 | 97,044 | 99,888 |
| D-2A Monthly | 5,684.50 | 6,007 | 6,310.50 | 6,617 | 6,947.50 | 7,294.50 | 7,538 | 7,804 | 8,087 | 8,324 |
| D-3 Annual | 76,170 | 79,950 | 84,024 | 88,290 | 92,622 | 97,212 | 100,440 | 103,590 | 106,920 | 110,370 |
| D-3 Monthly | 6,347.50 | 6,662.50 | 7,002 | 7,357.50 | 7,718.50 | 8,101 | 8,370 | 8,632.50 | 8,910 | 9,197.50 |

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

### 1% INCREASE EFFECTIVE January 1, 2016
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

| GRADE | First 12 Months Step 1 | After 12 Months Step 2 | After 18 Months Step 3 | After 30 Months Step 4 | After 42 Months Step 5 | After 54 Months Step 6 | After 10 Years Step 7 | After 15 Years Step 8 | After 20 Years Step 9 | After 25 Years Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| D-1 Annual | 46,668 | 66,606 | 70,380 | 74,028 | 77,670 | 81,588 | 84,450 | 87,384 | 90,618 | 93,240 |
| D-1 Monthly | 3,889 | 5,550.50 | 5,865 | 6,169 | 6,472.50 | 6,799 | 7,037.50 | 7,282 | 7,551.50 | 7,770 |
| D-2 Annual | 66,606 | 70,380 | 74,028 | 77,670 | 81,588 | 85,704 | 88,656 | 91,752 | 95,178 | 98,016 |
| D-2 Monthly | 5,550.50 | 5,865 | 6,169 | 6,472.50 | 6,799 | 7,142 | 7,388 | 7,646 | 7,931.50 | 8,168 |
| D-2A Annual | 68,898 | 72,804 | 76,482 | 80,196 | 84,204 | 88,410 | 91,362 | 94,584 | 98,016 | 100,884 |
| D-2A Monthly | 5,741.50 | 6,067 | 6,373.50 | 6,683 | 7,017 | 7,367.50 | 7,613.50 | 7,882 | 8,168 | 8,407 |
| D-3 Annual | 76,932 | 80,748 | 84,864 | 89,172 | 93,546 | 98,184 | 101,442 | 104,628 | 107,988 | 111,474 |
| D-3 Monthly | 6,411 | 6,729 | 7,072 | 7,431 | 7,795.50 | 8,182 | 8,453.50 | 8,719 | 8,999 | 9,289.50 |

**APPENDIX A** *(continued)*

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

**2% INCREASE EFFECTIVE July 1, 2016**
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

| GRADE | First 12 Months | After 12 Months | After 18 Months | After 30 Months | After 42 Months | After 54 Months | After 10 Years | After 15 Years | After 20 Years | After 25 Years |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
| D-1 Annual | 47,604 | 67,938 | 71,790 | 75,510 | 79,224 | 83,220 | 86,142 | 89,130 | 92,430 | 95,106 |
| D-1 Monthly | 3,967 | 5,661.50 | 5,982.50 | 6,292.50 | 6,602 | 6,935 | 7,178.50 | 7,427.50 | 7,702.50 | 7,925.50 |
| D-2 Annual | 67,938 | 71,790 | 75,510 | 79,224 | 83,220 | 87,420 | 90,432 | 93,558 | 97,080 | 99,978 |
| D-2 Monthly | 5,661.50 | 5,982.50 | 6,292.50 | 6,602 | 6,935 | 7,285 | 7,536 | 7,799 | 8,090 | 8,331.50 |
| D-2A Annual | 70,278 | 74,262 | 78,012 | 81,798 | 85,890 | 90,180 | 93,192 | 96,474 | 99,978 | 102,900 |
| D-2A Monthly | 5,856.50 | 6,188.50 | 6,501 | 6,816.50 | 7,157.50 | 7,515 | 7,766 | 8,039.50 | 8,331.50 | 8,575 |
| D-3 Annual | 78,468 | 82,362 | 86,562 | 90,954 | 95,418 | 100,146 | 103,470 | 106,722 | 110,148 | 113,706 |
| D-3 Monthly | 6,539 | 6,863.50 | 7,213.50 | 7,579.50 | 7,951.50 | 8,345.50 | 8,622.50 | 8,893.50 | 9,179 | 9,475.50 |

## SALARY SCHEDULE FOR SWORN POLICE PERSONNEL – 2012-2017

**1% INCREASE EFFECTIVE January 1, 2017**
*(Officers With Seniority Dates Earlier Than January 1, 1975, See Page 63)*

|  | First 12 Months | After 12 Months | After 18 Months | After 30 Months | After 42 Months | After 54 Months | After 10 Years | After 15 Years | After 20 Years | After 25 Years |
|---|---|---|---|---|---|---|---|---|---|---|
| GRADE | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
| D-1 Annual | 48,078 | 68,616 | 72,510 | 76,266 | 80,016 | 84,054 | 87,006 | 90,024 | 93,354 | 96,060 |
| D-1 Monthly | 4,006.50 | 5,718 | 6,042.50 | 6,355.50 | 6,668 | 7,004.50 | 7,250.50 | 7,502 | 7,779.50 | 8,005 |
| D-2 Annual | 68,616 | 72,510 | 76,266 | 80,016 | 84,054 | 88,296 | 91,338 | 94,524 | 98,052 | 100,980 |
| D-2 Monthly | 5,718 | 6,042.50 | 6,355.50 | 6,668 | 7,004.50 | 7,358 | 7,611.50 | 7,877 | 8,171 | 8,415 |
| D-2A Annual | 70,980 | 75,006 | 78,792 | 82,614 | 86,748 | 91,080 | 94,122 | 97,440 | 100,980 | 103,932 |
| D-2A Monthly | 5,915 | 6,250.50 | 6,566 | 6,884.50 | 7,229 | 7,590 | 7,843.50 | 8,120 | 8,415 | 8,661 |
| D-3 Annual | 79,254 | 83,184 | 87,426 | 91,866 | 96,372 | 101,148 | 104,502 | 107,790 | 111,252 | 114,846 |
| D-3 Monthly | 6,604.50 | 6,932 | 7,285.50 | 7,655.50 | 8,031 | 8,429 | 8,708.50 | 8,982.50 | 9,271 | 9,570.50 |

# APPENDIX A

## SALARY SCHEDULE FOR OFFICERS
## ON STEP 11 PRIOR TO JANUARY 1, 2006

Officers on Step 11 prior to January 1, 2006 will remain on "Step 11" until they leave the Department (i.e., retire, quit, die or are discharged). Officers on Step 11 prior to January 1, 2006 shall receive a **two** percent (**2**%) wage increase effective July 1, 20**12**, a **two** percent (**2**%) wage increase effective January 1, 20**13**, a two percent (2%) wage increase effective January 1, 20**14**, a **one** percent (**1**%) wage increase effective January 1, 201**5**, a **one** percent (**1**%) wage increase effective January 1, 201**6**, a **two** percent (**2**%) wage increase effective **July** 1, 201**6, and a one percent (1%) wage increase effective January 1, 2017** (and any base wage increases which may be subsequently negotiated) as follows:

### Schedule For Officers on Step 11 Prior to 1 JAN 2006

|               | Pay Grade  | D-1       | D-2        | D-2A       | D-3        |
| ------------- | ---------- | --------- | ---------- | ---------- | ---------- |
| **2% 1 Jul 12** | ANNUAL   | 90,924.00 | 95,580.000 | 98,370.00  | 108,192.00 |
|               | Per Month  | 7,577.00  | 7,965.00   | 8,197.50   | 9,016.00   |
| **2% 1 Jan 13** | ANNUAL   | 92,742.00 | 97,494.00  | 100,338.00 | 110,358.00 |
|               | Per Month  | 7,728.50  | 8,124.50   | 8,361.50   | 9,196.50   |
| **2% 1 Jan 14** | ANNUAL   | 94,596.00 | 99,444.00  | 102,342.00 | 112,566.00 |
|               | Per Month  | 7,883.00  | 8,287.00   | 8,528.50   | 9,380.50   |
| **1% 1 Jan 15** | ANNUAL   | 95,544.00 | 100,440.00 | 103,368.00 | 113,694.00 |
|               | Per Month  | 7,962.00  | 8,370.00   | 8,614.00   | 9,474.50   |
| **1% 1 Jan 16** | ANNUAL   | 96,498.00 | 101,442.00 | 104,400.00 | 114,828.00 |
|               | Per Month  | 8,041.50  | 8,453.50   | 8,700.00   | 9,569.00   |
| **2% 1 Jul 16** | ANNUAL   | 98,430.00 | 103,470.00 | 106,488.00 | 117,126.00 |
|               | Per Month  | 8,202.50  | 8,622.50   | 8,874.00   | 9,760.50   |
| **1% 1 Jan 17** | ANNUAL   | 99,414.00 | 104,502.00 | 107,550.00 | 118,296.00 |
|               | Per Month  | 8,284.50  | 8,708.50   | 8,962.50   | 9,858.00   |

No additional officers will enter onto Step 11 after December 31, 2005. Officers who are not on Step 11 as of January 1, 2006 will achieve their maximum salary rate at twenty-five (25) years of service - on Step 10.

# APPENDIX B

Timekeeper

Citation Clerk

Clerk (Office Clerical — performing such duties as secretarial, filing, preparing routine periodic reports, etc.)

Review Officer

Crossing Guard Supervisor

Radio Equipment Officer

Assembly Room Officer

Summary Case Management Officer — Traffic Division

Remote Terminal Officer

Motor Maintenance Supervisor

Lockup Keeper

Activity Officer

Motor Maintenance-Service Writers

Communications and Operations Section (including dispatchers and call-back personnel)

Auto Pound Supervisor

Police Officers working in the Crime Lab (excluding Mobile Unit)

Extradition Warrant Officers

Evidence and Recovered Property Officers

Abandoned Vehicle Officer

Police Officers working in Youth Division Administration — Missing Persons Section — performing Inquiry Aide/Clerical duty

## APPENDIX C

## AUXILIARY POLICE AIDES

The following are duties which may be performed by Auxiliary Police Aides:

A.  Prepare case reports of non-criminal incidents as directed by a sworn **O**fficer.

B**.**  Answer telephone inquiries and make appropriate referrals.

C.  Provide information to members of the public.

D**.**  Process Department reports and forms as directed by management.

E.  Aid in traffic direction and control.

F.  Run errands, and/or act as messengers.

G.  Assist in:

   1.  crowd control at parades, athletic events and other public gatherings where potential for violence is minimal.

   2.  times of disaster, disorder or emergency as directed by the Superintendent of Police.

   3.  the operation of the Youth Fingerprint, Law Enforcement Explorer and Junior Police programs, under the direction of program personnel.

H. Assist district neighborhood relations program personnel.

I.  Provide clerical assistance to court sergeants.

J.  Perform other administrative duties as determined by the unit commanding officer.

## APPENDIX D
## DENTAL PLAN

The Employer shall make dental coverage available to **O**fficers covered under this Agreement and their eligible dependents. The cost of this coverage will be borne by the Employer, subject to applicable **O**fficer co-insurance, deductibles, and co-payments. Officers will have the opportunity to choose between the Dental PPO Plan and the Dental HMO Plan. Under the Dental PPO Plan participants can use the dentist of their choice for services, but if they choose a dentist in the PPO network the benefit will be higher. If they choose an out-of-network dentist, the benefit will be lower. The Dental HMO Plan requires the member to select a participating network dentist. All family members must use the same Dental HMO dentist for their Dental services. Orthodontia is only available in the Dental HMO Plan. Lists of Dental PPO and Dental HMO dentists are available at the Benefits Management Office (312-747-8660).

## APPENDIX E

## NETWORK CHANGES

No change, modification or alteration in the composition of the hospital network in effect at the time this Agreement is executed (a list of which is attached) shall be made except in compliance with the following:

1. Lodge 7 FOP shall be notified in writing of the intent to change at least ninety (90) days prior to the proposed change where circumstances are within the City's control. In all other cases, the City will provide the maximum notice as is practicable under the circumstances.

2. The notice referred to shall, at the time the notice is given, provide sufficient information to explain the contemplated action and shall include, at a minimum, but shall not be limited to:

   a. The affected institutions.

   b. The precise reason(s) the action is being contemplated.

   c. The numbers of covered participants (employee and/or dependents) receiving in-patient service from such affected facility at the time the notice is given.

   d. The number of covered participants (employees and/or dependents) receiving in-patient service from such affected facility during the preceding twelve (12) months.

3. The City shall meet within seven (7) calendar days of a request from the Lodge to discuss the proposed change, shall provide all additional relevant information which is reasonably available, and shall be responsible for such notices to participants as may be reasonably demanded by the Lodge. In the event the parties are unable to resolve a dispute within seven (7) calendar days of the first meeting or such other time as may be mutually agreed upon, the dispute shall be submitted to arbitration pursuant to Section 9.5, Step 3 within ten (10) days, and both parties shall cooperate to expedite the proceedings.

No change, modification or alteration covered by this Appendix shall be made or permitted for arbitrary or discriminatory reasons; nor shall any change, modification or alteration result in the unavailability of quality health care services in a specific geographic area.

## APPENDIX F

### IN-NETWORK/OUT-OF-NETWORK CARE

In-network co-insurance benefits shall be paid to eligible participants for the following out-of-network care or services:

A.  Emergencies defined as the sudden and unexpected onset of a medical condition with such severe symptoms that the absence of immediate medical attention could result in serious and permanent medical consequences.

B.  Care ordered by a physician which, after review by the Utilization Review vendor, is:

1.  medically necessary; and

2.  only available at a non-network hospital, or the proposed treatment is performed so infrequently in-network that direction to non-network hospital is medically appropriate; or

3.  available at a network hospital to which the patient cannot be safely transported (only until such time as the patient can be safely transferred to the network facility, arrangements for which should be initiated once the treatment plan has begun), provided the cost of the transfer shall be paid by the plan; or

4.  care rendered beyond a 50-mile radius (from any network hospital) where participant is domiciled or stationed.

This information is also contained in the Employee Benefit Handbook.

# APPENDIX G

## HEALTH CARE CONTRIBUTIONS
## FOR ACTIVE OFFICERS

Effective July 1, 2006, active **O**fficers covered by this Agreement will contribute the following percentages of their base salary from the appropriate Salary Schedule in Appendix A towards the cost of their health care:

Single Coverage:    1.2921%

Employee +1:    1.9854%

Family Coverage:    2.4765%

For example, contributions at selected salary levels per pay period will be as follows:

| ANNUAL SALARY | SINGLE 1.2921% | EMP + 1 1.9854% | FAMILY 2.4765% |
|---|---|---|---|
| $15,000 | $8.08 | $12.41 | $15.48 |
| $20,000 | $10.77 | $16.55 | $20.64 |
| $30,000 | $16.15 | $24.82 | $30.96 |
| $40,000 | $21.54 | $33.09 | $41.28 |
| $50,000 | $26.92 | $41.36 | $51.59 |
| $60,000 | $32.30 | $49.64 | $61.91 |
| $70,000 | $37.69 | $57.91 | $72.23 |
| $80,000 | $43.07 | $66.18 | $82.55 |
| $90,000 + | $48.45 | $74.45 | $92.87 |

# APPENDIX H

## PRESCRIPTION DRUG COSTS

The following are the co-payments and effective dates for the lesser of a 30-day supply or 100 units of the following prescription drugs:

| TYPE | Effective July 1, 2006 |
|------|------------------------|
| Generic Tier 1 | $10.00 |
| Brand Formulary Tier 2 | $30.00 |
| Brand Non-Formulary Tier 3_ | $45.00 |
| Brand with Generic Equivalent | Generic Co-Payment Plus Cost Difference Between Brand and Generic |

## MAIL ORDER DRUGS

Effective July 1, 2006, co-payments for prescriptions obtained through the mail order plan for all health care plans are as follows (per prescription; 90 day supply):

(1) Generic Tier 1: $20.00

(2) Brand Formulary Tier 2: $60.00

(3) Brand Non-Formulary Tier 3: Not available

(4) Brand with Generic Equivalent: Generic Co-Payment Plus Cost Difference Between Brand and Generic

# APPENDIX I

## CHEMICAL DEPENDENCY AND MENTAL HEALTH
## CO-INSURANCE AND LIMITS

Courses of treatment for inpatient chemical dependency and mental health shall include the continuum of care used to treat a particular diagnosis. A new course of treatment will be considered when there is a 30-day or longer period of time with no treatment or clinical supervision provided.

PPO In-Patient Care

| Co-Insurance: | City | Employee |
|---|---|---|
| In-Network | 90% | 10% |
| Out of Network | 60% | 40% |

PPO Outpatient Care:

   80% of $100 Max Covered Expenses per Session;

   Limit of Seven Sessions Covered if Treatment Is Not Certified

   Maximum Covered Expenses per Year: $5,000

HMO Co-Payments for Mental Health or Substance Abuse Care:

| Effective January 1, 2006: | $15.00 Co-Payment |
|---|---|
| Effective January 1, 2007: | $20.00 Co-Payment |

HMO Service Limitations:

| In-Patient Care: | Max of 30 Days per Year |
|---|---|
| Out-Patient Care: | Max of 30 Visits per Year |

It is understood that **all** in-network treatment**s are** subject to the **in-network** out-of-pocket maximum. **All out-of-network treatments are subject to the out-of-network out-of-pocket maximum, pursuant to the existing methodology for charging expenditures to the out-of-pocket maximum for out-of-network treatment.** All CD/MH treatment including out-patient may be subject to Utilization Review.

All chemical dependency and mental health treatment is subject to review by the utilization review program. Additionally, to be considered under the chemical dependency/mental health benefit structure, a claim for benefits must include a primary DSM-III-R (Diagnostic and Statistical Manual of Mental Disorders—Third Edition—Revised) diagnosis (or diagnosis under a subsequent revision).

# APPENDIX J

## BEHAVIORAL INTERVENTION SYSTEM — PERSONNEL CONCERNS PROGRAM

I. Hearings will be allowed for both the Behavioral Intervention System (BIS) and the Personnel Concerns (PC) Program.

    A. The hearing is voluntary and must be requested by the affected Department member.

        1. In the instance of the Behavioral Intervention System, a hearing must be requested within seven (7) working days of being presented with the Individualized Performance Plan (IPP) and the Behavioral Intervention System Counseling Record. The request for a hearing must be in writing to the Director of the Personnel Division.

        2. In the instance of the Personnel Concerns Program, a hearing must be requested within seven (7) working days of having attended a Personnel Concerns Conference. The request for a hearing must be in writing to the Director of the Personnel Division.

        NOTE: Department members upgraded from the Behavioral Intervention System to the Personnel Concerns Program are not entitled to a hearing.

    B. The Department will set the hearing date and notify the affected Department member of the date.

    C. The hearing time will be as close as possible to the **O**fficer's regular duty hours (i.e., morning for 1st watch **O**fficers, afternoon for 3rd watch **O**fficers) and will not be on the **O**fficer's furlough, Regular Day Off, or previously planned day off (i.e. Baby Furlough Day, Personal Day, etc.) unless the **O**fficer agrees to such. Overtime will not be granted for the hearing.

II. Hearing Procedures.

    A. The Department will explain its position for enrollment of the member in the Behavioral Intervention System or Personnel Concerns Program.

    B. The **O**fficer, or his or her representative, will present the **O**fficer's position.

    C. The Department representative may ask the **O**fficer questions.

    D. The **O**fficer's representative may question the **O**fficer.

    E. The Department representative will, within five (5) working days, notify the **O**fficer of his or her decision and that decision is final.

III. Placement Duration (Behavioral Intervention System/Personnel Concerns Program).

Placement in either program is for one (1) year.

NOTE: Placement in either program may be extended past the initial year or, in the instance of the Behavioral Intervention System, be upgraded to the Personnel Concerns Program. Additionally, a member may be removed from either program prior to a year being completed.

Any member who is upgraded from the Behavioral Intervention System to the Personnel Concerns Program will be informed at the Personnel Concerns Conference that he or she may forward a To/From subject report to the Commander of the Personnel Division outlining the reasons the member feels this upgrade should not take place. In addition, any **O**fficer who extends past one (1) year in the Behavioral Intervention System or the Personnel Concerns Program may submit a To/From outlining the reasons he or she believes that they should not be retained in the program.

## APPENDIX K

## HIGH RISK PREGNANCY
## SCREENING PROGRAM

In order to reduce the risk of a premature birth and the attendant health risks to mother and child and to avoid the costs associated with same, the City offers a high risk pregnancy screening program. The program is part of the medical advisor program.

Under the program, a pregnant employee, spouse or dependent is encouraged to notify the medical advisor during the first trimester of pregnancy. During the telephone interview, the nurse reviewers will collect information on the health status of the prospective mother, her medical history, and conduct a health risk assessment to determine if she meets criteria for a high risk pregnancy.

If the prospective mother does not meet criteria, the medical advisor would offer educational materials on pregnancy and advise her that they will be following up with a call in her second trimester of pregnancy. Further, they will advise her that they are available if she has any questions about her pregnancy. Subsequent follow up will depend on the course of the pregnancy. As delivery approaches, they will advise her about expected lengths of stay postpartum.

If the prospective mother meets criteria for a high risk pregnancy, the medical advisor will contact her physician to discuss the risk factors and identify what steps, if any, are appropriate to reduce the risk of early delivery. They will follow the case as appropriate. If home health or other services available under the plan are necessary, they will approve the care plan and negotiate discounts for approved services. They will be available as a resource to both the prospective mother and her physician.

# APPENDIX L

## AFFIDAVITS IN DISCIPLINARY INVESTIGATIONS

1. No affidavit will be required in support of anonymous complaints of criminal conduct. IPRA and IAD shall continue the current and past practice with respect to classifying allegations as either criminal or excessive force. Allegations of excessive force shall not be classified as criminal for purposes of avoiding the affidavit requirement.

2. Anonymous complaints of Medical Roll Abuse and/or Residency violations will not be made the subject of a Complaint Register (CR) investigation until verified, consistent with the current procedure. If the anonymous complaint has been verified, no affidavit will be required.

3. Where a supervisor receives an allegation of misconduct from a citizen, the supervisor will not be required to sign an affidavit.

4. Where one Department member makes an allegation of misconduct against another Department member, neither Department member will be required to sign an affidavit because both Department members are subject to discipline for making a false report under the Rule 14 of the Department's Rules and Regulations.

5. A complaint which is supported by an affidavit will not require additional affidavits in support of additional allegations within the same complaint.

6. In all other cases, IPRA and IAD will make a good faith effort to obtain an appropriate affidavit from the complainant within a reasonable time. An "appropriate affidavit" in the case of a citizen complainant is one where the complainant affirms under oath that the allegation(s) and statement(s) made by the complainant are true.

7. When an appropriate affidavit cannot be obtained from a citizen complainant, the head of either IPRA or IAD may sign an appropriate affidavit according to the following procedure. An "appropriate affidavit" in the case of the head of either IPRA or IAD is an affidavit wherein the agency head states he or she has reviewed objective verifiable evidence of the type listed below, the affidavit will specify what evidence has been reviewed and in reliance upon that evidence, the agency head affirms that it is necessary and appropriate for the investigation to continue.

8. The types of evidence the agency head must review and may rely upon will be dependent on the type of case, but may include arrest and case reports, medical records, statements of witnesses and complainants, video or audio tapes, and photographs. This list is illustrative only and is not to be considered exclusive or exhaustive.

9. In the case of an investigation of the type normally conducted by IPRA, the head of IAD will execute the affidavit described above, if the head of IAD believes execution of the required affidavit is appropriate under the facts of the case based upon the evidence received at that time. In the case of an investigation of the type normally conducted by IAD, the head of IPRA will execute the affidavit described above if the head of IPRA believes the

required affidavit is appropriate under the facts of the case based upon the evidence received at that time.

10. No **O**fficer will be required to answer any allegation of misconduct unless it is supported by an appropriate affidavit, except as specified in paragraphs one through five above. In the event that no affidavit is received within a reasonable time, the investigation will be terminated and no record of the complaint or investigation will appear on the **O**fficer's Disciplinary History.

11. Upon the receipt of a complaint which requires an affidavit, IPRA or IAD may conduct a preliminary investigation into those allegations but no Complaint Register (CR) number will be issued unless and until the required affidavit is obtained.

# APPENDIX M

## EXPEDITED ARBITRATION RULES

**The following provisions shall be applicable to those arbitrations where the parties have agreed to expedited arbitration pursuant to Section 9.3.B. Nothing herein prevents the parties from adding to, deleting or modifying these provisions by mutual agreement.**

A. Arbitrators will receive all grievance documents at least one week prior to the hearing, at the discretion of the Arbitrator.

B. Arbitrators will be permitted to issue subpoenas in accordance with applicable law. Subpoenas shall not be used for purposes of delay.

C. The expenses of witnesses for either side shall be paid by the party producing such witnesses.

D. Hearings will be scheduled alternately at City and Lodge locations.

E. **Except where mutually agreed otherwise by the parties**, each party will represent itself at the hearing, and may designate any representative who is not an attorney.

F. The hearings shall be informal. The Arbitrator shall assist the parties in ensuring that there is a complete record.

G. The Arbitrator may require witnesses to testify under oath.

H. There shall be no stenographic record of the proceedings.

I. The rules of evidence normally followed in arbitration proceedings shall apply. The Arbitrator shall be the sole judge of the relevance and materiality of the evidence offered.

J. The parties will not file post-hearing briefs. The parties may argue orally on the record and may present relevant authorities to the Arbitrator at the hearing, except that any decisions rendered in the expedited proceedings under these rules may not be cited to the Arbitrator.

K. The Arbitrator will issue a short, written decision no later than sixty (60) days after the completion of the last day of any scheduled block of hearings. His or her decision shall be based upon the record developed by the parties before and at the hearing, and shall include a brief written explanation of the basis for his or her conclusion and shall include reference to the evidence considered and the role that evidence played in reaching his or her decision.

L. **If the parties mutually agree, the Arbitrator presiding over the expedited arbitration held pursuant to this Appendix M shall be selected from the panel provided for in Appendix Q, applicable to arbitration of suspension grievances pursuant to Section 9.6.B. In the absence of mutual agreement to utilize the panel, the parties shall select the Arbitrator pursuant to the process set forth in Section 9.3.A.**

**PROCEDURES FOR INJURY ON DUTY AND RECURRENCE CLAIMS**

An **O**fficer who has been certified as injured on duty shall be provided a **list** of available physicians for treatment. **The list** of available physicians **shall indicate the physicians' medical specialties and the** physicians **shall be** members in good standing of a network of worker' compensation physicians qualified to render appropriate medical care for the injury claimed. The **O**fficer will select a physician from the **list** provided by the Employer. The Medical Services Section will refer the **O**fficer to the physician selected by the **O**fficer.

**An Officer claiming a recurrence of an injury on duty will have his or her claim evaluated by a physician from the Medical Services Section. A claim of a recurrence of an injury on duty includes a claim by an Officer that an injury, illness or condition is related to an injury on duty.**

**If the Medical Services Section physician finds the injury, illness or condition complained of is not a recurrence of or related to an injury on duty, the Medical Services Section will provide the Officer with the list of physicians described above. The Officer will select a physician from the list provided by the Medical Services Section and the Medical Services Section will refer the Officer to the physician selected by the Officer (Referral Physician).**

**The parties may accept the Referral Physician's finding, which shall be final and binding on both the Officer and the Employer, or either party may seek an Independent Medical Examination (IME). The physician conducting the IME (IME Referral Physician) shall be certified in the appropriate medical specialty(ies) and shall be selected by the Officer from a list of physicians provided by the Employer, which shall indicate the physicians' certified medical specialty(ies), who are members in good standing of a network of physicians qualified to render IMEs. The Medical Services Section will refer the Officer to the IME Referral Physician selected by the Officer for an examination. The IME Referral Physician shall consider all documents and medical records considered by the Referral Physician as well as the Referral Physician's finding. The IME Referral Physician's finding shall specify the reasons for the finding and shall be supported by the evidence in the documents and medical records. The finding of the IME Referral Physician shall be final and binding on both the Officer and the Employer.**

**The following shall apply if the Medical Services Section finds that the injury, illness or condition complained of is not a recurrence of or related to an injury on duty and it is later determined, pursuant to the process described above, that the injury, illness or condition complained of is a recurrence of or related to an injury on duty. Under these circumstances, the twelve (12) month period of time for which an Officer receives full pay and benefits as set forth in Section 18.1 shall be extended and the Officer shall receive, in addition to the twelve (12) month period of time set forth in Section 18.1, full pay and benefits from the date the Medical Services Section initially found that the injury, illness or condition complained of was not a recurrence of or related to an injury on duty through the date it is later**

**certified by the Medical Services Section that the injury, illness or condition complained of is a recurrence of or related to an injury on duty.**

# APPENDIX O

## SUBROGATION LANGUAGE FOR CITY OF CHICAGO

In the event the Plan provides benefits for injury, illness, medical care or other loss (the "Injury") to any person, the Plan is subrogated to all present and future rights of recovery that person, his or her parents, heirs, guardians, executors, or other representatives (individually and collectively called the "Participant") may have arising out of the Injury. The Plan's subrogation rights include, without limitation, all rights of recovery a Participant has: 1) against any person, insurance company or other entity that is in any way responsible for providing or does provide damages, compensation, indemnification or benefits for the Injury; 2) under any law or policy of insurance or accident benefit plan providing No Fault, Personal Injury Protection or financial responsibility insurance; 3) under uninsured or underinsured motorist insurance; 4) under motor vehicle medical reimbursement insurance; and, 5) under specific risk or group accident and health coverage or insurance, including, without limitation, premises or homeowners medical reimbursement, athletic team, school or workers compensation coverages or insurance.

Upon notice of an Injury claim, the Plan may assert a subrogation lien to the extent it has provided, or may be required to provide, Injury-related benefits. Notice of either the Plan's right of subrogation or the Plan's subrogation lien is sufficient to establish the Plan's rights of subrogation and entitlement to reimbursement from insurers, third parties, or other persons or entities against whom a Participant may have an Injury-related right of recovery. The Plan shall be entitled to intervene in or institute legal action when necessary to protect its subrogation or reimbursement rights.

The Participant and anyone acting on his or her behalf shall promptly provide the Plan or its authorized agents with information it deems appropriate to protect its right of subrogation and shall do nothing to prejudice that right and shall cooperate fully with the Plan in the enforcement of its subrogation rights. Reasonable attorney's fees and costs of Participant's attorney shall be paid first from any recovery by or on behalf of a Participant, and the amount of the Plan's subrogation claim shall be paid next from such recovery. Neither a Participant nor his or her attorney or other representative is authorized to accept subrogation or other Injury-related reimbursement payments on behalf of the Plan, to negotiate or compromise the Plan's subrogation claim, or to release any right of recovery prior to the payment of the Plan's subrogation claim.

The Participant and all other parties to a recovery are required to contact the Plan to determine, and arrange to pay the Plan's subrogation claim at or prior to the time an Injury-related payment or settlement is made to or for the benefit of the Participant. If the Participant obtains a payment or settlement from a party without the Plan's knowledge and agreement, the Plan shall be entitled to immediate reimbursement of its total subrogation claim from the Participant or any party providing any Injury-related payment. In the alternative, the Plan, in its sole discretion, may deny payment of benefits to or on behalf of the Participant for any otherwise covered claim incurred by the Participant until the amount of the unpaid coverage is equal to and offset by the unrecovered amount of the Plan's subrogation claim.

The Plan Administrator or its authorized agents are vested with full and final discretionary authority to construe subrogation and other Plan terms and to reduce or compromise the amount of the Plan's recoverable interest where, in the sole discretion of the Plan Administrator or its authorized agents, circumstances warrant such action. The Plan shall not be responsible for any litigation-related expenses or attorney fees incurred by or on behalf of a Participant in connection with an Injury claim unless the Plan shall have specifically agreed in writing to pay such expenses or fees.

The payment of benefits to or on behalf of the Participant is contingent on both the Participant's full compliance with the Plan's provisions, including the subrogation provision, and, when the Plan deems appropriate, the Participant's signing of a reimbursement agreement. However, the Participant's failure to sign this reimbursement agreement will not affect the Plan's subrogation rights or its right to assert a lien against any source of possible recovery and to collect the amount of its subrogation claim.

## APPENDIX P

### BENEFITS DURING PROBATIONARY PERIOD

In connection with the extension of the probationary period from a twelve (12) month period to an eighteen (18) month period, the following rights, privileges and benefits shall apply upon the completion of the first twelve (12) months of the probationary period:

| | |
|---|---|
| Article 3 - | Lodge Security |
| Section 7.1 - | Administration of Summary Punishment |
| Article 8 - | Employee Security |
| Article 10 - | Non-Discrimination |
| Article 11 - | Holidays |
| Article 12 - | Promotions |
| Article 18 - | Disability Income |
| Article 19 - | Bereavement Leave |
| Article 20.1 - | Work Day and Work Week |
| Article 20.2 - | Compensation for Overtime |
| Article 20.3 - | Sixth and Seventh Day Work |
| Article 20.4 - | Call-Back |
| Article 20.5 - | Court Time |
| Article 20.8 - | Stand-By |
| Article 20.11 - | Accumulation of Compensatory Time |
| Article 20.12 - | Back to Back Shifts on Change Day |
| Article 21.3 - | Uniform Allowance |
| Article 22 - | Indemnification |
| Article 24 - | Educational Reimbursement |
| Article 25 - | Life and Health Insurance Provisions |
| Article 26 - | Wages |
| Article 27 - | Residency |
| Article 29 - | Baby Furlough Days |
| Article 29.A. - | Furloughs |
| Article 30 - | Personal Leaves of Absence |
| Appendix A - | Salary Schedule for Sworn Police Personnel |
| Appendix D - | Dental Plan |
| Appendix E - | Network Changes |
| Appendix F - | In-Network/Out-of-Network Care |
| Appendix G - | Health Care Contributions for Active **Officers** |

Appendix H - Prescription Drug Costs

Appendix I - Chemical Dependency and Mental Health Co-Insurance &

Appendix K - Limits High Risk Pregnancy Screening Program Procedures

Appendix N - for Injury on Duty and Recurrence Claims Subrogation

Appendix O - Language for City of Chicago

LOU Regarding Retroactivity of Wage Increases to Retirees

LOU Regarding One-Half Hour Lunch Period

LOU Regarding Article 22 Indemnification

MOU Regarding Health Care Plan

LOU Regarding Health Care Plan/Election by Married Employees

Any dispute or difference between the parties concerning the interpretation and/ or application of any of the above provisions shall be subject to the Grievance Procedure of Article 9.

The parties further agree that an **O**fficer who successfully completes his or her probationary period after having been placed on I.O.D. shall be entitled to the benefits under the contract on the same basis as police **O**fficers who were in that **O**fficer's class who did not have his or her probationary period extended.

Finally, the parties agree that in the event a probationary police officer during his or her final six (6) months of the probation period and a non-probationary police **O**fficer are involved together in a situation which gives rise to the non-probationary police **O**fficer and the probationary police officer each receiving discipline of a five (5) day suspension or less and the discipline for the non-probationary police **O**fficer is subsequently rescinded or reduced, any discipline imposed on the probationary police officer may be reviewed in accordance with the collective bargaining agreement and the City will not assert timeliness provided the **O**fficer has completed successfully his or her probationary period.

## APPENDIX Q

## GROUND RULES FOR ARBITRATION OF SUSPENSION GRIEVANCES PURSUANT TO SECTION 9.6.B AND 9.6.C

**The following procedures shall apply to arbitrations of grievances challenging suspensions of eleven (11) to three hundred sixty-five (365) days.**

**A.      The Lodge and the Employer have agreed to a panel of five (5) Arbitrators who shall comprise the exclusive list of Arbitrators to preside over the suspension grievances. The five (5) Arbitrators are:     . Each December the Lodge and the City shall each be permitted to strike one (1) Arbitrator from the panel for any reason. In the event an Arbitrator is removed from the panel, the parties shall attempt to agree upon a replacement Arbitrator. If the parties are unable to agree upon a replacement, they shall request a list of seven (7) Arbitrators from the American Arbitration Association, each of whom must be a member of the National Academy of Arbitrators. Within ten (10) days after receipt of the list, the parties shall select an Arbitrator. Both the Employer and the Lodge shall alternately strike names from the list. The remaining person shall be the added to the panel. In the event the Lodge and the City each strike an Arbitrator from the panel as part of the December process, and if the parties are unable to agree upon replacement Arbitrators, the parties shall request two lists from the American Arbitration Association to be used to select the two replacement Arbitrators.**

**B.      Within ten (10) days of the Lodge electing to forward the suspension grievance to arbitration, the parties shall meet and select an Arbitrator from the panel. The parties shall inform the Arbitrator of the Arbitrator's appointment and request a hearing date within sixty (60) days. If the Arbitrator is unable to provide a hearing date within sixty (60) days from the date of being contacted, the parties shall select another Arbitrator from the panel who is able to provide a hearing date within sixty (60) days. Upon appointment of the Arbitrator, but prior to the date on which a cancellation fee would be incurred, and unless they have already done so, the parties shall schedule a date to conduct a settlement conference to attempt to resolve the grievance. More than one suspension grievance may be discussed at the settlement conference. If the parties are unable to resolve the suspension grievance, they shall proceed with the Arbitration Process outlined in this Memorandum of Understanding.**

**C.      Provided the Lodge accepts a hearing date within sixty (60) days of appointment of the Arbitrator, the Officer will not be required to serve the suspension, nor will the suspension be entered on the Officer's disciplinary record, until the Arbitrator rules on the merits of the grievance. In the event additional day(s) of hearing may be required to resolve the grievance, such additional day(s) shall be scheduled within thirty (30) days of the first day of hearing. If the Lodge is not ready to proceed on a scheduled hearing date,**

the Officer shall be required to serve the suspension prior to the Arbitrator ruling on the merits of the grievance.

D.      The authority and expenses of the Arbitrator shall be governed by the provisions of Sections 9.7 and 9.8 of the Agreement.

E.      The provisions of this Appendix Q supersede Appendix S of the predecessor collective bargaining agreement. However, nothing shall prohibit or require the parties agreeing upon an expedited or "fast track" arbitration procedure for a specific grievance or category of grievances.

# APPENDIX R

## PROCEDURES FOR PSYCHOLOGICAL REVIEW

Any **O**fficer covered by this Agreement who has been involuntarily removed from active duty for psychological reasons has a right to file a grievance pursuant to Section 9.4 of this Agreement. In order to achieve a fair and prompt resolution of such a grievance, the Lodge and the Employer agree that these procedures will be followed.

I.   ISSUES FOR REVIEW

   A.   Is the Grievant presently psychologically fit to perform the duties of a full duty police officer?

   B.   Was the Grievant psychologically capable of performing the duties of a full duty police **O**fficer at the time he or she was removed from duty or at any time thereafter? If so, on what date?

The duties of a full duty police **O**fficer shall include the ability to perform the duties set forth in the following two paragraphs.

Police Officers, as part of and empowered by the community, protect the lives, property, and rights of all people, maintain order, and enforce the law impartially. They work in partnership with the community to respond to crime and neighborhood disorder. They work various shifts and days as assigned, patrolling an assigned beat by vehicle and/or on foot in order to observe conditions, intervene in observed situations that require their attention, and provide a visible presence to prevent crime from occurring. Police Officers respond to a variety of assignments such as crimes in progress, accidents, damage to property, and domestic and other disturbances. They may have to deal with unruly persons and overcome forceful resistance. They protect crime scenes until detectives or superiors arrive; examine the scene for evidence, and question suspects, victims, and witnesses in order to gather information. Under Chicago's Alternative Policing Strategy (CAPS), Police Officers participate in and conduct neighborhood meetings to identify community concerns and work with supervisors and peers to analyze crime patterns and develop responses to criminal activity in an area.

Police Officers respond to a variety of emergencies and must pursue suspects on foot over a variety of terrain and obstacles. Police Officers prepare reports, recording all details of an incident; prepare arrest slips to start the booking procedure; and testify in court. Police Officers must possess the ability to physically control suspects and to safely discharge firearms to protect citizens and/or themselves. They perform a wide variety of other tasks, such as directing pedestrian or vehicular traffic, issuing traffic citations, and assisting sick and injured persons in a variety of ways. They perform all other related duties as required and directed in order to serve citizens by enforcing laws and protecting lives and property.

The Panel must find that an **O**fficer is either fit or unfit for full duty as a Police Officer. When an **O**fficer is found fit for full duty, the Panel may recommend that

the Grievant participate in counseling. However, the Panel's recommendation may not be conditioned upon such participation.

## II. INFORMATION AVAILABLE FOR REVIEW BY THE PANEL

A.    The Grievant must execute a release in proper legal form authorizing the Lodge to have access to the Employer's psychological files. The term "psychological files" does not include the results of any standardized psychological/ psychiatric tests.

B.    No documentation in the possession of any member of the Panel shall be withheld if requested by another Panel member. Each member of the Panel shall provide to the other members of the Panel the results of any standardized psychological/psychiatric tests, conclusions based on said tests, and each Panel member's rationale for finding the Grievant fit or unfit.

C.    The mutually-appointed member of the Panel may interview, examine, and evaluate the Grievant and may request additional data through the representatives of the Lodge and the Employer. Any member of the Panel is authorized to review any and all information or documents contained in Complaint Register files that are open, not-sustained, and/or sustained. However, no member of the Panel shall review any information or documents in Complaint Register files in which the finding was exonerated or unfounded. The restrictions on the retention of Complaint Register files set forth in Section 8.4 of this Agreement shall also apply to the Psychological Review process.

## III. PROCEDURES

A.    All members of the Panel shall meet and discuss the Grievant's fitness and reach a conclusion regarding fitness.

B.    The mutually-appointed member of the Panel shall draft the Panel's decision regarding the Grievant's fitness. The decision must specifically address whether the **O**fficer was fit for some or all of the time the **O**fficer has been removed from duty and the **O**fficer's present fitness. The decision must also address all of the issues submitted for review and state the evidence relied upon as the basis for the decision.

C.    The mutually-appointed member of the Panel shall send the draft of the Panel's decision to the Panel members appointed by the Lodge and the Employer for verification of their representations within fourteen (14) days from the date of the meeting of the Panel. The members of the Panel appointed by the Lodge and the Employer shall have fourteen (14) days from the postmark date of the draft report to verify said representations and to provide suggestions, recommendations, and comments to the mutually-appointed member of the Panel. The mutually-appointed member of the Panel may make any revisions to the decision based upon the comments received from the other members of the Panel. The final decision shall issue no later than fourteen (14) days from the postmark date of the latest response of the other members of the Panel, if any. In all cases, the decision of the Panel shall issue no later than sixty (60) days from the date of the meeting of the Panel. Failure to meet these time

guidelines does not divest the Panel of authority to make fitness for duty decisions, nor expose the Employer to any liability.

D.      Copies of the decision of the Panel shall be provided immediately to the representatives of the Lodge and the Employer.

# APPENDIX S
## GRIEVANCE MEDIATION PROGRAM GROUND RULES

The parties agree to establish a grievance mediation program in accordance with the following ground rules:

1)      Grievance mediation sessions shall be scheduled by the parties by mutual agreement, but not more frequently than once quarterly.  Such mediation sessions shall be presided over by an arbitrator/mediator, to be selected by mutual agreement of the parties from among the following three (3) arbitrators/mediators: Edwin Benn, Peter Meyers and George Roumell.

2)      In order to be eligible for submission to this mediation pilot program, grievances must be of the "contract interpretation" variety (i.e., neither disciplinary nor medical grievances shall be eligible for this process), the Lodge must have invoked arbitration of the grievance, and there are no issues with respect to the procedural arbitrability of the grievance(s).

3)      Each party shall identify up to four (4) grievances for presentation at each session (i.e., a total of eight (8) grievances per session). The parties shall agree upon the agenda of grievances to be submitted at least fourteen (14) days prior to the mediation session, and shall jointly prepare an agreed upon statement of the issue(s) presented in each grievance.

4)      At least ten (10) days before the session, the parties shall confer for the purpose of exchanging the documents upon which each intends to rely at the session, including copies of any correspondence, orders, statements, etc. The parties are expected to resolve any disputes regarding authenticity of any proposed documents or other exhibits prior to the mediation session.

5)      Within three (3) days of the session, each party shall prepare and exchange with the other party a written statement, for each grievance, of no more than one (1) page in length, outlining its position and arguments concerning the grievance. The governing principle in this mediation process, to be adhered to by both parties, is that there be no claims or defenses offered for the first time at the mediation.

6)      A party's failure to comply with any of the timelines set forth in this Appendix shall result in the cancellation of the mediation session and assessment of the Mediator's cancellation fee and expenses against that party. Otherwise, the parties shall split evenly the cost of the Mediator's expenses and fees. Each party shall bear its own fees and expenses related to the mediation.

7)      Within three (3) days of the session, each party shall submit to the Mediator a set of the documents previously provided to the other party. Only under extraordinary circumstances will a party be allowed to introduce a document at the hearing that was not previously identified and submitted. As part of the submission to the Mediator, each party may submit the one (1) page written statement, for each grievance, referenced in paragraph 3 above, outlining its position concerning the grievance.

**8)** At the session, each party may be represented by one (1) attorney and one (1) party representative. The grievant may also be present; if there are multiple grievants, then one grievant representative may be present. Each party shall make a presentation of no more than thirty (30) uninterrupted minutes in length (including rebuttal) with respect to each grievance. There shall be no witnesses; however, if the mediator indicates that hearing from the grievant would be helpful to the mediator, the grievant may make a statement. The thirty (30) allowed minutes shall include the grievant's statement. Each party shall otherwise make its presentation through offer(s) of proof. The rules of evidence shall not apply and there shall be no procedural or substantive legal objections to the parties' presentations or to the evidence submitted at mediation (e.g., objections based on lack of foundation). There shall be no recording of the session. The parties expect that the Mediator will conduct the mediation by initially having both parties in the same room making their initial presentation(s), and will thereafter separate the parties to conduct the mediation, as the Mediator deems appropriate.

**9)** Each party's representative(s) shall come to the session with authority to resolve each grievance scheduled to be heard, and shall have authority to enter into a settlement agreement. Where a settlement agreement is reached, the parties shall reduce to writing the terms of the agreement and execute such agreement prior to the conclusion of the mediation session.

**10)** Any settlement reached at mediation shall be binding with respect to that particular grievance(s) only, and shall have no precedential value with respect to any other grievance, nor may it may be used or referred to in any subsequent proceeding between the parties, unless both parties agree in writing. The mediation session(s) shall be confidential, and nothing said by either party at the session(s) may be used, referred to or relied upon in any subsequent proceeding.

**11)** The Mediator shall not be eligible to serve as an arbitrator with respect to any grievances submitted to the Mediator as part of the mediation pilot program.

**12)** The location of the mediation session shall rotate among the offices of the Lodge, the Management and Labor Affairs Section or another location agreed to by the parties.

**13)** Upon mutual agreement, the parties may strike the name(s) of one or more of the Mediators identified in Paragraph (1) above and, by agreement, substitute a different Mediator to replace the stricken name(s).

**14)** Both parties acknowledge their shared interest in streamlining the grievance/arbitration process and providing for timely and appropriate resolutions of grievances.

# APPENDIX T

## DRUG AND ALCOHOL TESTING

Pursuant to the award issued *In the Matter of the Arbitration Between the City of Chicago and Fraternal Order of Police, Chicago Lodge No. 7* by Arbitrator Edwin H. Benn on April 16, 2010, the Chicago Police Department's drug and alcohol testing program shall be amended as follows:

A. The Department's existing policies and orders regarding random drug testing shall be revised to include the following components:

    1. Testing for the presence of alcohol while on duty.

        a. Officers selected for random drug testing shall also be tested for alcohol.

        b. Upon notification to submit to random testing, Officers shall continue to report to the Random Drug Testing Unit for the collection of urine specimens.

        c. The Department may use urine specimens to test for the presence of both drugs specified in this agreement and alcohol. The Department may also test for alcohol using a breath alcohol test administered by a qualified tester using a certified and calibrated Breathalyzer.

        d. The initial and confirmatory test levels for a positive presence of alcohol shall be a breath alcohol level of .021 or its urine concentration equivalent, unless a different standard is required by paragraph (e) below.

        e. If the test reveals a breath alcohol level of .021 through .039 or their urine concentration equivalents, the Officer shall be relieved from duty without compensation until the next duty day and shall submit to drug and alcohol testing prior to his/her return to duty. If the return-to-duty test reveals an alcohol level of .00, the Officer may return to duty and shall not be subject to discipline based on the initial test result; however, during the six- (6-) month period following the date of the initial test, the Officer will be selected for random drug and alcohol testing from an eligibility pool consisting of similarly situated Officers.

        If the return-to-duty test or any test administered within the six-(6-) month period described above reveals any presence of alcohol, the Officer shall be relieved from duty without compensation until ordered to return to duty, and the Random Drug Testing Unit will refer the matter to the Internal Affairs Division.

        If the test reveals a breath alcohol level equal to or greater than .04 or its urine concentration equivalent, the Officer shall be relieved from duty without compensation until ordered to return to duty, and the Random Drug Testing Unit will refer the matter to the Internal Affairs Division. In the event discipline is recommended, the Internal Affairs Division shall consider whether to agree to hold the discipline in abeyance in exchange for the Officer's agreement to participate in a rehabilitation program, remain drug and alcohol free

for a defined period and comply with other appropriate terms and conditions (i.e., a "last chance" agreement).

An Officer who is relieved from duty without compensation in accordance with this subsection may utilize accrued elective time during the unpaid period of absence.

    f. The above changes shall be implemented effective January 1, 2012, or thereafter.

2. Bidders and/or applicants for assignments in the Narcotics Section, Gang Enforcement Section, Gang Investigation Section and Vice Control Section in the Organized Crime Division and the Intelligence Section in the Counterterrorism and Intelligence Division shall be required to submit to a drug and alcohol test prior to appointment. Thereafter, all Officers assigned to these Units shall be selected for random drug and alcohol testing from an eligibility pool consisting solely of Officers assigned to such Units.

B. The procedures applicable to drug testing conducted by the Department, regardless of whether the basis for the testing is random, for cause or any other basis, shall be amended to include the following:

1. Ecstasy (MDA/MDMA) and steroids shall be added to the panel of substances for which the Department tests, and Methaqualone shall be removed from such panel. The modernized panel shall thus read as follows:

| SUBSTANCE | INITIAL TEST LEVEL (ng/mL) | CONFIRMATORY TEST LEVEL (ng/mL) |
|---|---|---|
| Anabolic Steroids | Any Presence | Any Presence |
| Amphetamines | 1000 | 500 |
| Barbiturates | 300 | 200 |
| Benzodiazepines | 300 | 200 |
| Cocaine Metabolites | 300 | 150 |
| Marijuana Metabolites | 50 | 15 |
| MDA/MDMA | 250 | 200 |
| Methadone | 300 | 200 |
| Opiates | 2000 | 2000 |
| Phencyclidine | 25 | 25 |
| Propoxyphene | 300 | 200 |

2. Initial and confirmatory test levels will be consistent with the federal regulations promulgated by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration ("SAMHSA") for those substances covered by such regulations.

3. During the term of this Agreement, the Department may add or remove additional substances to the panel referred to above when it has reasonable grounds for such addition or removal (such as when new drugs are developed or changes occur in patterns of consumption of dangerous or illegal drugs), provided that it shall provide Lodge 7 with thirty (30) days' advance written notice and, upon request, meet with Lodge 7 to negotiate the addition or removal of a substance to or from the panel. If the parties are unable to agree on the addition or removal of a substance from the panel, the dispute shall be resolved through the binding grievance arbitration procedure set forth in Article 9. The sole issue before the Arbitrator shall be whether the Department has a reasonable basis for adding or removing the substance to or from the panel and for the initial and confirmatory test levels.

4. If a test reveals a positive presence of a substance on the above panel or the abuse of prescription drugs, the Random Drug Testing Unit will continue to refer the matter to the Internal Affairs Division.

C. Effective upon ratification, in any instance where an Officer discharges his/ her weapon, whether on or off duty, the Officer shall submit to drug and alcohol testing at the direction of the Internal Affairs Division or any superior authority. If the Officer has discharged his/her weapon off duty and the test reveals the presence of alcohol, the Department shall not discipline the Officer based solely on the results of the alcohol test when the Officer's actions are consistent with the Department's use of force guidelines.

D. The Department's existing policies and orders regarding drug and alcohol use shall be amended to state that an Officer is prohibited from consuming alcohol within the four-(4-) hour period preceding the start of a previously scheduled shift or after receiving notice to report for duty. Alleged violations of this rule cannot result in discipline unless a test conducted pursuant to the testing procedures is positive.

E. The Department will continue to conduct its drug and alcohol testing program in accordance with the regulations promulgated by the Illinois State Police set forth in Title 20, Part 1286, of the Illinois Administrative Code.

## NOTICE TO SUPERVISORS REGARDING PROGRESSIVE
## DISCIPLINE

Supervisors, including Watch Commanders, retain the flexibility, authority and discretion where circumstances warrant to issue reprimands to offending **O**fficers for infractions. Second or even repeated infractions of minor rules may, but do not always, require increased punishment (particularly including loss of time or income) when an oral or written reprimand will suffice to achieve the goal of correcting improper behavior.

There is some belief that a progressive system of discipline requires enhanced penalties no matter how insignificant the infraction. This is not correct.

You are permitted and urged to use your judgment in determining the appropriate level of discipline. Officers in this Department are a valuable resource which should not be wasted or unduly restricted.

## MEMORANDUM OF UNDERSTANDING
## REGARDING MAINTENANCE OF BENEFITS

It is further understood that the below-listed benefits enjoyed by **O**fficers covered by this Agreement will be maintained for the duration of the Agreement and shall not be diminished, modified, or eliminated during the term of the Agreement.

Sickness in family time

Change of uniforms at District

Use of department lockers and mailboxes

Use of gymnasium facilities during off-duty hours

Physical and optical examinations

Health care fringe benefits, including hospitalization insurance

Furloughs and compensatory (baby) furloughs

Marriage leave

Pension benefits as provided by statute

Utilization of compensatory time earned in partial tour or full tour segments consistent with Article 20 and Article 23.5 of Agreement.

One half-hour lunch period taken during the tour of duty

Life insurance rates, including cost of optional insurance

Any obligation of the City of Chicago to indemnify **O**fficers for punitive damages assessed, adjudged, or otherwise levied shall be based upon City Ordinances and/or State Statutes providing for such indemnification.

## MEMORANDUM OF UNDERSTANDING
## REGARDING DISTRICT UNIT BID ASSIGNMENTS

The Lodge and the Employer agree that Lodge members who have successfully bid for the position of district desk or district lockup keeper will continue to function in that position for the duration of this contract unless removed in accordance with the provisions of Section 23.9.

The Lodge and the Employer further agree to open for bid in accordance with the provisions of Section 23.9 the position of District Watch Relief in each of the Patrol Division's 25 Districts. The member bidding for the position of District Watch Relief must be able to perform to the satisfaction of the Employer the functions of a desk **O**fficer, lockup keeper and district review **O**fficer after a period of orientation. Successful district bid members will be utilized in bid assignments before full duty non-bid members. When not required to function as district watch relief; the member will be assigned to district patrol duties.

The Employer shall select the most senior qualified bidder for the position of District Watch Relief. If there are not sufficient bidders to fill a District Watch Relief position declared vacant by the Employer, the Employer shall fill such vacancy within its discretion.

The following are the number of District Desk, District Lockup, and District Watch Relief positions subject to bid under the provisions of Section 23.9:

| Dist | Desk | Lockup | W/Relief | Dist | Desk | Lockup | W/Relief |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 001 | 6 | 0 | 9 | 014 | 6 | 3 | 9 |
| 002 | 6 | 6 | 12 | 015 | 6 | 3 | 9 |
| 003 | 6 | 3 | 9 | 016 | 6 | 3 | 9 |
| 004 | 6 | 3 | 9 | 017 | 6 | 3 | 9 |
| 005 | 6 | 6 | 12 | 018 | 6 | 3 | 9 |
| 006 | 6 | 3 | 9 | 019 | 6 | 6 | 12 |
| 007 | 6 | 3 | 9 | 020 | 6 | 3 | 9 |
| 008 | 6 | 3 | 9 | 021 | 6 | 3 | 9 |
| 009 | 6 | 3 | 9 | 022 | 6 | 3 | 9 |
| 010 | 6 | 3 | 9 | 023 | 6 | 3 | 9 |
| 011 | 6 | 6 | 12 | 024 | 6 | 3 | 9 |
| 012 | 6 | 3 | 9 | 025 | 6 | 6 | 12 |
| 013 | 6 | 3 | 9 | | | | |

## MEMORANDUM OF UNDERSTANDING
## REGARDING BIDDING PROCEDURES

The City of Chicago and the Fraternal Order of Police, Chicago Lodge No. 7, jointly agree that the following procedures and interpretations will apply to processing bids to Fill Recognized Vacancies in accordance with Section 23.8 of the contract:

1. All sworn full duty non-probationary members below the career service rank of sergeant will be allowed to bid for one transfer request. Members who are currently on the medical roll but who are otherwise full duty will be allowed to bid.

2. Bids for vacancies must be submitted in accordance with the instructions contained in the Recognized Vacancy Announcement and must be forwarded to the Management and Labor Affairs Section within 72 hours of the time the announcement is posted. Members may fax a copy of the bid to the Management and Labor Affairs Section to ensure timely receipt; however, two copies of the properly completed bid form must also be forwarded to the Management and Labor Affairs Section. The bid form must contain the signature of the member, and the signature of his or her commanding officer/watch commander specifying the date and time the bid was submitted.

3. A successful bidder may not bid for another recognized vacancy within one police period year unless reassigned by the Employer. For example, a member who submits a successful bid in the 11th period for a 12th period vacancy in 2000 is not eligible to submit another bid to fill a recognized vacancy until the 11th period of 2001 for a 12th period of 2001 vacancy.

4. Probationary members may not submit a bid to fill a recognized vacancy while on probation. A probationary member whose probationary period will expire during the 72-hour period to submit bids, may submit a bid for a recognized vacancy. The member must be off probation at the time of the bid. A member whose probationary period expires after the 72-hour bid period but prior to the beginning of the period when the vacancy will be filled is not eligible to bid.

5. The member is responsible for ensuring that the bid form set has been received by the Management and Labor Affairs Section by the deadline specified in the Recognized Vacancy Announcement. The member will forward the original and white copy to the Management and Labor Affairs Section, the green copy to the Lodge, and will retain the gold copy for their records.

6. Bids which do not contain the required information or are otherwise improperly completed will not be accepted.

## LETTER OF UNDERSTANDING AND AGREEMENT
## REGARDING PHYSICAL FITNESS

The City of Chicago and Fraternal Order of Police Lodge No. 7 jointly recognize that physical fitness of police **O**fficers is of mutual benefit to the officers, the City and the public.

Therefore, the City and the Lodge hereby agree to undertake a joint effort to develop a reasonable physical fitness program applicable to all bargaining unit members.

The City and the Lodge hereby establish a Physical Fitness Committee consisting of 3 members designated by the Lodge and 3 members designated by the Superintendent of Police. The Committee may be assisted by such consultants or other individuals (paid for by the Employer, provided the Employer agrees to their participation) as may be necessary to accomplish its goals.

The Committee's recommendations shall be advisory only. Upon receipt of the Committee's recommendations, the Superintendent may adopt or modify the recommended program. If the Superintendent modifies the program, he/she shall so notify the Committee and the Lodge in writing. Within ten (10) calendar days of such notice, the Lodge may request arbitration of the modifications under Article 9. The issue before the arbitrator shall be whether the modifications proposed by the Superintendent are reasonable.

No **O**fficer shall be discharged, suspended, relieved from duty, demoted, or disciplined in any manner under or relating to any physical fitness program.

# PHYSICAL FITNESS INCENTIVE

In an effort to promote physical fitness among the **O**fficers covered by this Agreement, the Employer and Lodge agree to the following:

Beginning in 2001, every officer covered by this Agreement will have one opportunity annually to schedule an appointment for a physical fitness test. An **O**fficer will have one opportunity to re-schedule the test, but will only be allowed to take the test once each year. The test must take place prior to November 1 of every year.

An **O**fficer will complete a waiver which indicates that he or she is volunteering to take this test and will not hold the Employer liable for any injuries or illness that occurs as a result of his or her participation in the testing process.

- Successful completion of the physical fitness test will result in payment of a physical fitness premium of $350**,** payable December 1 of the year the **O**fficer successfully completes the test.

- It is understood that this is a voluntary program. Officers who participate in the physical fitness test will do so during off-duty hours without compensation.

- Any injury, illness, or death that results from participation in this program will not be considered an Injury on Duty or a death in the performance of duty.

- The performance requirement for each test is based on the State of Illinois P.O.W.E.R. test. Officers must pass every test and meet the minimum standards listed below to qualify for the physical fitness premium:

| | MALE | | | | FEMALE | | | |
|---|---|---|---|---|---|---|---|---|
| **Test** | **23-29** | **30-39** | **40-49** | **50+** | **23-29** | **30-39** | **40-49** | **50+** |
| **Sit & Reach** | 16.0 | 15.0 | 13.8 | 12.8 | 18.8 | 17.8 | 16.8 | 16.3 |
| **1 Minute** | 37 | 34 | 28 | 23 | 31 | 24 | 19 | 13 |

| Maximum Bench Press Ratio | .98 | .87 | .79 | .70 | .58 | .52 | .49 | .43 |
|---|---|---|---|---|---|---|---|---|
| **1.5 Mile Run** | 13.46 | 14.31 | 15.24 | 16.21 | 16.21 | 16.52 | 17.53 | 18.44 |

- The following are not subject to the grievance procedure:

  The test standards.

  The results of the testing.

  The medical status of an **O**fficer who is injured participating in this program.

## MEMORANDUM OF UNDERSTANDING
## RE: HEALTH CARE PLAN – F.O.P., LODGE 7

This memorandum confirms our conversations relating to health care contributions in the situation where a bargaining unit officer has a spouse employed by the City. The City will not require such employees to pay two single contributions.

If an officer is married to another City employee (whether in or out of the F.O.P. bargaining unit), it is understood that the employee whose plan is selected shall be required to pay the appropriate contribution (in the case where the spouse is outside the F.O.P. unit). Furthermore, dependent eligibility will be determined by the plan of the employee making the contributions.

In the event the officer elects to be covered as a dependent on his/her spouse's plan, and the spouse is not an F.O.P. bargaining unit member, the officer's health care benefits will be determined in accordance with the provisions of that plan and not the plan applicable to the F.O.P. or the several memoranda of understanding applicable to the F.O.P. plan.

It is also agreed by the Lodge and the Employer that, in the event that two employees marry in the future, or the spouse of a current employee becomes an employee of the City, the required election will be made within thirty (30) days of the date of marriage. The required election will be made by contacting the City of Chicago Benefits Eligibility Unit to receive the forms necessary to make the election. Further information is set forth in the Employee Benefits Handbook.

Officers who are unavailable for reasons such as leave of absence, medical, furlough, etc., will be allowed to make the election within seven (7) working days of their return to duty.

It is understood that this agreement will be incorporated into the City of Chicago Medical Plan for sworn police employees, as well as the plan available to non-sworn personnel (F.O.P. Revision December, 1989) as revised.

Please acknowledge your agreement in the space provided below.

**AGREED:**

City of Chicago

James C. Franczek, Jr.
Chief Labor Negotiator

**AGREED:**

Fraternal Order of Police, Lodge #7

Thomas J. Pleines
General Counsel

101

FRANCZEK   SULLIVAN p.c.
                    ATTORNEYS AT LAW

JAMES C. FRANCZEK, JR.
    312-786-6110
    jcf@nlfpc.com

300 SOUTH WACKER DRIVE
SUITE 3400
CHICAGO, ILLINOIS 60606
PHONE 312-986-0300
FAX 312-986-9192
http://www.nlfpc.com

November 8, 2000

Thomas J. Pleines, Esq.
General Counsel
F.O.P., Chicago Lodge No. 7
1412 West Washington Boulevard
Chicago, Illinois 60607-1821

     Re:    **Alternative Medical Coverage**

Dear Tom:

This letter sets forth the parties' agreement with respect to the issue of alternate medical coverage in the case of employees who fail to comply with the City's medical plan enrollment requirements.

1.    The City will offer alternate coverage for individuals who (a) are otherwise eligible under the Plan; (b) have been denied coverage under the Plan because they failed to comply with the Plan's enrollment requirements; (c) first became eligible for coverage subsequent to the close of the last most recent open enrollment period; and (d) agrees to pay the required premium.

2.    In addition to the foregoing, persons who are entitled to coverage as the spouse of an eligible employee shall not be eligible for alternate coverage if the spouse is currently covered by other medical insurance coverage. Also, the employee must not be covering another person as spouse at the time the application for coverage is made by the employee.

3.    When an employee who has applied for coverage for an otherwise eligible dependent is denied coverage because of failure to meet enrollment deadlines, the employee shall be notified of the availability of the Alternative Coverage. The employee shall have thirty (30) days to respond to the offer of Alternative coverage. The employee shall elect one of the following:

    a.    Retrospective coverage. Coverage shall be effective as of the date the dependent would have been eligible for coverage had the employee completed the enrollment on a timely basis. If the employee elects retrospective coverage, the employee must pay the required premium

102

from the date of eligibility through the next December 31. Premium payment(s) shall be due for the period of retrospective coverage upon submission of the application. Premiums shall be due thereafter no later than the first day of the month for which the coverage is effective.

b. Prospective coverage only. Coverage shall be effective on the first day of the month following the month in which the required premium is submitted. Premiums are due thereafter no later than the first day of the month for which the coverage is effective.

c. In the event the employee fails to apply for Alternative coverage within the time specified, the employee may next apply for coverage for the dependent during the open enrollment period. No further offer of Alternative Coverage shall be made to the employee with respect to the applicable dependent.

4. The Alternative Coverage shall be provided on the same basis as the coverage of the plan selected by the employee. Coverage shall be made available under the Alternative Plan as of the Effective Date of the Alternative Coverage without regard to pre-existing conditions. The dependent covered under the Alternative Coverage will be included in the membership unit of the employee. Further, covered expenses will be included in any calculation of deductible or out-of-pocket expenses, annual and lifetime benefit maximums in accordance with the applicable plan.

5. The cost of the Alternative Coverage as of the effective date of this amendment shall be $130 per covered person per month. However, no employee shall be required to pay more than $390 per month effective with the effective date of this amendment. The premium for the Alternative Coverage shall be adjusted on each January 1 occurring thereafter by the amount of the change in the Medical Care Component of the Consumer Price Index for Urban wage earners for the most recently reported 12 months.

6. Premiums for the Alternative Coverage shall be made in the form of a check or money order. Cash cannot be accepted, nor can a deduction be made from the paycheck of an employee. In the event an employee submits a check which is returned from the bank because of non-sufficient funds (NSF), the Alternative Coverage shall be terminated as of the last day for which premium payments have been received.

103

**FRANCZEK SULLIVAN** P.C.
ATTORNEYS AT LAW

Thomas J. Pleines, Esq.
November 8, 2000
Page 3

If the foregoing comports with your understandings, please sign in the space indicated below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Thomas J. Pleines, For the F.O.P., Lodge No. 7

JCF:mp
cc: Deputy Superintendent Jeanne Clark
Darka Papushkewych, Esq.
Commander George Rosebrock

104

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

June 15, 2000

WILLIAM J. NOLAN
President

BOB PODGORNY
1st Vice President

JOHN D. CAREY
2nd Vice President

HAROLD R. KUNZ
3rd Vice President

SHEILA C. BURKE
Recording Secretary

AL BARSKI
Treasurer

JOHN T. CAPPARELLI
Financial Secretary

Sergeants-At-Arms
JIM O'LEARY
TERENCE J. O'NEILL
*CHAEL T. SULLIVAN

JOHN M. DINEEN
Immediate Past President

Trustees

DEAN ANGELO
   Chairman
HAROLD BROWN
CARLOS E. CORTES
FRANK DIMARIA
MARK P. DONAHUE
BILL DOUGHERTY
BOB DOYLE
TIMOTHY M. FALLON
AL FRANCIS
LESLIE HARRIS
TED MACUDZINSKI
VIC RINI
DOMINIC RIZZI
RON SHOGREN
TOM SKELLY
RICK WAGNER
JOHN YANEZ

THOMAS J. PLEINES
General Counsel

Mr. James C. Franczek, Jr.
Franczek & Sullivan, PC
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606-6785

Re:    Educational Reimbursement

Dear Jim:

This letter confirms our discussions and acknowledgment that effective June 15, 2000, the benefits provided by Article 24 of the Agreement apply to courses taken on the Internet, provided that these courses meet the requirements set forth in Sections A.1. through 4. Further, such courses must be offered by colleges or universities accredited by the North Central Association of Colleges and Secondary Schools.

If this letter accurately states our discussions regarding Article 24, please sign your name below.

Sincerely,

Thomas J. Pleines
General Counsel

TJP/laj

Agreed and acknowledged

James C. Franczek, Jr.
for the City of Chicago

I:\FOP cba negotiations\1999\correspondence\thiscmt educational reimbursement 06-14-00.wpd

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

105

# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1267

November 17, 2000

WILLIAM J. NOLAN
President

BOB PODGORNY
1st Vice President

JOHN D. CAREY
2nd Vice President

HAROLD R. KUNZ
3rd Vice President

SHEILA C. BURKE
Recording Secretary

AL BARSKI
Treasurer

JOHN T. CAPPARELLI
Financial Secretary

Sergeants-At-Arms
JIM O'LEARY
TERENCE J. O'NEILL
CHAEL T. SULLIVAN

JOHN M. DINEEN
Immediate Past President

Trustees

DEAN ANGELO
Chairman
HAROLD BROWN
CARLOS E. CORTES
FRANK DIMARIA
MARK P. DONAHUE
BILL DOUGHERTY
BOB DOYLE
TIMOTHY M. FALLON
AL FRANCIS
LESLIE HARRIS
TED MACUDZINSKI
VIC RINI
MICHAEL P. SCHUMACHER
RON SHOGREN
TOM SKELLY
RICK WAGNER
JOHN YANEZ

THOMAS J. PLEINES
General Counsel

Ms. Darka Papushkewych
Chief Labor Negotiator
City of Chicago, Department of Law
30 N. LaSalle Street, Suite 1020
Chicago, IL 60602

Re: Negotiations / "Pattern and Practice" Litigation

Dear Ms. Papushkewych:

This letter will confirm the concerns that the Lodge raised regarding potential "pattern and practice" litigation that might be brought against the Chicago Police Department by the United States Department of Justice. We are both aware that such litigation has resulted in consent decrees being entered in several cities which arguably impact the collective bargaining agreements in effect. We have further discussed the fact that the FOP has attempted to intervene and affect the litigation in those cities.

The parties understand that, in the event of such a lawsuit, the City has no control over whether the Lodge is a party to the litigation. Furthermore, the City is not expressing an opinion on whether the Lodge has any legal claim or right to intervene. Nevertheless, the City will agree to meet and confer with the Lodge in the event of such litigation to allow the Lodge to express its concerns and viewpoint regarding any issues that may impact the rights and obligations which exist under the collective bargaining agreement.

Sincerely,

Thomas J. Pleines
General Counsel

Agreed and acknowledged on behalf of the City of Chicago:

Darka Papushkewych
Chief Labor Negotiator

f:\FOP cba negotiations\1999\correspondence\papushkewych 11-17-00 pattern & practice.wpd

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

106

# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

November 14, 2000

WILLIAM J. NOLAN
President

BOB PODGORNY
1st Vice President

JOHN D. CAREY
2nd Vice President

HAROLD R. KUNZ
3rd Vice President

SHEILA C. BURKE
Recording Secretary

AL BARSKI
Treasurer

JOHN T. CAPPARELLI
Financial Secretary

Sergeants-At-Arms
JIM O'LEARY
TERENCE J. O'NEILL
MICHAEL T. SULLIVAN

JOHN M. DINEEN
Immediate Past President

Trustees

DEAN ANGELO
Chairman
HAROLD BROWN
CARLOS E. CORTES
FRANK DIMARIA
MARK P. DONAHUE
BILL DOUGHERTY
BOB DOYLE
TIMOTHY M. FALLON
AL FRANCIS
LESLIE HARRIS
TED MACIUDZINSKI
VIC RINI
MICHAEL P. SCHUMACHER
RON SHOGREN
TOM SKELLY
RICK WAGNER
JOHN YANEZ

THOMAS J. PLEINES
General Counsel

Ms. Darka Papushkewych
Chief Labor Negotiator
City of Chicago, Department of Law
30 N. LaSalle Street, Suite 1020
Chicago, IL 60602

Re:     Negotiations / Section 8.4

Dear Ms. Papushkewych:

This letter will confirm our agreement, reached during negotiations for a successor to the collective bargaining agreement which expired on June 30, 1999, concerning Section 8.4. The Department has proposed the inclusion of new language in paragraph two of Section 8.4 concerning what use may be made of disciplinary investigations which are categorized as "not sustained." The parties agree that if a "not sustained" file is relied upon, it will be noted in the CR file being investigated. The disciplinary history will be limited to a five- (5) year retention period for sustained findings only and a one- (1) year retention period for summary punishments.

The inclusion of this language in Section 8.4 is not meant in any way to change or alter the fact that the Department has the burden of establishing that it had just cause to impose discipline or that the amount of discipline imposed is appropriate under the circumstances of any case. Further, the inclusion of this language does not prevent the Lodge from challenging whether the "not sustained" file(s) relied upon was sufficiently similar in number or type to be relevant and competent to be used for the purpose for which the Department has used the "not sustained" file. Further, the Lodge reserves the right to argue the relevancy and weight it believes is appropriate to those files.

If this letter accurately reflects your understanding and agreement regarding this issue, please sign where indicated and return a copy to me.

Sincerely,

Thomas J. Pleines, General Counsel

Agreed and acknowledged on behalf of the City of Chicago:

Darka Papushkewych, Chief Labor Negotiator

**THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS**

107

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

November 9, 2000

Ms. Darka Papushkewych
Chief Labor Negotiator
City of Chicago, Department of Law
30 N. LaSalle Street, Suite 1020
Chicago, IL  60602

       Re:    Negotiations / Section 8.7

Dear Ms. Papushkewych:

This letter will confirm our agreement, reached during negotiations for a successor to the collective bargaining agreement which expired on June 30, 1999, concerning Section 8.7. The listing of the job titles of Detective, Youth Officer and Gang Crime Specialist in paragraph one of Section 8.7 is not to be construed to mean that the absence of any other D-2 job titles from this Section indicates a waiver of the just cause standard concerning the demotion or removal of an officer from any other D-2 job title.

The position of the Lodge is that just cause is the appropriate standard of review whenever the Department seeks the removal or demotion of an officer from a D-2 position. The position of the Department is that just cause is not the appropriate standard of review in all cases where the Department seeks the removal or demotion of an officer from a D-2 position. Furthermore, it is the Department's position that just cause for removal/demotion may exist in a situation where the removal/demotion is not for disciplinary reasons, *i.e.*, where the Department demonstrates that an individual officer is unable or unwilling to satisfy the reasonable requirements of the D-2 position for whatever reason(s).

In the event the Department seeks to demote or remove an officer from a D-2 position other than Detective, Youth Officer, or Gang Crime Specialist, each party reserves the right to argue whether just cause is the appropriate standard of review of the Department's action in that particular case.

If this letter accurately reflects your understanding and agreement regarding this issue, please sign where indicated and return a copy to me.

Sincerely,

Thomas J. Pleines
General Counsel

Agreed and acknowledged on behalf of the City of Chicago:

Darka Papushkewych, Chief Labor Negotiator

# FRATERNAL ORDER OF POLICE

CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

January 20, 2000

WILLIAM J. NOLAN
President

BOB PODGORNY
1st Vice President

JOHN D. CAREY
2nd Vice President

HAROLD R. KUNZ
3rd Vice President

SHEILA C. BURKE
Recording Secretary

AL BARSKI
Treasurer

JOHN T. CAPPARELLI
Financial Secretary

Sergeants-At-Arms
JIM O'LEARY
TERENCE J. O'NEILL
MICHAEL T. SULLIVAN

JOHN M. DINEEN
Immediate Past President

Trustees

DEAN ANGELO
Chairman
HAROLD BROWN
CARLOS E. CORTES
FRANK DiMARIA
MARK P. DONAHUE
BILL DOUGHERTY
BOB DOYLE
TIMOTHY M. FALLON
AL FRANCIS
LESLIE HARRIS
TED MACUDZINSKI
VIC RINI
DOMINIC RIZZI
RON SHOGREN
TOM SKELLY
RICK WAGNER
JOHN YANEZ

THOMAS J. PLEINES
General Counsel

Mr. James C. Franczek, Jr.
Franczek & Sullivan, PC
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606-6785

Re:     Negotiations - City Proposal Re: Article 18

Dear Jim:

This letter is to confirm our mutual understandings and agreements in regard to the City's proposal to change the current language of the Agreement by replacing the terms "Department physician" and "Medical Director" with the term "Medical Services Section."

The Department's expressed reason for this proposed change in the language of the Agreement is to have the Agreement reflect the terminology currently, and for the foreseeable future, in use concerning the Medical Services Section. It is not the Department's intention that this change in terminology will allow medical decisions which are required to be made by a doctor to be made by anyone other than a qualified doctor. It is not the Department's intent to in any way alter its current practices in regard to medical decisions.

If this letter accurately states our understandings and agreements concerning this change in terminology, but not in practices, please sign your name below and return it to me.

Sincerely,

Thomas J. Pleines
General Counsel

Agreed and acknowledged on behalf of the City of Chicago:

James C. Franczek, Jr.
Chief Negotiator

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

109

# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

August 22, 2000

WILLIAM J. NOLAN
President

BOB PODGORNY
1st Vice President

JOHN D. CAREY
2nd Vice President

HAROLD R. KUNZ
3rd Vice President

SHEILA C. BURKE
Recording Secretary

AL BARSKI
Treasurer

JOHN T. CAPPARELLI
Financial Secretary

Sergeants-At-Arms
JIM O'LEARY
RENCE J. O'NEILL
HAEL T. SULLIVAN

JOHN M. DINEEN
Immediate Past President

Trustees

DEAN ANGELO
Chairman
HAROLD BROWN
CARLOS E. CORTES
FRANK DIMARIA
MARK P. DONAHUE
BILL DOUGHERTY
BOB DOYLE
TIMOTHY M. FALLON
AL FRANCIS
LESLIE HARRIS
TED MACIUDZINSKI
VIC RINI
MICHAEL P. SCHUMACHER
RON SHOGREN
TOM SKELLY
RICK WAGNER
JOHN YANEZ

THOMAS J. PLEINES
General Counsel

Mr. James C. Franczek, Jr.
Franczek, Sullivan, P.C.
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606-6785

Re:    Videotaping of Witnesses Before the Police Board

Dear Jim:

This letter will confirm our discussions and agreement that the testimony of all witnesses in hearings conducted by the Police Board of the City of Chicago will be video-recorded in addition to the current practice of stenographically recording their testimony. The videotape, the written transcripts, and all evidence will be forwarded to the Board members for their consideration and deliberations as a part of the record.

Additionally, the City of Chicago shall amend the Municipal Code of Chicago, Section 2-84-030, paragraph ten to read:

No member of the board may participate in any disciplinary recommendation or action without having read the written record and having viewed the taped testimony of the witnesses upon which said recommendation or action is based.

The City and the Lodge also acknowledge that certain details such as who will perform the video recording, provide and care for the equipment, and the date taping will begin, need to also be resolved through further discussions.

If this letter accurately sets forth our understanding and agreement, please sign your name below and return a copy of this letter to me.

Sincerely,

Thomas J. Pleines
General Counsel

Agreed and acknowledged on behalf of the City of Chicago:

James C. Franczek, Jr., Chief Negotiator

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

110

## LETTER OF UNDERSTANDING
## REGARDING DISPUTED I.O.D. CLAIMS

The employer will acknowledge in writing its responsibility for medical bills arising from IOD matters by providing a letter to officers receiving second or subsequent notices from covered health care institutions and collection agencies, said letter to be signed by the Director of Personnel or his or her designee, or the Medical Services Section Director or his or her designee, within ten (10) days of a grievance request for said letter. Such notices shall be submitted by the officer to the Director of Human Resources, Chicago Police Department. The Lodge shall be advised in writing of the name and business address/location of the incumbent Director as well as successor Directors. By way of example, the following language should be made available on City of Chicago letterhead:

Dear _____:

_____ (Name) has incurred medical expenses in connection with an injury which he/she is claiming arose in the line of duty. Please be advised that the City of Chicago guarantees payment of your medically necessary services for (Name).

If the injury is determined to have arisen in the line of duty, the City has assumed liability for all medical expenses incurred and you will be reimbursed accordingly by the Committee on Finance. If the injury is found not to be duty related, reimbursements will be made by the claims administrator of the city of Chicago's medical plan in accordance with its provisions.

Because you are medical services will be reimbursed by one of the entities noted above, the City cautions that you suspend efforts to obtain payment directly from (Name) _____ for payment of medical services arising from his/her injury, and that you not initiate or pursue any collection or garnishment actions against (Name) _____.

For further information please contact _____.

# FRATERNAL ORDER OF POLICE
CHICAGO LODGE # 7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE (312)930-9696 • FAX (312) 930-9967

October 18, 1996
VIA HAND DELIVERY
Mr. James C. Franczek, Jr.
Franczek, Sullivan, Mann,
    Cremení, Hein, Relias, PC
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606-6785

**Re:     Lodge 7 and the City of Chicago Article 22 Indemnification**

Dear Mr. Franczek:

This will confirm the continuation of the previous agreements between the City and the Lodge relating to Article 22 (Indemnification), including Section 22.3, of the collective bargaining agreement. It is understood and agreed than an officer's invocation of Fifth Amendment Rights (U.S. Constitution) shall not be considered by the parties to constitute "non-cooperation" within the meaning of Section 22.3 where legal representation offered by the Employer does not provide assurances of confidentiality and the attorney-client privilege.

It is the City's position, with which the Lodge agrees and on which the Lodge relies, that once an officer is named as a defendant in a civil cause of action resulting from or arising out of the performance of duties and he is required to submit to an interview with attorneys or investigators representing, associated with, or acting under the authority of the office of the Corporation Counsel to discuss the case, the resulting conversation is confidential and shielded from disclosure by the attorney-client privilege. As at least one arbitrator has acknowledged the privileged character of such communications:

> However, it is generally agreed that preliminary discussions with counsel are privileged even though the attorney does not ultimately represent the person making the statements.

> Thus, communications from the Grievant to the Assistant Corporation Counsel clearly would have been privileged. FOP, Lodge 7 and City of Chicago (David Stephans), Malin, 1987, pp. 7-8.

We, of course, understand that under such circumstances, an officer who nevertheless invokes his Fifth Amendment rights is deemed to have failed to cooperate in the "investigation, administration or litigation" of the claim.

It is further understood that when an officer invokes his or her Fifth Amendment rights in the course of a disciplinary (i.e., complaint register) investigation conducted by IAD or OPS, such conduct, standing alone, is not considered to constitute a breach of the duty to cooperate within the meaning of Section 22.3. (However, the City takes the position, with which the Lodge does not concur, that an officer's silence during a Departmental investigation may be taken into account in its determination whether the conduct complained of in the civil cause of action resulted from or arose out of the performance of duties (Section 22.1) and whether the officer seeking legal representation was acting within the scope of his or her employment (Section 22.4)).

Please signify your concurrence with the above in the space provided.

Sincerely,

Thomas J. Pleines
General Counsel

Acknowledged and agreed this 18th day of October, 1996:

James C. Franczek
Chief Negotiator for the City

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD · CHICAGO, ILLINOIS 60607-1821
PHONE (312)930-9696 · FAX (312) 930-9967

January 9, 1997

Mr. James C. Franczek, Jr.
Franczek, Sullivan, Mann, Crement, Hein, Relias, PC
300 S. Wacker Dr., Suite 3400
Chicago, IL 60606-6785

RE: Vehicle License Plate / City Sticker Violations

Dear Jim:

This letter concerns our prior agreement, as set forth in your letter of August 1, 1996, regarding the procedure the Department would follow in the event that the Department has cause to believe that a member of this bargaining unit is operating a vehicle which may be in violation of the licensing requirements mandated by either the State of Illinois or the City of Chicago. After August 1, 1996 the parties met on numerous occasions to discuss the feasibility of implementing that agreement as well as whether or not the letter of August 1, 1996 was as extensive and comprehensive as the parties desired it to be to give effect to our respective goals. The conclusion reached by the parties was that the procedures set forth in your letter were not workable.

The parties have met to negotiate this issue. As a result of this further negotiation, the following procedure was agreed to and will be followed in all cases where the Department has cause to believe that a member of this bargaining unit is operating a motor vehicle which is not properly licensed under the laws of the State of Illinois or the Municipal Code of the City of Chicago. This letter and the following procedure replaces and superceeds your letter of August 1, 1996 and the procedure contained therein.

The Department will no longer handle violations of this type as a part of the Complaint Register process. We agree that when a member of this bargaining unit is alleged to have failed to purchase, renew, or display current Illinois license plates on the vehicle the member is operating the following procedure will be followed:

1.  A supervisor will prepare only a Summary Punishment Action Request (SPAR) form against the member noting the violation. No Complaint Register Number (CR#) will be issued.

2.  Where the violation noted is the failure to purchase, renew, and/or display current State of Illinois license plates, the SPAR form will be processed with a recommendation for disciplinary action not to exceed a one (1) day suspension.

3.  The member will have ten (10) working days to show compliance with the State of Illinois licensing requirements. If the member does not comply within ten (10) working days, or in the event of prior licensing violations in the past one year period, the employer may issue a CR#.

4.  We further agree that when a member of this bargaining unit is alleged to have failed to purchase or display a city vehicle sticker, the member shall have five (5) working days to demonstrate that he did purchase the city vehicle sticker within the time specified by the City. In the event the member cannot demonstrate within five (5) working days that he did properly purchase the city vehicle sticker within the time specified by the City, the SPAR form will be processed with a recommendation for disciplinary action not to exceed a one (1) day suspension.

5.  The member will have ten (10) working days to show compliance with the City of Chicago vehicle sticker requirement. If the member does not comply within ten (10) working days, or in the event of prior city vehicle sticker violations in the past one year period, the employer may issue a CR#.

6.  In the event the member can demonstrate that he did purchase the city vehicle sticker within the time specified by the City and offer a reasonable explanation



# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD · CHICAGO, ILLINOIS 60607-1821
PHONE (312)930-9696 · FAX (312) 930-9967

why the city vehicle sticker was not displayed, the SPAR will be disposed of with no discipline imposed and the SPAR will not appear on the member's disciplinary record.

It is further agreed that the retention period for a SPAR form upon which discipline is entered will be one (1) year from the date of the incident. All other provisions of this collective bargaining agreement and the Department's orders concerning internal appeals, grievability, and the satisfaction of discipline imposed through the use of the SPAR form remain in force and effect and are applicable to the vehicle violations referred to in this letter.

If this letter accurately represents your understanding and agreement regarding these procedures, please sign your name below.

Sincerely,

Thomas J. Pleines
General Counsel

Agreed:

James C. Franczek, Jr.
For the City

114

# FRANCZEK SULLIVAN P.C.
### ATTORNEYS AT LAW

JAMES C. FRANCZEK, JR.
312-786-6110
jcf@nlfpc.com

300 SOUTH WACKER DRIVE
SUITE 3400
CHICAGO, ILLINOIS 60606
PHONE 312-986-0300
FAX 312-986-9192
http://www.nlfpc.com

July 23, 1996

Mr. Thomas J. Pleines, General Counsel
F.O.P., Lodge No. 7
600 West Fulton Street, Suite 300
Chicago, IL 60661

Re:     Memorandum of Understanding One-Half Hour Lunch Period

Dear Tom:

This will confirm the understanding of the parties with respect to the one-half hour
lunch period referenced in the Memorandum of Understanding incorporated in the
collective bargaining agreement between the parties. The parties agree and understand
that this one-half hour period is normally an uncompensated lunch period. In the event
that an officer works in excess of eight (8) hours in     a given tour of duty because he
has been required to perform work during a meal period, the officer may request
overtime compensation in accordance with the terms of the contract. Such requests shall
be initiated and processed according to the procedures set forth in the applicable general
order(s) governing all requests for overtime compensation.

Please indicate your agreement with this letter by signing on the line provided.
As always, we are appreciative of your kind courtesies.

Very truly yours,                              Acknowledged:

James C. Franczek, Jr.                         Thomas J. Pleines
Chief Labor Negotiator                         General Counsel

JCF:mp

cc: Ms. Darka Papushkewych
    Mr. William Nolan

# FRANCZEK SULLIVAN P.C.
### ATTORNEYS AT LAW

JAMES C. FRANCZEK, JR.
312-786-6110
jcf@nlfpc.com

300 SOUTH WACKER DRIVE
SUITE 3400
CHICAGO, ILLINOIS 60606
PHONE 312-986-0300
FAX 312-986-9192
http://www.nlfpc.com

July 23, 1996

Thomas J. Pleines, Esq.
General Counsel
F.O.P., Chicago Lodge No. 7
600 West Fulton Street, Suite 300
Chicago, Illinois 60661

**Re:** **LETTER OF AGREEMENT – Furloughs from Mounted Unit**

Dear Tom:

This letter confirms our discussions regarding the mounted unit and scheduling of mounted unit furlough during the summer months.

The Lodge and the City agree to allow two members of the Mounted Unit to select furlough segments 5B and 9B and to allow one (1) member of the mounted unit to select furlough segments 6A and 9A in addition to the current authorized furlough segments for the 1997 furlough selection process. The Lodge and the City agree that authorized extensions for furlough segment 6A and 9A by use of elective time such as personal days, baby furlough days or compensatory time will not be granted.

The Lodge and the City also agree that during 1997, prior to the furlough selection for 1998, both parties will meet and discuss authorizing additional furlough segments during the summer months for members assigned to the mounted unit.

If the understandings contained in this letter comport with yours, please sign this letter and return it to me promptly.

Very truly yours,

James C. Franczek, Jr.
Chief Labor Negotiator

Acknowledged:

Thomas J. Pleines
General Counsel

JCF:mp

116

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 I CHICAGO, IL 60606
T: 312.986.0300 I F: 312.986.9192 I WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean C. Angelo, Sr.
President
Fraternal Order of Police,
    Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL 60607

Dear President Angelo:

This letter confirms the parties' agreement that the City of Chicago will continue to remit to the Fraternal Order of Police, Chicago Lodge No. 7, a sum of $75,000.00 within thirty (30) days of the final date of ratification of this Agreement for 2014, and during, the first quarter of calendar years 2015, 2016, and 2017.

The Lodge agrees that these remittances shall be used for the sole purpose of sponsoring health fairs for its members. The Lodge further agrees to advise the City in writing regarding the planning, participation, implementation and results of its health fairs and will meet with the City upon request to discuss such matters.

The parties recognize that the City is under no obligation to continue these remittances beyond calendar year 2017. Any remittances beyond calendar year 2017 remain a subject for future negotiations.

Your acknowledgement and agreement is appreciated in the space provided below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Dean C. Angelo, Sr.

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T: 312.986.0300 | F: 312.986.9192 | WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean C. Angelo, Sr.
President
Fraternal Order of Police,
   Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL 60607

     Re:    Vocational Training Program

Dear President Angelo:

     This letter confirms the parties' agreement that the Employer will continue to offer an appropriate vocational training program for officers who receive duty or occupational disability benefits and who desire to avail themselves of such program. The continuation of the program is subject to the monies appropriated for such program, which shall be at least $120,000.00 for 2014 through 2017.

     Your acknowledgement and agreement is appreciated in the space provided below.

                    Very truly yours,

                    James C. Franczek, Jr.

AGREED:

Dean C. Angelo, Sr.

118

# FRANCZEK   SULLIVAN p.c.
## ATTORNEYS AT LAW

JAMES C. FRANCZEK, JR.
312-786-6110
jcf@franczek.com

300 SOUTH WACKER DRIVE
SUITE 3400
CHICAGO, ILLINOIS 60606
PHONE 312-986-0300
FAX 312-986-9192
http://www.franczek.com

March 7, 2005

Joel A. D'Alba, Esq.
Asher, Gittler, Greenfield & D'Alba, Ltd.
200 West Jackson Boulevard
Suite 1900
Chicago, Illinois 60606

### Re: Medical Services Section/Referral Physician List

Dear Mr. D'Alba:

This letter confirms our agreement with respect to the list of approximately 800 referral physicians maintained by the Department's Medical Services Section ("MSS"). An officer seeking a referral for an injury on duty will be allowed to select any physician on this list within the specialty appropriate to the treatment of the officer's injury(s).

The Department reserves the right both to add physicians to the physician referral list and to remove physicians from the list. The Department agrees that physicians will not be removed from the list for arbitrary or capricious reasons. The Department agrees to meet with designated representatives of the Lodge on a quarterly basis for the purpose, among others, of discussing the composition of the referral list, including suggestions for expansion of the list and to respond to Lodge inquiries concerning removals from the list.

If this letter accurately reflects your understanding and agreement regarding this issue, please sign where indicated and return a copy to me.

Very truly yours,

James C. Franczek, Jr.

Acknowledged and Agreed to this ⟍ day of March, 2005

Joel A. D'Alba, Esq.
Attorney, Fraternal Order of Police, Chicago Lodge No. 7

119

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE CITY OF CHICAGO AND
### THE FRATERNAL ORDER OF POLICE, CHICAGO LODGE No. 7
### RE: DEPARTMENT-PROCURED OUTSIDE EMPLOYMENT

The parties agree to implement a Department-procured outside employment program, subject to the following terms and conditions:

A. The Department-procured outside employment program is a voluntary program that allows non-probationary full-duty officers to work on their days off for non-governmental employers, subject to the terms and conditions set forth below.

B. The Department will procure outside employment opportunities; however, officers who participate in the program will work directly for the non-governmental employer for a pre-determined uniform rate of pay established exclusively by the Employer, and the non-governmental employer shall be solely responsible for paying each officer and otherwise accounting for the officer's compensation.

C. An officer's eligibility for Department-procured outside employment is governed by the following terms and conditions:

1. An officer is not eligible to work any Department-procured outside employment assignment under the following circumstances:

   a. The officer's most recent overall performance rating was "requires improvement" or "unacceptable".

   b. The officer is serving a suspension or has been relieved from regular duty as a result of summary punishment.

   c. The officer is on the medical roll or has been released from the medical roll for furlough.

   d. During the thirty- (30-) day period prior to the date of the officer's application, the officer was absent from duty for five (5) or more days as a result of a non-duty-related injury or illness.

   e. The officer's disciplinary record contains three (3) or more summary punishment actions within the prior twelve- (12-) month period.

   f. The officer has been disqualified from participating in the program based on his or her performance while working a special employment or Department-procured outside employment assignment.

2. An officer will be suspended from working a Department-procured outside employment assignment for a period of thirty (30) calendar days if the officer was scheduled for a Department-procured outside employment assignment and failed to work such assignment without reasonable cause for such absence acceptable to the Employer (e.g., a death in the family, an injury on duty or a change in the officer's regular duty schedule).

3. An officer will be suspended from working a Department-procured outside employment assignment for a period of ninety (90) calendar days if the officer was scheduled for a Department-procured outside

employment assignment and failed to work such assignment without advance notice to the Employer of his or her absence (i.e., a "no call/no show").

D.  If an officer believes that he or she has been wrongfully declared ineligible to work Department-procured outside employment, the officer shall submit a "To-From-Subject Report" to the coordinator of the Department-procured outside employment program no later than four (4) calendar days following his or her receipt of notification of ineligibility. If the program coordinator's response is unsatisfactory to the officer, then the officer may initiate a grievance at Step One of the grievance procedure set forth in Section 9.2 no later than seven (7) of the officer's working days following his or her receipt of such response.

E.  The Employer shall assign Department-procured outside employment opportunities to eligible officers on a rotating basis.

F.  The Employer shall publish any limitations it establishes on the number of hours, tours or assignments that may be worked by officers in the program and may restrict participation in the program to officers who are assigned to certain Units or who have specialized knowledge, skills or abilities.

G.  The exclusive remedy for any incorrect assignment of Department-procured outside employment shall be the assignment of future Department-procured outside employment opportunities in a manner that corrects the error in assignment.

H.  The parties recognize that the Department-procured outside employment program is a new initiative for the Department. Therefore, the parties agree to establish a labor-management committee to facilitate its implementation and administration. The labor-management committee will be composed of equal representation from the Department and the Lodge and will be charged with the following responsibilities: monitoring and evaluating the implementation and administration of the program; attempting to resolve any disputes arising out of the program prior to invoking the formal grievance procedure; and attempting to develop joint recommendations regarding the program's modification, continuation, expansion or discontinuation. Any joint recommendation by the committee to modify, continue, expand or discontinue the program is subject to the approval of the Department and the Lodge.

I.  Notwithstanding any recommendation by the committee, the Department may discontinue the program at its discretion. If the Department intends to discontinue the program, the Department will timely provide the Lodge with written notice of its intent and upon request will promptly meet with the Lodge to discuss its rationale.

J.  This memorandum of understanding shall be implemented as expeditiously as possible following its execution.

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF CHICAGO
AND THE
FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7
REGARDING
RETIREE HEALTH CARE BENEFITS

The parties agree that the health care benefit provided to Officers who retire on or after age sixty (60) pursuant to Section 25.2 of the parties' collective bargaining agreement ("the Agreement") shall be extended to Officers who retire on or after age fifty-five (55), subject to the following terms and conditions:

## A.    Applicability

This memorandum of understanding applies only to any Officer who retires on or after age fifty-five (55) with an effective date of retirement on or after January 1, 2015 and who intends to avail himself/herself of the health care benefit provided to Officers who retire on or after age sixty (60) by Section 25.2 of the Agreement.

## B.    Health Care Benefits Upon Retirement

### 1.    Officers Who Retire on or After Age Sixty (60)

Officers who retire on or after age sixty (60) shall continue to receive the health care benefit set forth in Section 25.2 of the Agreement and may elect to have their final compensation paid in accordance with Section (C). Any Officer who intends to exercise this option shall notify the Employer of his/her intent in writing at the time he/she files for retirement and shall otherwise comply with any administrative procedures established by the Employer to implement this provision. After an Officer files for retirement, he/she may only rescind his/her election prior to the effective date of retirement or by any administrative deadline established by the Employer, whichever date is earlier. Upon retirement, the Officer's election becomes irrevocable.

### 2.    Officers Who Retire on or After Age Fifty-Five (55) and Before Age Sixty (60)

Officers who retire on or after age fifty-five (55) and before age sixty (60) shall be eligible for the health care benefit set forth in Section 25.2 of the Agreement, provided that the required number of eligible Officers file for retirement in accordance with the following schedule:

| Required Number of | Filing Deadline | Effective Date of Retirement |
|---|---|---|
| | | (must be age 55 through 59) |
| 100 | 10/01/2014* | 01/01/2015 through 12/31/2015 |
| 100 | 10/01/2015 | 01/01/2016 through 12/31/2016 |
| 75, and each year thereafter | 10/01/2016, and each 10/01 thereafter | 01/01/2017 through 12/31/2017, and each 01/01 through 12/31 thereafter |

\* For retirements occurring in calendar year 2015, the 2014 filing deadline shall be extended to December 1, 2014, provided: at least 100 Officers file for retirement by the December 1, 2014 date; and the effective date of retirement for those filing their retirement applications between October 1, 2014, and December 1, 2014, is no earlier than March 1, 2015.

At least thirty (30) calendar days prior to each filing deadline, the Employer shall send notice to the Lodge of the number of retirement applications filed to date and the name of each applicant and shall send notice to each applicant of the number of retirement applications filed to date. If the requirement set forth in this subsection is not satisfied, the Employer shall send notice to the Lodge and each applicant that the minimum threshold was not met within three (3) business days of the filing deadline, and such applicants shall have the right to withdraw their filings for retirement within fifteen (15) business days from the date of such notice.

**Effective for retirements occurring after June 1, 2017, Officers retiring on or after age fifty-five (55) and before age sixty (60) and who elect to participate in this benefit shall contribute two percent (2%) of their annuity then being received pursuant to the provisions of the Policemen's Annuity and Benefit Fund Act of the Illinois Pension Code (40 ILCS 5/5-101 et seq.). Such Officers shall continue to contribute this percentage contribution for as long as they receive the health care benefit set forth in Section 25.2 of the Agreement.**

## C. Payment of Final Compensation Upon Retirement

1. Legally Required Final Compensation

Upon retirement, the Employer shall pay to each eligible Officer or his/her estate if necessary any compensation owed to such Officer in the form of wages earned, unused compensatory time granted pursuant to the federal Fair Labor Standards Act ("FLSA"), unused elective time provided by the Agreement (e.g., furlough days, Baby Furlough Days and personal days) and any other final compensation that may be legally owed to such Officer, except as provided by subsection (C)(2). Any wage increases that are implemented as a result of negotiations, mediation or interest arbitration for a successor collective bargaining agreement and that are effective prior to the Officer's date of retirement shall be applied retroactively to his/her legally required final compensation paid pursuant to this subsection.

2. Non-FLSA Compensatory Time

Upon retirement, the Employer shall calculate the value of each Officer's accumulated non-FLSA compensatory time (if any) based on the Officer's rate of pay in effect at the time of retirement. Any wage increases that are implemented as a result of negotiations, mediation or interest arbitration for a successor collective bargaining agreement and that are effective prior to the Officer's date of retirement shall be applied retroactively to the value of his/her non-ELSA compensatory time paid pursuant to this subsection.

As part of the officer's legally required final compensation, the Employer will pay to the Officer or his/her estate the value of his/her non-FLSA compensatory time up to yet not exceeding $10,000.00.

On or before March 1 of the first calendar year following the date of the Officer's retirement, the Employer shall pay to the Officer or his/her estate the value of his/her remaining non-FLSA compensatory time up to yet not exceeding $15,000.00. If a remainder exists, the Employer shall also pay to the Officer or his/her estate one-third of the value of the remainder.

123

On or before March 1 of the second calendar year following the date of the Officer's retirement, the Employer shall pay to the Officer or his/her estate the value of his/her remaining non-FLSA compensatory time up to yet not exceeding $20,000.00. If a remainder exists, the Employer shall also pay to the Officer or his/her estate one-half of the value of the remainder.

On or before March 1 of the third calendar year following the date of the Officer's retirement, the Employer shall pay to the Officer or his/her estate the value of any and all remaining non-FLSA compensatory time.

D.    Term of Memorandum of Understanding

The terms and conditions of this memorandum of understanding shall be subject to renegotiation by the parties on or after June 30, 2017.



# FRANCZEK RADELET

*Attorneys and Counselors*

300 South Wacker Drive   Suite 3400   Chicago, IL 60606
Phone 312.986.0300   Fax 312.986.9192   franczek.com

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

July 17, 2009

Mr. Joel A. D'Alba
Asher, Gittler, Greenfield & D'Alba, Ltd.
200 West Jackson Boulevard, Suite 1900
Chicago, Illinois 60606

### Re:   Joint Pension Legislation Council

Dear Mr. D'Alba:

This letter confirms the agreement between the City of Chicago and the Fraternal Order of Police, Chicago Lodge No. 7, to establish a Joint Pension Legislation Council. As we have discussed, the Joint Pension Legislation Council will be responsible for reviewing, researching and developing recommendations if appropriate regarding any and all legislation impacting or otherwise related to the *Policemen's Annuity and Benefit Fund of Chicago, Illinois*. The parties have already explored the issues of membership, legislative review procedures and scheduling and agree to continue to discuss and ultimately decide upon the necessary features of the Joint Pension Legislation Council. Finally, this letter confirms the parties' intent that the Joint Pension Legislation Council be established and fully operational prior to the 2010 spring session of the 96th General Assembly.

Your acknowledgment and agreement is appreciated in the space provided below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Joel A. D'Alba   7/17/09

Joel A. D'Alba

## MEMORANDUM OF UNDERSTANDING
## FOR WORK DAY SCHEDULES

### *As Amended By the Parties on November 13, 2009*

### *Amendments To Be Effective Operationally on January 10, 2010*

With respect to (I) the Work Day Schedule; (II) Impasse Resolution and Ratification Procedures for the Work Day Schedule and its implementation; and (III) the modification of certain provisions of the collective bargaining agreement in order to facilitate and implement the Work Day Schedule, the parties hereby agree as follows:

I.    The Work Day Schedule

 A.    Ten (10) Hour Work Day Schedule for District Rapid Response Cars.

  1.    The parties agree to pilot a ten (10) hour work schedule in Districts 3, 7, 10, and 15 for officers assigned or detailed to the third watch Rapid Response cars. This will result in a fifth watch. This schedule will be the same as the previously piloted CHA Rotating schedule, except as specifically modified herein.

  2.    The starting time for the Rapid Response Cars on the fifth watch will be 1600.

  3.    Each participating District shall have at least fifteen (15) Rapid Response car positions which will be filled by the eighty percent (80%)/twenty percent (20%) bidding process.

  4.    This pilot program will be discontinued at the end of the 2009 thirteenth police period.

1 of 10

B.  Ten (10) Hour Work Schedule in Detective Division Area Two (2) and Juvenile Intervention and Support Center.

   1.  The parties agree to pilot a ten (10) hour work schedule in Detective Division Area Two (2) and for Detectives assigned or detailed to the Juvenile Intervention and Support Center. The schedule will be the same as the pilot schedule currently in effect at the time of this amendment.

   2.  The ten (10) hour schedule will not apply to Summary Investigation Detectives, Review Investigation Detectives, Detectives assigned or detailed to Administrative Desk Duty Assignments or Detectives assigned or detailed to fixed day off groups.

   3.  The starting times for the ten (10) hour schedule will be 0800; 1800; and 2200.

   4.  This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

C.  Ten (10) Hour Work Day Schedule in Districts 5 and 20.

   1.  The parties agree to pilot a ten (10) hour work schedule for officers assigned or detailed to Districts 5 and 20. The schedule will be the same as the pilot schedule currently in effect at the time of this amendment.

   2.  The ten (10) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS, school duties, officers on authorized foot posts, and Review Officer positions.

   3.  The starting times for the ten (10) hour schedule will be 0700; 1600; and 2130.

   4.  Officers who hold Desk, Lockup, and Watch Relief positions on the First Watch will be considered successful bidders to a 1930 start time, which falls within the plus or minus two (2) hour adjustment period from the regularly designated 2130 starting time in accordance with Section 20.7 of the Agreement, unless the officers elect to opt out of their current position. Officers who successfully bid to Desk, Lockup,

and Watch Relief positions on the First Watch will ordinarily, but subject to the Department's discretion, be assigned field duties between 1930 and 0130.

5. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

D. Ten (10) Hour Work Day Schedule for Officers Assigned or Detailed to the Targeted Response Unit, Mobile Strike Force and the Special Functions Group.

   1. The parties agree to pilot a ten (10) hour work schedule for officers assigned or detailed to field duties in the Targeted Response Unit or Mobile Strike Force and mutually agreed upon field functions within the Special Functions Group. The schedule will, at the Department's option, have either fixed or rotating consecutive days off. In the event the Department selects fixed days off, at least one of the fixed consecutive days off shall be either a Saturday or a Sunday.

   2. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

E. Six-Three Eight and One Half (8 1/2) Hour Schedule in Districts 8 and 13.

   1. The parties agree to pilot a six-three eight and one half (8 1/2) hour work schedule for officers assigned or detailed to Districts 8 and 13. This schedule will have three rotating days off.

   2. The eight and one half (8 1/2) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS, school duties, authorized foot posts or fixed day off groups.

   3. The starting times for the six-three eight and one half (8 1/2) hour schedule will be 0700; 1500; and 2200.

   4. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or

3 of 10

128

individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

F. Four-Two Eight and One Half (8 1/2) Hour Schedule in Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24 and 25.

   1. The parties agree to implement a four-two eight and one half (8 1/2) hour work schedule for officers assigned or detailed to Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24 and 25. This schedule will have two rotating days off.

   2. The eight and one half (8 1/2) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS, school duties, fixed posts at the filtration plant or fixed day off groups.

   3. The starting times for the four-two eight and one half (8 and 1/2) hour schedule will be 0700; 1500; and 2200.

   4. This work schedule will remain in effect through the thirteenth police period of the calendar year in which the parties' successor labor agreement to the 2003-2007 current labor agreement expires [e.g., if the successor labor agreement expires on June 30, 2012, then the work schedule will remain in effect through the 2012 thirteenth police period] and is subject to renegotiation upon such expiration with any changes effective no earlier than the first police period of the calendar year following such expiration [e.g., if the successor labor agreement expires on June 30, 2012, then the work schedule is subject to renegotiation beginning July 1, 2012, and any changes to the work schedule will become effective no earlier than the 2013 first police period].

G. Four-Two Eight-and-One-Half Hour Schedule for Detectives Assigned or Detailed to Areas 1, 3, 4 and 5.

   1. The parties agree to pilot a four-two eight-and-one-half hour work schedule for Detectives assigned or detailed to Areas 1, 3, 4 and 5. This schedule will have two rotating days off.

   2. The four-two eight-and-one-half hour schedule will not apply to Summary Investigation Detectives, Review Investigation Detectives, Detectives assigned or detailed to Administrative Desk Duty Assignments or Detectives assigned or detailed to fixed day off groups.

4 of 10

129

3. The starting times for the four-two eight-and-one-half hour schedule will be 0830; 1700; and 0001.

4. This pilot program will remain in effect through the 2010 thirteenth police period and may thereafter be discontinued collectively or individually by the Department in accordance with the procedure set forth in Paragraph II(F) and (G).

H. All starting times may be adjusted plus or minus two (2) hours from the designated starting times in accordance with Section 20.7 of the Agreement.

I. Officers will initially select their watches and be assigned day off groups. Officers will then select their furloughs.

J. Furloughs will be selected by unit for the calendar years beginning January 1, 2010 and each January thereafter in accordance with Section 23.2 of the Agreement.

Ratification, Implementation and Dispute Resolution

A. The implementation or continuation of the pilot programs or work schedules described in Paragraph I is contingent upon the approval of such programs by Unit 156A-Sergeants.

B. If approved, the Department will immediately announce the anticipated implementation or continuation of the pilot programs or work schedules described in Paragraph I, which will provide a sufficient period for affected officers to bid into or out of the affected units. Officers will bid to the ten (10) hour shifts and eight and one half (8 1/2) hour shifts pursuant to Article 31. Officers assigned to the ten (10) and eight and one half (8 1/2) hour shifts will be subject to the reverse seniority provisions of Sections 31.5 and 31.6.

C. A Joint Labor Management Committee shall continue to meet monthly for the purpose of monitoring, reviewing, ascertaining and making recommendations regarding the pilot programs and work schedules and promptly addressing errors and omissions in the pilot programs and work schedules. The Committee will continue to consist of the Commanding Officer of the Management and Labor Affairs Section and the Lodges' Grievance Committee Chairman (or their designees) and additional persons designated by each party up to a maximum of five (5) persons for each party. At the end of each police period, reports will continue to be presented by

both the City and the Lodge to this Committee for the purpose of monitoring and reviewing the pilot programs and work schedules.

D. The goals of the pilot schedules are to attempt to boost employee productivity, reduce employee stress, reduce medical and IOD absences, reduce automobile accidents, reduce overtime assignments, reduce response time between radio assignments, reduce radio assignments pending, reduce crime, reduce citizen complaints, improve service to the community, and boost employee morale. The parties recognize that implementation of the pilot schedules might not result in measurable improvements in each of these goals.

E. The Joint Labor Management Committee will meet promptly upon the request of either party in order to make recommendations and attempt to reach agreement by negotiations in good faith regarding the pilot schedules' continuation, expansion, modification, or discontinuation. The Committee shall have the authority to continue, modify, expand or terminate any of the pilot schedules by mutual agreement. Any mutual decision to continue, expand, modify, or discontinue pilot schedules by the Committee shall be binding upon the parties, subject to ratification by the parties.

F. The pilot programs that are approved and implemented shall remain in effect through the 2010 thirteenth police period and may thereafter be continued either collectively or individually at the discretion of the Department. If the Department intends to discontinue one (1) or more pilot programs, the Department will provide the Lodge with written notice of its intent no later than July 1, 2010 and upon request shall promptly meet with the Lodge to discuss the rationale for its decision.

G. In the event the Lodge disagrees with the rationale for the Department's decision and believes one (1) or more of the pilot programs identified by the Department for discontinuation should be continued beyond the 2010 thirteenth police period, the dispute shall not be submitted to interest arbitration and may only be resolved through the following dispute resolution procedure:

1. Within five (5) business days of the meeting required by subsection (F), the Lodge shall submit a demand for arbitral review to the Management and Labor Affairs Section. In the event that two (2) or more bargaining units file a demand for arbitral review, the actions shall be consolidated into the same proceeding. In the event that the arbitrator believes he/she could not award complete relief among the parties because a particular bargaining unit is not a party to the

proceedings, the arbitrator shall have the authority to order such other bargaining unit to join the proceedings as either an involuntary grievant or respondent.

2. Within thirty (30) calendar days of the execution of this memorandum of understanding, the parties shall mutually select an arbitrator and pre-schedule such arbitrator for a hearing beginning on or about August 1, 2010.

3. The issue before the arbitrator shall be whether the Department was unreasonable in deciding to discontinue a pilot program.

4. The arbitrator shall issue an abbreviated written decision and order within ten (10) business days of the close of the hearing and shall issue a full written decision and order thereafter.

5. The arbitrator's written decisions and orders shall be binding on both the Department and the Lodge, provided that the arbitrator does not exceed his/her authority as defined in this memorandum of understanding.

6. The parties shall share equally the fees and expenses of the arbitrator and any other arbitration costs that are common to both parties. Each party shall be responsible for compensating its own attorneys and representatives.

7. The established time limits in this dispute resolution procedure may only be extended by mutual written agreement.

8. During the parties' discussions and the impasse procedures, the pilot programs shall continue in effect.

H. In the event a dispute arises out of the implementation or administration of the work schedules described in Paragraph I, the parties may mutually agree to attempt to resolve the dispute through mediation, or either party may invoke the grievance and arbitration procedure set forth in the parties' labor agreement.

Contract Modifications and Understandings Regarding the Implementation of the Pilot Programs

Notwithstanding any other provision of the current collective bargaining agreement successor collective bargaining agreement for the duration of the pilot programs and chedules, the following provisions and understandings shall be in effect:

A. The normal tour for the ten (10) hour shift will be ten and one half (10 1/2) hours, which includes a one half (1/2) hour uncompensated lunch period. The normal tour for the eight and one half (8 1/2) hour shift will be nine (9) hours, which includes a one half (1/2) hour uncompensated lunch period. The parties agree and understand that if an officer is required to perform work during the one half (1/2) hour meal period, the officer will receive overtime compensation in accordance with the terms of this Agreement.

B. For officers working the ten (10) and eight and one half (8 1/2) hour schedules, the Lodge waives the overtime provisions of Section 20.1 of the Agreement insofar as that section requires payment of overtime for all hours worked in excess of the normal work day of eight (8) hours. Overtime in excess of the normal tour of duty will be compensated at the overtime rate.

C. Officers with straight day furloughs will be given the same number of straight furlough days in the ten (10) and eight and one half (8 1/2) hour schedules. Officers with working day furloughs will have any remaining days converted to hours. Where the conversion of working day furloughs to hours results in a remainder of hours that is lower than the eight and one half (8 1/2) hour tour of duty, officers may utilize compensatory time to attain a complete tour of duty or, in the alternative, will forfeit the remainder hours.

D. Compensation for Designated Holidays is granted as follows:

1. Officers on the ten (10) hour shift will receive ten (10) hours of holiday compensation for holidays occurring on their days off and will receive ten (10) hours of compensation and five (5) hours of holiday compensation when officers are required to work a ten (10) hour shift on a holiday.

   Officers on the eight and one half (8 1/2) hour shift will receive eight and one half (8 1/2) hours of holiday compensation for holidays occurring on their days off and will receive eight and one half (8 1/2) hours of compensation and four and one quarter (4 1/4) hours of holiday compensation when officers are required to work an eight and one half (8 1/2) hour shift on a holiday.

2. Officers on the ten (10) hour shift whose regular day off coincides with an established holiday, and who are required to work a regular tour of duty ten (10) hours on that holiday, will be credited with twenty-five (25) hours of compensatory time and five (5) hours of compensatory time or additional pay, as the officer elects.

   Officers on the eight and one half (8 1/2) hour shift whose regular day off coincides with an established holiday, and who are required to work a regular tour of duty eight and one half (8 1/2) hours on that holiday, will be credited with twenty-one and one quarter (21 1/4) hours of compensatory time and four and one quarter (4 1/4) hours of compensatory time or additional pay, as the officer elects.

3. In the event that an officer covered by this agreement is required to attend court on his or her regular day off and that day that is also a holiday, the officer will be compensated at a rate of double-time for the minimum set forth in 20.5 or double-time for the actual hours worked, whichever is greater, plus compensatory time or additional pay in an amount equal to the normal tour of duty, as the officer elects.

E. For those officers working a ten (10) hour schedule, a personal day, if used, will be worth a tour of duty, ten (10) hours, and baby furlough days will be worth eight (8) hours each. An officer assigned to the ten (10) hour schedule who wishes to use a baby furlough day will be required to use an additional two (2) hours of compensatory time.

For those officers working an eight and one half (8 1/2) hour schedule, a personal day, if used, will be worth a tour of duty, eight and one half (8 1/2) hours, and baby furlough days will be worth eight (8) hours each. An officer assigned to the eight and one half (8 1/2) hour schedule who wishes to use a baby furlough day will be required to use an additional one half (1/2) hour of compensatory time.

F. For officers working a ten (10) hour schedule, an officer who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a Desk Sergeant for more than four (4) hours within a single ten (10) hour tour of duty shall be paid at a D-3 rate consistent with his or her own tenure for a ten (10) hour tour of duty, or for the time spent, which ever is greater. An officer who is directed to perform substantially all the duties and assumes substantially all the responsibilities of a Desk Sergeant

for four (4) hours or less shall be paid at a D-3 rate consistent with his or her own tenure for the actual hours worked.

G. The number of District Desk, District Lockup, and District Watch Relief positions that will be subject to bid in Districts 5 and 20 shall be as follows:

| District | Desk | Lockup | Watch Relief |
|----------|------|--------|--------------|
| 005 | 3 | 6 | 12 |
| 020 | 3 | 3 | 9 |

Chicago Police Department

Jody Weis
Superintendent of Police

Dated: 16 NOV 07

Fraternal Order of Police,
Chicago Lodge No. 7

Mark P. Donahue
President

Dated: 16 Nov 07

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1267

President
MARK P. DONAHUE

1st Vice President
BILL DOUGHERTY

2nd Vice President
FRANK J. DIMARIA

3rd Vice President
GREGORY BELLA

Recording Secretary
SIDNEY M. DAVIS

Financial Secretary
RICHARD L. AGUILAR

Treasurer
JOHN T. CAPPARELLI

Sergeants-At-Arms
BILL BURNS
JAMES E. MORIARTY, JR.
KENNETH L. WATT

Immediate Past President
WILLIAM J. NOLAN

Trustees

Chairman
ROBERT J. RUTHERFORD

DERRICK L. ARMSTONG
JIM BAILEY
HAROLD BROWN
RHONDA BULLOCK
JOSEPH M. BUTNEY
PATRICK W. DUCKHORN
MICHAEL P. GARZA
KEVIN WILLIAM GRAHAM
ANNA K. HANLEY
CHESTER HORNOWSKI
EDWARD KING
TOM McDONAGH
ROBERT PODGORNY
RONALD H. SHOGREN
THOMAS J. SKELLY
DAN TREVINO

January 5, 2010

Commander Donald J. O'Neill
City of Chicago, Dept. of Police
Management and Labor Affairs Section
3510 South Michigan Avenue, 4th Floor
Chicago, IL 60653

### RE: Amendment to Work Schedule Agreement

Dear Cmdr. O'Neill:

The purpose of this letter is to memorialize our agreement to amend the November 16, 2009, Memorandum of Understanding for Work Day Schedules as it pertains to officers working an 8 ½ hour day. Specifically, it is agreed that page 3 sec. E (3) and page 4, section F (3) will be amended from the specified 1500 hour starting time to a 1530 hour starting time for the 3rd watch. This amendment does not alter in anyway the Department's right to change the 1530 hours starting time by no more than 2 hours without incurring an extra pay obligation pursuant to section 20.7 of the collective bargaining agreement.

If this letter is an accurate statement of our agreement, please sign your name below to indicate your agreement.

Sincerely,

William Dougherty
First Vice President

AGREED: _____
Commander Donald O'Neill

DATE: 5 JAN 2010

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

136

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

President
MARK P. DONAHUE

1st Vice President
BILL DOUGHERTY

2nd Vice President
FRANK J. DIMARIA

3rd Vice President
GREGORY BELLA

Recording Secretary
SIDNEY M. DAVIS

Financial Secretary
RICHARD L. AGUILAR

Treasurer
JOHN T. CAPPARELLI

Sergeants-At-Arms
BILL BURNS
JAMES E. MORIARTY, JR.
KENNETH L. WITT

Immediate Past President
WILLIAM J. NOLAN

Trustees

Chairman
ROBERT J. RUTHERFORD

DERRICK L. ARMSTONG
JIM BAILEY
HAROLD BROWN
RHONDA BULLOCK
JOSEPH M. BUTNEY
PATRICK W. DUCKHORN
MICHAEL P. GARZA
KEVIN WILLIAM GRAHAM
ANNA K. HANLEY
CHESTER HORNOWSKI
EDWARD KING
TOM McDONAGH
ROBERT PODGORNY
RONALD H. SHOGREN
THOMAS J. SKELLY
DAN TREVINO

January 5, 2010

Commander Donald J. O'Neill
City of Chicago, Dept. of Police
Management and Labor Affairs Section
3510 South Michigan Avenue, 4th Floor
Chicago, IL 60653

**RE: Change of Schedule**

Dear Cmdr. O'Neill:

The purpose of this letter is to confirm our discussions and agreement concerning T.A.R.A. training when it occurs during the new work schedule. We have agreed that an officer who is scheduled for week long (5 consecutive days) T.A.R.A. training will have his or her days off changed to Sunday and Saturday of the same week for the week in which T.A.R.A training is to take place. This change will not result in the payment of compensation or overtime. Upon the completion of T.A.R.A. training the affected officer(s) will be returned to their original day off groups.

If this letter is an accurate statement of our discussions and agreement, please indicate this by signing your name below.

Sincerely,

Thomas J. Pleines
General Counsel

TJP/mk
cc:     William Dougherty
         Mark Donahue

AGREED: _____
Commander Donald O'Neill

DATE: 5 Jan 2010

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS



# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

*President*
MARK P. DONAHUE

*1st Vice President*
BILL DOUGHERTY

*2nd Vice President*
FRANK J. DIMARIA

*3rd Vice President*
GREGORY BELLA

*Recording Secretary*
SIDNEY M. DAVIS

*Financial Secretary*
RICHARD L. AGUILAR

*Treasurer*
JOHN T CAPPARELLI

*Sergeants-At-Arms*
BILL BURNS
JAMES E. MORIARTY, JR.
KENNETH L. WATT

*Immediate Past President*
WILLIAM J. NOLAN

*Trustees*

*Chairman*
ROBERT J. RUTHERFORD

DERRICK L. ARMSTRONG
JIM BAILEY
HAROLD BROWN
RHONDA BULLOCK
JOSEPH M. BUTNEY
PATRICK W DUCKHORN
MICHAEL P. GARZA
KEVIN WILLIAM GRAHAM
ANNA K. HANLEY
CHESTER HOFINOWSKI
EDWARD KING
TOM McDONAGH
ROBERT PODGORNY
RONALD H. SHOGREN
THOMAS J. SKELLY
DAN TREVINO

April 12, 2010

Commander Donald O'Neill
Management and Labor Affairs Section
City of Chicago, Department of Police
3510 S. Michigan Ave.
Chicago, IL 60653

Re:     District Desk Officer Bid Positions/
        Work Day Schedules

Dear Commander O'Neill:

The purpose of this letter is to confirm and memorialize our discussions and agreements regarding the increased number of bid positions for District Desk which will be available under the next collective bargaining agreement.

By way of background and to put this matter in the appropriate context, a brief recitation of certain facts is necessary. During negotiations for a successor agreement to the 2003-2007 agreement, the parties spent a great deal of time negotiating a new Work Day Schedule. Those efforts resulted in an agreement signed by the parties on November 16, 2009. The last paragraph of the agreement specifies the number of Desk positions in the 005 and 020 Districts will be three (3) in each district.

Subsequently, the parties negotiated an increase in the number of bid positions for the District Desk in all districts except 001, 007, 009, 018 and 019. This agreement therefore increased the number of bid positions for District Desk in the 005 and 020 districts from three (3) to six (6). Upon ratification of Arbitrator Benn's award by the City Council, these new bid positions will be opened for bid in accordance with the provisions of Section 23.9 in each affected district.

If the foregoing is an accurate account of our discussions and agreements, please so indicate by signing your name below.

Sincerely,

Thomas J. Pleines
General Counsel

TJP/cm

AGREED: _____
        Commander Donald O'Neill

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

138

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

*President*
MARK P. DONAHUE

*1st Vice President*
BILL DOUGHERTY

*2nd Vice President*
FRANK J DIMARIA

*3rd Vice President*
GREGORY BELLA

*Recording Secretary*
SIDNEY M. DAVIS

*Financial Secretary*
RICHARD L AGUILAR

*Treasurer*
JOHN T. CAPPARELLI

*Sergeants-At-Arms*
BILL BURNS
JAMES E MORIARTY, JR.
KENNETH L WATT

*Immediate Past President*
WILLIAM J NOLAN

*Trustees*

*Chairman*
ROBERT J RUTHERFORD

DERRICK L ARMSTRONG
JIM BAILEY
HAROLD BROWN
RHONDA BULLOCK
JOSEPH M. BUTNEY
PATRICK W DUCKHORN
MICHAEL P. GARZA
KEVIN WILLIAM GRAHAM
ANNA K. HANLEY
CHESTER HORNOWSKI
EDWARD KING
TOM McDONAGH
ROBERT PODGORNY
RONALD H SHOGREN
THOMAS J SKELLY
DAN TREVINO

March 15, 2010

Commander Donald O'Neill
Management and Labor Affairs Section
City of Chicago, Department of Police
3510 S. Michigan Ave., Suite 4005
Chicago, IL 60653

Dear Commander O'Neill:

During the negotiations for a successor to the 2003-2007 agreement, the parties mutually acknowledged the need to make certain amendments to Article 23, *Seniority*, Section 23.1 – *Definition and Application*. Specifically, the parties agreed to amend 23.1, subsections B and C, to update and clarify language.

It was agreed that these amendments will not have a retroactive effect. Any officer whose continuous length of service (seniority) had been changed due to suspensions under subparagraph B(1) or absences from duty under paragraph B(3), would not have his seniority date recalculated as a result of these amendments. Conversely, an officer whose seniority date should have been adjusted, pursuant to subparagraphs B(1) or B(3), but was not so adjusted, will not now be adjusted. The Department had the right to make the required adjustments under the original language of Section 23.1 and if it did not do so then, it has waived its right to do so now.

In regards to subparagraph B(2), the parties agreed that leaves of absence from the "Department's" service would clarify that an officer would not continue to accrue seniority for purposes of this section, by working for the City of Chicago (the Employer) in a non-law enforcement position. Also, in regards to "suspensions of more than thirty (30) days", when an officer serves such a suspension, the entire period of suspension will be deducted from his seniority. However, any suspension time which is satisfied by the use of compensatory time through the granting of options, will not be deducted from the officer's seniority.

Finally, the provisions of Section C no longer have any applicability and the continuation of that section would serve no purpose.

If the above accurately reflects our agreements and the purpose of these amendments, please so indicate by signing your name below.

Sincerely,

Thomas J. Pleines
General Counsel

TJP/cm
cc: David Johnson
    James Franczek
    Greg Bella
    William Dougherty

Donald O'Neil

Date: 18 MAR 10

THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

139



# FRANCZEK RADELET

Attorneys and Counselors

300 South Wacker Drive | Suite 3400 | Chicago, IL 60606
Phone 312.986.0300 | Fax 312.986.9192 | franczek.com

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

April 16, 2010

Mr. Joel A. D'Alba
Asher, Gittler, Greenfield & D'Alba, Ltd.
200 West Jackson Boulevard, Suite 1900
Chicago, Illinois 60606

### Re: Disciplinary Investigations

Dear Mr. D'Alba:

This letter confirms the Employer's representations during negotiations regarding the amendments to Sections 6.1 and 6.2 of the parties' collective bargaining agreement ("the Agreement").

## I. Audio Recording of Statements Made by Non-Department Members During Disciplinary Investigations

Throughout these negotiations, the parties discussed the legality and practicality of a policy requiring non-Department members to submit to audio recording and the impact such policy may have on the credibility and integrity of the investigative process. During these discussions, the Lodge articulated legitimate and reasonable concerns regarding the consequences of a non-Department member's refusal to consent to audio recording, including the distinctions between audio-recorded and written statements and how such distinctions if present may influence the investigation. In response to these concerns, the Employer explained that the Independent Police Review Authority ("IPRA") and the Internal Affairs Division ("IAD") were firmly committed to obtaining audio-recorded statements from non-Department members within the confines of the law. Moreover, the Employer has invited the Lodge to review the protocols, procedures and training materials for audio recording non-Department members as they are developed and to submit recommendations as may be appropriate. This letter affirms such invitation and the Employer's commitment to collaborate with the Lodge as these policies are implemented.

## II. Officer's Right To Edit and Correct Statements Made During Disciplinary Investigations

This letter also confirms the parties' discussions regarding an officer's right to edit and correct statements made during disciplinary investigations. Specifically, the Employer agrees that the amendments to Sections 6.1 and 6.2 regarding the method of recording statements do not modify the current policy or practice governing the editing and correcting of statements. The Employer also recognizes that this policy or practice may need to be modified to accommodate the new method of recording and that such modifications will only become effective upon the written consent of the Lodge.

Your acknowledgement and agreement with the understandings set forth above is appreciated in the space provided below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Joel A. D'Alba

141

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T. 312.986.0300 | F. 312.986.9192 | WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean C. Angelo, Sr.
President
Fraternal Order of Police,
    Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL 60607

   Re: Department Vehicles

Dear President Angelo:

  The purpose of this letter is to confirm our discussions with respect to the Police Department's motor vehicle fleet and the City's current intentions with respect to the purchase of additional vehicles to the Department's vehicle fleet.

  Both the Lodge and the City recognize their shared interest in having a fleet of vehicles of sufficient size and flexibility to continue to allow the Police Department to fulfill its mission. To further their shared interests, the parties agree to establish a Police Vehicle Committee, to which each party shall appoint three (3) members. This Committee shall be formed and shall hold its initial meeting within ninety (90) days of the final date of ratification of this Agreement. At least one of the City-appointed members of the Committee shall be an employee of the Police Department, one shall be an employee of the Department of Fleet and Facility Management and one shall be an employee of the Office of Budget and Management. The Committee shall meet at least once every six months, or more frequently upon mutual agreement. The City-appointed members of the Committee shall share with the Lodge-appointed members the existing protocols with respect to scheduled repair, maintenance and retirement of vehicles. The Lodge-appointed members shall be permitted to make advisory recommendations and suggestions with respect to enhancing such protocols, to which the City-appointed members shall respond. The Lodge and the City mutually acknowledge the importance of having a safe and reliable fleet of vehicles in the Police Department. The Committee shall consider the issue of mandatory removal of vehicles from the Patrol Division, in light of the practices followed by other city, state and governmental law enforcement agencies. In addition, the City recognizes it is a priority for it to purchase additional Patrol Division vehicles, absent exigent circumstances.

  Both parties acknowledge that the number of Patrol Division vehicles purchased in any given calendar year necessarily depends on numerous factors, including but not limited to:

142

available funding; the needs for other categories of Police Department vehicles, such as canine unit vehicles, squadrols, van cell cargo vans, prisoner transport vehicles and unmarked vehicles; and the parameters of multi-year purchase schedules, which may make it more (or less) economical to purchase vehicles in a particular sequence or time frame. Subject to these caveats, the City has represented to the Lodge its intention to purchase four hundred (400) vehicles for the Police Department before the close of 2014 and has advised the Lodge of its intention to purchase, on average, two hundred (200) Patrol Division vehicles each year during the term of this Agreement, beginning in 2015. During the first quarter of each calendar year beginning in 2015, the Committee shall meet and the City shall share with the Lodge-appointed Committee members its progress in attaining this goal. In any year where the City does not reach this goal, upon request the City-appointed members shall meet with the Union-appointed members to discuss the reason(s) for not attaining the goal.

Your acknowledgement and agreement is appreciated in the space provided below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Dean C. Angelo, Sr.

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T: 312.986.0300 | F: 312.986.9192 | WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean C. Angelo, Sr.
President
Fraternal Order of Police,
    Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL 60607

      Re:    Field Training Officer Program

Dear President Angelo:

      This letter confirms our agreement with respect to the Field Training Officer program.

      Within thirty (30) days of the ratification of this Agreement, the Department and the Lodge shall each designate representatives to comprise a Labor Management Committee to review and study ways in which to improve and strengthen the Field Training Officer program. Within ninety (90) days of the first meeting, this Committee shall prepare recommendations in writing with respect to its suggestions for the improvement and strengthening of the FTO program, and submit them to the Superintendent. If the Superintendent agrees with the recommendations, or any of them, the Department shall implement them on a timely basis.

      If the above accurately reflects our agreement, please so indicate by signing your name below.

Very truly yours,

James C. Franczek Jr.

James C. Franczek, Jr.

AGREED:

Dean C. Angelo, Sr.

144

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T: 312.986.0300 | F: 312.986.9192 | WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean C. Angelo, Sr.
President
Fraternal Order of Police,
 Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL 60607

Re:  City of Chicago and Fraternal Order of Police, Chicago Lodge No. 7

Dear President Angelo:

Confirming our conversations, the parties understand and agree as follows:

1.    The City agrees that economic increases, including but not limited to, wage allowance, salary and pay increases agreed to by the parties shall be retroactive to July 1, 2012; provided, however, that all overtime pay for all overtime, within the meaning of Sections 20.1 and 20.2, worked between July 1, 2012, at 12:01 a.m., through June 30, 2013, at 11:59 p.m., inclusive, shall not be eligible for any retroactive increase or adjustment

2.    Any bargaining unit member who retires, dies, or voluntarily leaves the bargaining unit between June 30, 2012, and approval by the City Council of Chicago of any successor collective bargaining agreement between Fraternal Order of Police Chicago Lodge No. 7 and the City of Chicago, shall receive all increases in economic benefits including, but not limited to, wage, allowance, salary, pay and/or bonus to which he/she would have been entitled during the period the member was employed between June 30, 2012, and leaving the bargaining unit as described; provided, however, that all overtime pay for all overtime within the meaning of Sections 20.1 and 20.2, worked between July 1, 2012, at 12:01 a.m., through June 30, 2013, at 11:59 p.m., inclusive shall not be eligible for any retroactive increase or adjustment.

3.    If retroactive payments are not made within seventy-five (75) days of City Council ratification, all officers on the payroll at any time on or after July 1, 2012 shall be entitled to interest at four-and-one-half percent (4.5%) per annum until fully paid, provided that any failure is within the City or Department's control. Any disputes shall be resolved through the parties' grievance procedure.

145

If the above accurately reflects our agreement, please so indicate by signing your name below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Dean C. Angelo, Sr.

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T: 312.986.0300 | F: 312.986.9192 | WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean C. Angelo, Sr.
President
Fraternal Order of Police,
    Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL 60607

      Re:    Section 8.4

Dear President Angelo:

      This letter confirms the parties' understandings and agreements with respect to the use of bargaining history over Section 8.4.

      During the negotiations for this Agreement, both the Employer and the Lodge advanced certain proposals to modify Section 8.4. With the sole exception of the agreed-upon modification to Section 8.4 pertaining to the length of time reprimands and suspensions of from one (1) to five (5) days may stay on an officer's disciplinary history, both parties agreed to withdraw their respective proposals to modify Section 8.4. We have mutually agreed that no significance whatsoever should be attached to the fact that either party made such proposals and subsequently withdrew them and that neither party shall introduce evidence of the making and/or withdrawal of these proposals in any arbitration or administrative hearing for the purpose of interpreting Section 8.4.

      Your acknowledgement and agreement is appreciated in the space provided below.

Very truly yours,

James C. Franczek Jr.

AGREED:

James C. Franczek, Jr.

Dean C. Angelo, Sr.

cc:    Joseph Burns
       Joseph Martinico

## MEMORANDUM OF UNDERSTANDING
## RE: HEALTH CARE PLAN – FOP LODGE 7

This Memorandum confirms our understandings and agreements relating to changes to the PPO and HMO medical plans.

I.  *Changes to the PPO*

A.  Effective January 1, 2015, the following changes to the PPO Plan covering the bargaining unit represented by the Lodge shall be implemented:

1)  The $600 per year "wellness benefit" is eliminated and shall be replaced by the Preventive Care Benefit in accordance with the United States Preventive Services Task Force Level A and B recommended services. There is no cap on the dollar value of this benefit, which shall be 100% of the maximum allowable charges without payment of a co-payment or coinsurance, provided the services are provided in accordance with the recommendations of the USPSTF and are provided in-network. There is no coverage for services provided out of network.

2)  Outpatient Speech and Occupational Therapy services provided in-network shall no longer be subject to co-insurance or the deductible and shall, instead, be subject to a $20 co-payment per visit. Services related to acquisition of function will become a covered benefit. These services will continue to be subject to medical necessity review as they are today.

3)  The exclusion of coverage for self-inflicted injuries is eliminated.

4)  Bargaining unit members, their spouses and eligible dependents shall be eligible to participate, on a voluntary basis, in the Diabetes and Maternity Management Programs.

5)  The $1.5 million lifetime maximum is eliminated.

B.  Effective January 1, 2017, the following changes to the PPO Plan covering the bargaining unit represented by the Lodge shall be implemented:

1)  The Blue Choice Nested Network, with the following features: hospitals in the Blue Choice Network shall comprise Tier 1; the individual Tier 1 deductible will be $300; the family Tier 1 deductible will be $900; the individual out of pocket maximum will be $1,000; the family out of pocket maximum will be $2,000; physician office visit co-payments will be $0 for ACA preventive services, $20 for primary care physicians, $30 for specialist physicians; these co-payments do not apply to the deductible, but are applied to the out of pocket maximum; $150 Emergency Room co-payment; co-insurance remains at 90%/10% except

that subscriber share applies. "Subscriber share" means that the discounts that Blue Cross Blue Shield obtains from its contracted providers are shared between the plan sponsor and the covered member (the Subscriber). When claims are adjusted, the amount of any estimated discount is subtracted from the allowable amount before the plan of benefits is applied.

Tier 2 retains existing provisions with respect to deductibles ($350 for individual and $1,050 for family) and out of pocket maximums ($1,500 for individual and $3,000 for family); physician office visits shall be subject to the $0/$25/$35 co-payments for preventive services/primary care physicians/specialist physicians ; these co-payments do not apply to the deductible, but are applied to the out of pocket maximum; $150 Emergency Room co-payment; and co-insurance (with subscriber share) is 75%/25%. "Subscriber share" means that the discounts that Blue Cross Blue Shield obtains from its contracted providers are shared between the plan sponsor and the covered member (the Subscriber). When claims are adjusted, the amount of any estimated discount is subtracted from the allowable amount before the plan of benefits is applied.

The provisions with respect to out of network services remain unchanged, except the Emergency Room co-payment is $150.

The Emergency Room co-payment(s) referenced above shall continue to be waived if the individual is admitted as an in-patient.

2) Medically necessary specified organ transplants and bariatric surgery must be performed at a Blue Cross "Center of Distinction" to be covered. The Employer shall provide to the Lodge and officers a list of "Centers of Distinction", including the specific procedures for which they are recognized, and shall provide sixty (60) days' advance, written notice of any change in such list, to the extent the City has been provided with such notice.

3) Medically necessary out-patient MRI, PET and CT scans will be paid at 100% if the scan is obtained at a free-standing (non-hospital) facility and not billed by a hospital; otherwise subject to the deductible and 90%/10% co-insurance. All scans are subject to pre-authorization by the entity designated for this purpose by the Employer. The Employer shall provide to the Lodge and officers a list of approved free-standing facilities and shall provide sixty (60) days' advance, written notice of any change in such list, to the extent the City has been provided with such notice.

4) Medically necessary outpatient diagnostic laboratory tests performed by an independent in-network lab (a non-hospital, such as Quest) and not billed by a hospital shall be paid by the Plan at 100%; otherwise subject

149

to deductible and 90%/10% co-insurance. Coverage for such tests not performed by such providers remain subject to the deductible and co-insurance level for the applicable Tier. The Employer shall provide to the Lodge and officers a list of approved in-network labs and shall provide sixty (60) days' advance, written notice of any change in such list, to the extent the City has been provided with such notice.

5) Prescription drugs: after third refill at retail, subsequent refills are obtained either through mail order at the applicable co-payment schedule or, if the subsequent refills are obtained at retail, the member will pay double the co-payment at retail. Provisions of the Caremark Advanced Control Formulary (or its successor) apply. The Employer shall provide the Lodge and officers with the specific provisions of the Advanced Control Formulary (or its successor) and shall provide sixty (60) days' advance, written notice of any change in the Advanced Control Formulary (or its successor), to the extent the City has been provided with such notice.

## II. Changes to the HMO:

1) Effective January 1, 2017, the schedule of co-payments for physician office visits will be $25 for a primary care physician and $35 for a specialist.

2) Effective January 1, 2017, the Emergency Room co-payment is $150. The Emergency Room co-payment(s) referenced above shall continue to be waived if the individual is admitted as an in-patient.

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## CITY OF CHICAGO DEPARTMENT OF POLICE
## AND THE
## FRATERNAL ORDER OF POLICE CHICAGO LODGE NO. 7

The Chicago Police Department ("Department"), as part of and empowered by the community, is committed to protect the lives, property, and rights of all people, to maintain order, and to enforce the law impartially. The Department will provide quality police service in partnership with other members of the community. To fulfill the Department's mission, it will strive to attain the highest degree of ethical behavior and professional conduct at all times. This, the Department's mission statement, embodies the essential purpose of the Chicago Police Department, to serve and protect. To achieve this mission, the Department must maintain proper staffing levels to effectively deploy manpower and provide protection to members of the public. Moreover, sufficient manpower is a critical component of ensuring Police Officer safety. However, the Department recognizes the countervailing concerns of its Police Officers regarding the use of elective time. Use of elective time allows Police Officers to cope with job related stress and spend quality time with family and friends.

Accordingly, for Police Officers assigned to District Law Enforcement, the parties agree that the Department shall comply with the following Elective Time (compensatory time, personal days and baby furlough days) requests, the approval of which shall not be unreasonably denied:

1) Furlough and related furlough extensions will be granted in accordance with Department directives.
2) Family Medical Leave Act – intermittent leave as required by the Act.
3) Personal Days submitted no later than ten (10) days prior to the requested day off will be approved so long as the granting of the Personal Day does not adversely affect Department operations. Denial of use of a Personal Day must be made three (3) days prior to the requested date to allow for tour of duty exchange options. Any dispute stemming from multiple timely Personal Day requests submitted by Police Officers on the same watch will be resolved by seniority.
4) All other elective time (baby furlough days, vacation days, and compensatory time) submitted no later than seven (7) days prior to the requested day off, but no earlier than thirty-five (35) days prior to the requested day off, will be granted in seniority order. A Police Officer whose timely elective time request is denied will be notified a minimum of three (3) days in advance of the requested day off to allow the Police Officer to utilize the tour of duty exchange option.
5) Day Off Holiday requests submitted no later than seven (7) days prior to the requested day off, but no earlier than thirty-five (35) days prior to the requested day off will be given priority and granted in seniority order. A Police Officer whose timely Day Off Holiday request is denied will be notified five (5) days in advance of the requested day off. The tour of duty exchange option is not available for holidays. Unit

Commanders/Commanding Officers will ensure that a notice informing Police Officers of the day off holiday request procedures will be placed in the CO Book as needed.

6) Nothing precludes the Unit Commanders/Commanding Officers from determining a minimum set percentage of Police Officers on each watch in each district who may be granted the use of Elective Time. The Department and the Lodge agree to form a Labor Management Committee for the purpose of establishing a minimum set percentage of officers who will be given an option for the use of Elective Time.

7) Nothing contained in this Memorandum of Understanding will modify the current policy or practices which govern the use and awarding of Elective Time, except as expressly provided for herein.

8) The Department continues to retain the right to cancel all days off for Police Officers by district or unit when warranted, as it has in the past, due to exigent circumstances.

Each quarter, the Department agrees to provide the Lodge with the number of Police Officers on each watch in each district, including the number of Police Officers who were on furloughs, IOD and non-IOD, and the number of Police Officers who requested and were granted the use of Elective Time and will make every reasonable effort to determine officers who were denied the use of Elective Time.

City of Chicago, Department of Police      Fraternal Order of Police, Chicago Lodge
                                                           No. 7



# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1307

*President*
DEAN ANGELO, SR.

*1st Vice President*
RAY CASIANO, JR.

*2nd Vice President*
FRANK J. DIMARIA

*3rd Vice President*
DANIEL D. GORMAN

*Recording Secretary*
GREG BELLA

*Financial Secretary*
KEVIN C. KILMER

*Treasurer*
JOHN T. CAPPARELLI

*Past President*
WILLIAM J. NOLAN

*Sergeants-At-Arms*
BILL BURNS
AL FRANCIS, JR.
JAMES E. MORIARTY, JR.

*Trustee Chairman*
ROBERT RUTHERFORD

*Trustees*
DEAN C. ANGELO, JR.
MARK P. DONAHUE
PATRICK W. DUCKHORN
SERGIO ESCOBEDO
KATHLEEN L. GAHAGAN
MICHAEL P. GARZA
JOSEPH GENTILE
KEN HAUSER
TOM LONERGAN
KEVIN MCNULTY
TIM MORIARTY
JAY R. RYAN
STEVE SCHORSCH
RONALD H. SHOGREN
DANIEL G. TREVINO
MIKE VOIGHT

*Field Representatives*
KEITH CARTER
MARLON HARVEY
THOMAS MCDONAGH

September 3, 2014

James C. Franczek, Jr., Esq.
**Franczek Radelet**
300 South Wacker Drive; Suite 3400
Chicago, IL 60606

Re:     *Bomb Technician Work Schedule*

Dear Mr. Franczek:

The Lodge and the Chicago Police Department mutually acknowledge the critical importance that the job duties of Bomb Technicians have to the safety of the citizens of the City of Chicago. In recognition of the foregoing, the parties agree that, within ninety (90) days of the ratification of this Agreement, the Department and the Lodge shall each designate representatives to comprise a Labor Management Committee to review and study ways in which to improve the work schedule for Bomb Technicians, consistent with the operational needs of the Police Department. The Committee shall meet upon request of either party and shall prepare recommendations in writing with respect to its suggestions for the improvement of the Bomb Technician work schedule, and submit them to the Superintendent. If the Superintendent agrees with the recommendations, or any of them, the Department shall implement them.

If the above accurately reflects our agreement, please so indicate by signing your name below.

Very truly yours,

*Dean C. Angelo, Sr.*

Dean C. Angelo, Sr.

**AGREED:**

*James C. Franczek, Jr. Esq.*

James C. Franczek, Jr. Esq.

Date: 9/3/14

## THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

# FRATERNAL ORDER OF POLICE

## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD · CHICAGO, ILLINOIS 60607-1823
PHONE: 312-733-7776 · FAX: 312-733-1367

*President*
DEAN ANGELO, SR.

1ˢᵗ *Vice President*
RAY CASIANO, JR.

2ⁿᵈ *Vice President*
FRANK J. DIMARIA

3ʳᵈ *Vice President*
DANIEL D. GORMAN

*Recording Secretary*
GREG BELLA

*Financial Secretary*
KEVIN C. KILMER

*Treasurer*
JOHN T. CAPPARELLI

*Past President*
WILLIAM J. NOLAN

*Sergeants-At-Arms*
BILL BURNS
AL FRANCIS, JR.
JAMES E. MORIARTY, JR.

*Trustee Chairman*
ROBERT RUTHERFORD

*Trustees*
DEAN C. ANGELO, JR.
MARK P. DONAHUE
PATRICK W. DUCKHORN
SERGIO ESCOBEDO
KATHLEEN L. GAHAGAN
MICHAEL P. GARZA
JOSEPH GENTILE
KEN HAUSER
TOM LONERGAN
KEVIN MCNULTY
TIM MORIARTY
JAY R. RYAN
STEVE SCHORSCH
RONALD H. SHOGREN
DANIEL G. TREVINO
MIKE VOIGHT

*Field Representatives*
KEITH CARTER
MARLON HARVEY
THOMAS MCDONAGH

September 3, 2014

James C. Franczek, Jr., Esq.
Franczek Radelet
300 South Wacker Drive; Suite 3400
Chicago, IL 60606

Re:     Honor Guard

Dear Mr. Franczek:

This letter confirms the parties' understandings and agreements with respect to the Honor Guard. The Lodge and the Department mutually acknowledge the importance of the activities of the Honor Guard as representatives of the Chicago Police Department, its continuing accomplishments and its contributions to the reputation of the City of Chicago throughout the country. For these reasons, the Honor Guard and its members shall receive an appropriate level of support, effective January 1, 2015, as set forth in greater detail below.

Officers who are members of the Honor Guard who are scheduled to work on a day on which the Honor Guard has been designated to perform duties at an event, including any approved day of travel to and from the event when the event is located outside of the local area, shall be excused from their regular duties without loss of pay. Officers shall not be entitled to any additional compensation when such activities fall on a day they are not scheduled to work. When Officers who are members of the Honor Guard have been approved to travel out of town for an Honor Guard event, they shall be eligible for reimbursement of travel, lodging, meals and incidental expenses in accordance with the City of Chicago Travel Guidelines in effect for City employees. Recognizing that from time to time additional expenses are necessarily and legitimately incurred by the Honor Guard with respect to specialized accessories, equipment, etc., in order to carry out its functions, the City agrees to make available up to thirty thousand dollars ($30,000), on an annual basis, beginning January 1, 2015, to reimburse the Guard for such expenditures. Within thirty (30) days of ratification of this Agreement, the Police Department shall develop and promulgate protocols and forms to implement the reimbursement process.

Your acknowledgment and agreement in the space provided below is appreciated.

Very truly yours,

Dean C. Angelo, Sr.

AGREED:

James C. Franczek, Jr., Esq.

Date: 9/3/14

## THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

154

# FRANCZEK RADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 I CHICAGO, IL. 60606
T: 312.986.0300 I F: 312.986.9192 I WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Joseph M. Burns
Jacobs, Burns, Orlove & Hernandez
150 North Michigan Avenue
Suite 1000
Chicago, IL 60601

### Re: Capitalization of "Officer"

Dear Mr. Burns:

This letter sets forth the parties' agreement with respect to capitalization of the term "Officer" in the 2012-2017 Agreement.

The 2007-2012 Agreement, as was the case with previous Agreements between the parties, contained different approaches to the term "Officer": sometimes the word was capitalized, sometimes it was not. Sometimes it was part of a hybrid expression, such as "police officer". There was no discernible pattern to these usages. Lodge representatives on the Contract Drafting Committee expressed the view that, in order to convey the appropriate level of respect for the men and women serving in the Chicago Police Department, the term should be uniformly capitalized. The City wholeheartedly concurs with the desire to evidence the proper respect. Accordingly, the parties have agreed that the term should be uniformly capitalized. In so doing, the Lodge and the City acknowledge that they intend no substantive change of any kind or degree in the rights, privileges, obligations or benefits of any sworn Police Officer, regardless of whether the individual is a member of the Lodge's bargaining unit or is a probationary Police Officer, etc. Neither party will assert, in any grievance, arbitration, administrative agency or court proceeding, that the fact that the term "Officer" is now capitalized when it previously was not has any bearing on the appropriate interpretation of any provision in the Agreement.

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS

If the above accurately reflects our agreement, please so indicate by signing your name below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Joseph M. Burns, for the FOP, Chicago Lodge No. 7

cc:   Joseph P. Martinico
      Donald J. O'Neill

156

# FRANCZEKRADELET

ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T: 312.986.0300 | F: 312.986.9192 | WWW.FRANCZEK.COM

September 3, 2014

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

Joseph M. Burns
Jacobs, Burns, Orlove & Hernandez
150 North Michigan Avenue
Suite 1000
Chicago, IL 60601

### Re: Section 29A.4

Dear Mr. Burns:

This letter sets forth the parties' agreement with respect to Section 29A.4.

Effective calendar year 2012, the Chicago Police Operations Calendar was revised to provide that the first day of each Police Period will begin on a Sunday. Prior to and in anticipation of this revision, the Department and the Lodge reached certain understandings and agreements regarding furloughs and furlough extensions under the new Calendar and in the context of different work schedules, as set forth in their letter of agreement dated September 2, 2011. It is the parties' intent that those understandings and agreements shall continue to apply during the term of this collective bargaining agreement, and the parties' decision not to revise the language appearing in Section 29A.4 regarding furloughs and furlough extensions is not intended to and shall not be interpreted as an agreement to modify the understandings and agreements referenced in this paragraph.

If the above accurately reflects our agreement, please so indicate by signing your name below.

Very truly yours,

James C. Franczek, Jr.

AGREED:

Joseph M. Burns, for the FOP, Chicago Lodge No. 7

cc: Joseph P. Martinico
Donald J. O'Neill

157

# FRANCZEKRADELET

### ATTORNEYS & COUNSELORS



300 SOUTH WACKER DRIVE, SUITE 3400 | CHICAGO, IL 60606
T: 312.986.0300 | F: 312.986.9192 | WWW.FRANCZEK.COM

JAMES C. FRANCZEK, JR.
312.786.6110
jcf@franczek.com

September 3, 2014

Dean Angelo, Sr.
President
Fraternal Order of Police,
   Chicago Lodge No. 7
1412 West Washington Blvd.
Chicago, IL  60607

     Re:    **Wellness Benefit**

Dear President Angelo:

     I am writing to confirm that the reference in Arbitrator Benn's February 28, 2005 award to "$600.00 per year (effective 1/1/06)" for the City's wellness benefit is to be interpreted as a commitment by the City to fund up to $600.00 of eligible wellness benefits for each officer enrolled in the City's PPO plans and each covered member of the officer's family who is also enrolled in the City's PPO plans.

     The parties agree that, effective January 1, 2015, this $600.00 per year wellness benefit is eliminated and replaced in accordance with the Preventive Care Benefit provided for in Paragraph (I)(A) of the parties' Memorandum of Understanding Re: Health Care Plan. The parties further agree that, if during the term of this Agreement the Preventive Care Benefit provided for in Paragraph (I)(A) of the parties' Memorandum of Understanding Re: Health Care Plan is reduced or eliminated by an amendment to federal law or by a court ruling, upon the request of either party, the parties shall meet promptly and negotiate with respect to substitute terms intended to provide benefits substantially similar to those available under the Preventive Care Benefit or, if such result is not possible, the pre-existing $600.00 per year wellness benefit. In the event the parties are unable to agree upon substitute terms, the dispute shall be submitted to the impasse resolution procedure set forth in Section 28.3(B).

     Your acknowledgement and agreement is appreciated in the space provided below.

                Very truly yours,

                James C. Franczek, Jr.

AGREED:

Dean Angelo, Sr.

# INDEX

## A

Accumulation Of
Compensatory Time ...............32, 82
Acting Desk Sergeant .........................41
Affidavit ......................................17. 75
Alcohol And Drug Testing ............91-93
Alternate Response ...........30, 37, 51, 52
Alternative Medical Coverage...102-103
Ambulance Fees .................................44
Americans With Disabilities Act...19-20
Attendance At Lodge Meetings ..........25
Authority Of The Arbitrator ..........17-18
Auto-Residency Card ....................... 7-8
Auxiliary Police Aides........................65

## B

Baby Furlough Days............................49
Back To Back Shifts On
Change Day.............................32, 82
Behavioral Intervention System.....72-73
Bereavement Leave ............................28
Bid Assignments.................................96
Bidding ..................37-41, 51-53, 96-97
Bi-Lingual Compensation..............45-46
Bomb Technician Work Schedule ....153
Bulletin Boards...................................22

## C

Call-Back.....................................29, 82
Capitalization of Officer............155-156
Challenge Of Summary Punishment...10
Change Of Schedule ..............30-31, 137
Civilianization ....................................41
Compensation For Holidays ..........20-21
Compensatory Time ......... 20-21, 24-26,
. 29, 32, 34-35, 39, 42, 46, 49, 82, 95
Complete Agreement...........................54
Compulsion Of Testimony ...................7
Continuing Effect ...............................47
Court Time ............................29-30, 82

## D

Day-Off Cancel or
Change...................19-21, 29, 32, 35-37
Day-Off Group Assignment ...............32
Death In Family..................................28
Definition Of Family .........................28

Dental Plan .........................................66
Department-Procured Outside
Employment .........................120-121
Department Vehicles .................142-143
Desk Sergeant.....................................41
Details...........................................40-41
Disability Income ...............................26
Disabling Defects ...............................23
Disciplinary
Investigation ........... 4-7, 75-76, 140-141
Discipline, Progressive .......................94
Displaced...................See Civilianization
District Desk Bid Positions...............138
District Watch Relief...............38-39, 96
Drug And Alcohol Testing ............91-93
Dues......................................................2
Duty Availability Allowance..............33
Duty Exchange ...................................30

## E

Educational Reimbursement..41-42, 105
Elective Time ............................151-152
Employee Security..............................10
Equal Employment Opportunity.........19
Expedited Arbitration ............. 12, 34, 77
Expense Of The Arbitrator .................18
Extended Bereavement Leave ............28

## F

Field Officer Training Program ........144
File Inspection ....................................10
Filling Recognized Vacancies .......37-38
Filling Unit Duty Assignments......38-39
Foot Patrol ...................................31, 52
Furloughs................................35, 49-50

## G

Grievance Procedure ... 11, 84-85, 89-90

## H

Health Care...... 14, 27-28, 43-44, 66-71,
........ 74, 101-104, 122-124, 148-150
Health Fairs ......................................117
Holidays .................................19-21, 37
Honor Guard.....................................154

Hours And Overtime ...............28-33, 46

## INDEX

### I

Indemnification...........................34, 112
Injury On Duty14, 26-28, 33, 78-79, 111

### J

Just Cause ...........3, 10-11, 17, 38-39, 52

### L

Labor Management Committee On Health
    Care.................................................44
Layoffs .............................................22
Legal Representation ..........................34
Life Insurance....................................43
Limited Duty . ...................26, 38-41, 51
Lost Shields.......................................34

### M

Media Information Restrictions............8

### N

No Strike .............................................3
Not Sustained Files....................10, 107

### O

Orientation...................................... 1-2
Out Of Grade .....................................46
Overtime.................2, 28-32, 36, 45, 72

### P

Payment Of Time ...............................46
Payment Of Wages.............................46
Personal Day...............21, 26, 36, 50, 72
Personal Leaves Of Absence .........50-51
Personnel Concerns Program..............72
Photo Dissemination............................7
Physical Fitness ...........................94, 95
Political Activity Or Campaigning .....20
Polygraph ............................................7
Probationary Period . 1, 22, 34, 33-40, 82
Promotion .........................21, 30-32, 36
Psychological Review........ 13-14, 86-88

### R

Reassignment Of Duties ....................41
Recognized Openings........26, 37-39, 53
Religious Holiday Accommodation....19
Residency .............................4, 7, 47, 75
Retiree Health Care Benefits .....122-124
Rule 14 ...........................................5, 7
Retroactivity .........................2, 145-146

### S

Safety................................. 13-14, 22-23
Salary Schedule ................. 44-46, 56-63
Schedule ........................ 30-32, 126-138
Secondary Employment.................23-24
Seniority .........21-24, 32, 34-35, 39, 139
Separation......................5, 9, 11, 15, 35
Sixth And Seventh Day Work ............29
Special Compensation Time ...............21
Stand-By............................................31
Steady Watch................................51-54
Subrogation ..................................80-81
Summary Punishment..4, 6, 9-11, 15, 24

### T

Term Of Agreement ...........................47
Training .................................30-32, 118

### U

Uniform Allowance ............................33
Uniforms ...........................................33
Uniforms And Equipment Advisory
    Committee....................................33
Unit Bid Assignments...................53, 96
Unit Duty Assignment...................48-39

### V

Vehicle License Plate/City
    Sticker Violations.................113-114
Vocational Training..........................118

### W

Wages................................ 44-46, 56-63
Watch Assignment...................30, 51-54
Wellness Benefit...............................158
Work Out Of Grade...........................46

# Notes

**Notes**

# Notes

**Notes**

# Notes

# Notes

# Notes

# Notes

**CHICAGO LODGE No. 7**
**Representing Over 17,000 Active and Retired Officers**

**DEAN C. ANGELO, SR. –** *President*
**RAY CASIANO, JR. –** *1st Vice President*
**FRANK J. DiMARIA –** *2nd Vice President*
**DANIEL D. GORMAN –** *3rd Vice President*
**GREG BELLA –** *Recording Secretary*
**JOHN T. CAPPARELLI –** *Treasurer*
**KEVIN C. KILMER –** *Financial Secretary*

*Sergeants-At-Arms*
**BILL BURNS     AL FRANCIS, JR.     JAMES E. MORIARTY, JR.**

*Past President*
**WILLIAM J. NOLAN**

*Trustee Chairman*
**ROBERT RUTHERFORD**

*Trustees*
**DEAN C. ANGELO, JR.**
**MARK P. DONAHUE**
**PATRICK W. DUCKHORN**
**SERGIO ESCOBEDO**
**KATHLEEN L. GAHAGAN**
**MICHAEL P. GARZA**
**JOSEPH GENTILE**
**KEN HAUSER**
**TOM LONERGAN**
**KEVIN MCNULTY**
**LANDRY REEVES**
**INEZ RILEY**
**JAY R. RYAN**
**STEVE SCHORSCH**
**RONALD H. SHOGREN**
**DANIEL G. TREVINO**

*Field Representatives*
**KEITH CARTER     MARLON HARVEY**
**THOMAS MCDONAGH**

**General Meetings are on the 3rd Tuesday of Every Month**
**(No Meetings in July & August)**
*ATTENDING YOUR MEETINGS KEEPS YOU INFORMED*

# Fraternal Order of Police
# Chicago Lodge No. 7



**1412 West Washington Boulevard
Chicago, Illinois  60607-1821
Phone:  312-733-7776
Facsimile:  312-733-1367**

# WWW.CHICAGOFOP.ORG

# EXHIBIT C

| Chicago Police Department | **Special Order  S08-01** |
|---|---|
| **COMPLAINT AND DISCIPLINARY INVESTIGATORS AND INVESTIGATIONS** | |

| ISSUE DATE: | 31 December 2021 | EFFECTIVE DATE: | 31 December 2021 |
|---|---|---|---|
| RESCINDS: | 04 May 2018 Version | | |
| INDEX CATEGORY: | 08 - Professionalism | | |
| CALEA: | Law Enforcement Standards Chapter 82 | | |

## I.    PURPOSE

This directive:

A.    outlines the selection criteria and the selection process for  BIA investigators and accountability sergeants.

B.    outlines the confidentiality of Log Number investigations.

C.    defines the responsibilities of district commanders, unit commanding officers, BIA supervising lieutenants, BIA case management supervisors, BIA investigators, and accountability sergeants for Log Number investigations.

D.    describes the training BIA investigators and accountability sergeants receive.

E.    provides the investigation notifications and timelines required for Log Number investigations conducted by the Department.

F.    provides for the consistent application of the investigative process as defined by this directive and subsequent related directives.

G.    provides definitions of terms related to complaint and disciplinary investigators and investigations, including Bureau of Internal Affairs (BIA) investigators and accountability sergeants

## II.    DEFINITIONS

A.    **Accountability Sergeant**: a sergeant assigned to a district or unit responsible for receiving, processing, and investigating misconduct complaints made against Department members assigned to his or her district or unit, which are referred for investigation by BIA.

B.    **BIA Case Management Supervisor**: a sergeant assigned to BIA who assists the BIA Supervising Lieutenant with the review and approval of investigations conducted by accountability sergeants.

C.    **BIA Investigator**: a sworn Department member, assigned or detailed to BIA responsible for receiving, processing, and investigating misconduct complaints made against Department members assigned to BIA for investigation. Sergeants, police officers (assigned as detectives), and, in certain limited circumstances, police officers may serve as BIA investigators to conduct Log Number investigations.

D.    **BIA Supervising Lieutenant**: a lieutenant assigned to the BIA who supervises and reviews investigations conducted by accountability sergeants or BIA investigators.

E.    **Case Management System (CMS):** the application for processing Log Number investigations initiated on or after 11 February 2019. The CMS maintains investigation data regarding the number, classification, and status of all Log Number investigations initiated on or after 11 February 2019, from the intake process through the final disposition.

F. **Civilian Office of Police Accountability (COPA):** an agency within the City of Chicago responsible for administrative investigations of certain complaints against Department members as well other as incidents where no complaint is made. Chapter 2-78 of the Municipal of Code of Chicago establishes COPA.

G. **Conflict of Interest**: when a Department member assigned to investigate, review, or participate in making any disciplinary decisions or recommendations with respect to a Log Number investigation:

    1.    is a reporting party;

    2.    is an accused or witness;

    3.    authorized, engaged in conduct that led to, or otherwise allegedly participated in the incident giving rise to the complaint;

    4.    would experience a positive or negative impact to his or her financial interests upon resolution of the matter under investigation;

    5.    has a household or immediate family member (e.g. spouse, domestic partner, parent, sibling, child) who would experience a positive or negative impact to his or her financial interests upon resolution of the matter under investigation;

    6.    has a professional, external business, financial, or close personal relationship with a reporting party, a witness, or the accused;

    7.    has a household or immediate family member (e.g. spouse, domestic partner, parent, sibling, child) with a professional, external business, financial, or close personal relationship with a reporting party, a witness, or the accused;

    8.    directly reports to a reporting party, a witness, or the accused in his or her chain of command; or

    9.    has any other conflict of interest identified by the Department member.

H. **Command Channel Review:** a process in which exempt-level supervisor's review completed Log Number investigations for allegations against members under their command.

I. **Complaint:** one or more allegations of misconduct reported to the Department, COPA, or the Office of the Inspector General (OI).

J. **District Commander:** an exempt commanding officer accountable for the performance of all district personnel and the actions taken to address police service and crime suppression activities within a district.

K. **Exempt Supervisor:** a command staff member at or above the level of commander or director.

L. **Final Disciplinary Decision:** the final decision of the Superintendent or his or her designee regarding whether to issue or recommend discipline after review and consideration of the investigative findings and recommendations, including after any additional investigation conducted as a result of such review. For COPA investigations, the final disciplinary decision occurs after the conclusion of the process described in Chicago Municipal Code Section 2-78-130(a).

M. **Final Disposition:** the status of a Log Number investigation after the final disciplinary decision and any grievance process, arbitration, Police Board proceeding, or appeal relating to the final disciplinary decision.

N.  **Log Number:** a unique tracking number assigned to any incident brought to the attention of the Department or COPA by a reporting party involving a Department member that may be investigated and that will be linked with all phases of the investigation and disciplinary process through the final disposition. A Log Number is classified by type to identify the incident notification or investigation's administrative process. The Log Number classification type may change based on the progress of the administrative notification and investigation of the incident; however, the Log Number itself will always remain the same, including during the grievance process, arbitration, any Police Board proceeding, or appeals therefrom thereby permitting reporting parties/subjects (or their representatives) the opportunity to track their complaints. The Department will ensure that information related to any grievance process, arbitration, Police Board proceeding, or appeals therefrom (e.g., grievance numbers and docket numbers) are entered into CMS. The Log Number classification types are:

1.  INFORMATION/COMPLAINT—the classification given to a Log Number when it is initiated to document a complaint (allegation of misconduct).

2.  COMPLAINT REGISTER (CR)—the classification given to a Log Number by a BIA investigator or accountability sergeant after he or she completes the preliminary investigation and obtains a sworn affidavit or sworn affidavit override, or determines that a sworn affidavit is not required to conduct a full investigation.

3.  NOTIFICATION—the classification given to a Log Number that is initiated for administrative tracking purposes because the incident requires an immediate notification to COPA even when there is no accompanying complaint (allegation of misconduct). This notification to COPA is required for the following incidents:

    a.  when a sworn Department member discharges a firearm (on or off duty) and another person is injured or killed by one or more bullets fired by that member, or when a sworn Department member has suffered a self-inflicted gunshot wound.

    b.  when a sworn Department member discharges a firearm (on or off duty) at a person and the person is not injured or killed.

    c.  unintentional firearm discharge incidents and firearm discharge incidents solely for the destruction or deterrence of an animal.

    d.  Taser discharges.

    e.  Oleoresin Capsicum (OC) and other chemical agent discharges.

    f.  the use of chemical/smoke dispensing or distraction devices.

    g.  an incident involving a motor vehicle accident with fatalities including any death resulting from a motor vehicle accident involving a Department member engaging in law enforcement activity off duty.

    h.  any other miscellaneous and extraordinary incidents including death in custody, suicide in custody, or an attempted suicide in custody.

O.  **Log Number Investigation**: The process during which evidence is collected, assessed, and analyzed about an incident subsequent to the assignment of a Log Number.

P.  **Misconduct**: Any violation of law or any Department rule, regulation, directive, or order.

Q.  **Objective Verifiable Evidence**: information based on facts that can be proven to be true by means of search such as analysis, measurement, and observation. Examples of objective verifiable evidence include, but are not limited to, Department calendars and schedules, swiping reports, body-worn camera video, in-car camera video systems, Police Computer Aided Dispatch (PCAD) messages, and Global Positioning System (GPS) data.

R.   **Preliminary Investigation**:  the initial investigatory steps conducted by the BIA Intake and Analytical Section and continued by the assigned BIA investigator or accountability sergeant after a complaint is received. Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to, all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the preliminary investigation.

S.   **Reporting Party/Subject**: the complainant that brings an incident involving a Department member that may be investigated to the attention of the Department or COPA. The reporting party/subject can be a member of the public or a sworn or civilian Department member.

T.   **Reporting Party/Third Party**: a Department supervisor initiating a Log Number after receiving a complaint presented by a reporting party/subject.

U.   **Sworn Affidavit**: a sworn written statement against a sworn Department member by a non-Department member certifying that the statement is true and correct under penalties provided by law. A copy of a sworn affidavit may be provided to a reporting party upon request.

V.   **Sworn Affidavit Override**: an action taken by the Chief Administrator, Civilian Office of Police Accountability (COPA), or the Chief of BIA when the standards defined by the appropriate collective bargaining agreement have been met to continue the investigation without the sworn affidavit requirement when objective, verifiable evidence exists and attempts to contact a reporting party are unsuccessful or the reporting party refuses to sign a sworn affidavit.

W.   **To-From-Subject Report**: A written report used for intra-Departmental correspondence submitted for situations where there is not already a prepared form when a situation requires a written response, for use as an informational report, or when documentation is required. The To-From-Subject Report format is used to maintain consistent, efficient, and professional intra-Department communications.

X.   **Quick View Report**: A display page in CMS that provides a summary of the of information pertaining to the Log Number including an incident description, incident narrative, involved Department members, involved Non-Department individuals, and the location of occurrence.

Y.   **Unit Commanding Officer:** a Department supervisor accountable for the performance of Department members assigned to a unit.

III.   **POLICY**

A.   The goal of the Department's accountability system is to thoroughly, fairly, timely, and efficiently investigate all complaints of misconduct, whether from internal or external sources.

B.   Resolution of complaints through a fair and prompt investigative process supports the Department's legitimacy and effectiveness by fostering community trust and promoting Department and community member confidence in the accountability structure.

C.   The foundation of the Department's accountability system is qualified and dedicated investigators who are committed to achieve the accountability goals of the Bureau of Internal Affairs and the Department. District commanders and designated unit commanding officers select candidate accountability sergeants whom the Chief of BIA approves. BIA provides training for all personnel selected as accountability sergeants

D.   Accountability sergeants remain assigned to their respective units and generally are supervised by their unit's chain of command. BIA directs and instructs accountability sergeants to receive, process, and investigate Log Numbers that are referred to districts or units by BIA. The Department and the Chief of BIA will ensure investigations completed by accountability sergeants are held to the same investigative standards as those investigations completed by BIA investigators.

E.    Upon receiving a complaint against a Department member, a supervisory Department member will obtain a Log Number consistent with the Department directive titled "Complaint Initiation and Log Number Investigation Assignment." COPA will initiate the complaint intake process and either retain the Log Number investigation or assign the Log Number investigation to BIA, consistent with its jurisdiction as defined in the Municipal Code of Chicago, Title 2, Chapter 2-78.

F.    When BIA receives a Log Number, BIA and assigned accountability sergeants will investigate all complaints fairly and impartially under its authority, the procedures outlined in this and associated directives, and any applicable internal BIA procedures. Objective, comprehensive, and timely Log Number investigations will establish the facts of the incident to support or disprove allegations following a fair, well-defined, and consistent investigative process. All investigative findings will be supported by the appropriate standard of proof and documented in the Case Management System (CMS). Adherence to this policy helps ensure that Department members who commit misconduct are held accountable under a disciplinary system that is fair, timely, consistent, and provides due process.

G.    BIA investigators and accountability sergeants will comply with all applicable BIA unit-level and Department directives associated with Log Number investigations, in addition to the policies, directives, rules, and regulations that govern all Department members.

H.    All districts will designate at least two accountability sergeants consistent with this directive. Additionally, the Chief of BIA will designate which other Department units are required to have accountability sergeants.

## IV.    CONFIDENTIALITY IN INVESTIGATIONS

A.    All Department members, especially assigned BIA investigators and accountability sergeants, have a professional and ethical obligation to maintain confidentiality. Department members who improperly disclose any information from a Log Number investigation will be subject to disciplinary action.

B.    BIA investigators, accountability sergeants, and other Department supervisors assigned to investigate a Log Number or review a Log Number investigation will:

1.    ensure the confidentiality of any information related to a Log Number investigation to which they are assigned or to which they become aware;

2.    limit the dissemination of information concerning Log Number investigations to only those who are necessary for the investigation, consistent with applicable Department directives, collective bargaining agreements, and BIA directives;

3.    secure any documents related to the investigation, including but not limited to notes, reports, or other documentation;

4.    not discuss Log Number investigations in non-secure areas or areas where persons other than those involved in the Log Number investigation may have access;

5.    not make public, via any social media outlet or a public forum, any information or comments related to any Log Number investigation; and

6.    maintain a professional rapport with any person involved in a Log Number investigation and refrain from expressing personal comments, opinions, or "off-the-record" discussions while interacting with parties involved in the investigation.

## V.    INVESTIGATION NOTIFICATIONS AND TIMELINES

A.    Within 72 hours of being assigned a Log Number investigation, the BIA investigator or accountability sergeant will provide the accused member's immediate supervisor with a Quick View Report from the CMS consistent with the Department directive titled "Complaint Initiation and Log Number Investigation Assignment."

B.    Within 72 hours of being assigned a Log Number investigation, the BIA investigator or accountability sergeant will make reasonable attempts to secure a sworn affidavit from the reporting party/subject, including in-person visits, phone calls, and email.

C.    Investigations conducted by accountability sergeants are to be completed within 90 days of the date initiated. If an investigation cannot be completed within that time frame, the accountability sergeant will:

    1.    request an extension of time via the Case Management System;

    2.    within 5 days of the deadline, provide written notice of the reasons for the inability to complete the investigation within the designated time frame to:

        a.    the reporting party/subject or the reporting party/subject's representative;

        b.    the accused CPD member(s) or his or her counsel (unless such notification would compromise the integrity of the investigation); and

        c.    the district commander or unit commanding officer requesting an extension of time via Department email.

    3.    update the written notice required by Item V-C-2 every 90 days until the investigation is complete and include all notices and extension approvals in the investigative file.

D.    Investigations conducted by BIA investigators are to be completed within 180 days of the date the investigation was initiated. If an investigation cannot be completed within that time frame, the BIA investigator will:

    1.    request an extension via the Case Management System;

        **NOTE:**    The Chief of BIA, or designee, must approve extension requests for BIA investigators within the Case Management System.

    2.    within 5 days of the deadline, provide written notice of the reasons for the inability to complete the investigation within the designated time frame to:

        a.    the reporting party/subject or the reporting party/subject's representative; and

        b.    the accused CPD member(s) or his or her counsel (unless such notification would compromise the integrity of the investigation).

    3.    update the written notice required by Item V-D-2 every 90 days until the investigation is complete and include all notices and extension approvals in the investigative file.

E.    If the assigned BIA investigator or accountability sergeant does not arrive at an investigative finding within 180 days, they will periodically, but at least once every 60 days, attempt to contact the reporting party/subject or the reporting party/subject's representative to provide status updates until the investigative findings and recommendations are issued. Such contact and attempts to contact will be documented in the Log Number investigative file.

**VI.**    **SELECTION OF INVESTIGATORS**

A.    Candidates for BIA investigator and accountability sergeant must meet the highest possible standards of integrity to achieve the goals of the Department and BIA. Therefore, applicants will not be considered for selection unless they meet all the minimum qualification criteria as outlined in this directive. However, applicants that only meet the minimum qualification criteria may be deemed unsuitable for such assignment by the Chief of BIA upon review of the specific allegations and complaints contained within the candidate's disciplinary history or other factors identified in the candidate's work history.

B.    **Selection Qualification Criteria**. As of the effective date of this directive, the minimum qualification criteria for BIA investigator and accountability sergeant are:

1.     no outstanding debt to the City of Chicago.

2.     a minimum of one year in grade as a sergeant or a police officer (assigned as a detective). Police officer (assigned as a detective) candidates for BIA investigator will have a minimum of five years in grade.

3.     an acceptable medical usage record. If the candidate's medical roll usage reflects nine or more medical incidents or forty-five days or more on the medical roll within the preceding three-year period, absent exceptional circumstances or demonstrates a pattern of medical roll abuse or misuse, the candidate will be disqualified.

        **NOTE:**     Medical time used in relation to approved FMLA leaves, ADA accommodations, or IOD injuries cannot be the basis for disqualification.

4.     an acceptable attendance record. If the candidate's attendance record reflects any unauthorized absences within the preceding twelve-month period, the candidate will be disqualified.

5.     performance ratings above the minimum rating score necessary to qualify for a step increase as defined in the Department directive titled "Performance Evaluations of All Sworn Department Members below the Rank of Superintendent" for each of the two last evaluations.

6.     a disciplinary history that includes:

    a.     no sustained complaint register (CR) investigations within the past year resulting in any suspension time.

    b.     no sustained CR investigations within the past five years where the sustained finding directly relates to excessive use of force, false reports, or verbal abuse.

    c.     no more than two sustained CR investigations within the last five years resulting in suspensions of any length of time.

    d.     no open or pending CR investigations which, upon review of the evidence underlying such complaint(s), indicates in the judgment of the Department as determined by the Chief of BIA that a reasonable probability exists that the candidate may receive discipline consistent with Item VI-B-6-a, b, or c of this directive or would impede the candidate's ability to achieve the accountability goals of the Department and BIA.

        **NOTE:**     Sustained CR investigations with findings of "No Disciplinary Action" will not be considered as sustained violations for purposes of this selection process.

C.     Identification and Selection of Accountability Sergeants

1.     All district commanders and designated unit commanding officers will submit a To-From-Subject Report providing the names of a minimum of two accountability sergeant candidates who meet or exceed the above-listed minimum qualification criteria to the Chief of BIA for review and approval.

2.     If a district commander or unit commanding officer elects to replace an accountability sergeant, he or she will submit a To-From-Subject Report with a new accountability sergeant candidate who meets or exceeds the above-listed minimum qualification criteria to the Chief of BIA to the Chief of BIA for review and approval.

3.     The Chief of BIA will:

    a.     assess the suitability of accountability sergeant candidates by reviewing:

        (1)     the type, severity, and the number of allegations and complaints in the candidate's entire disciplinary history, including patterns that may indicate barriers to achieving the accountability goals of the Department and BIA;

(2)    other applicable factors identified in the candidate's work history, including previous performance evaluations and demonstrations of integrity that indicate the ability to achieve the accountability goals of the Department and BIA; and

(3)    whether the candidate only meets or exceeds the minimum qualification criteria established in Item VI-B of this directive

b.    approve or disapprove of accountability sergeant candidates; and

c.    notify the district commander or unit commanding officer upon the approval or disapproval of an accountability sergeant.

4.    The Chief of BIA has the final authority to approve a candidate for selection as an accountability sergeant. District commanders or unit commanding officers will not remove or replace an accountability sergeant without the approval of the Chief of BIA.

D.    Selection of BIA Investigators

1.    The Chief of BIA will assess the suitability of BIA investigator candidates by reviewing:

a.    the type, severity, and the number of allegations and complaints in the candidate's entire disciplinary history, including patterns that may indicate barriers to achieving the accountability goals of the Department and BIA;

b.    other applicable factors identified in the candidate's work history, including previous performance evaluations and demonstrations of integrity that indicate the ability to achieve the accountability goals of the Department and BIA; and

c.    whether the candidate only meets or exceeds the minimum qualification criteria established in Item VI-B of this directive.

2.    The Chief of BIA:

a.    may develop additional procedures, steps, or reviews determined to be necessary (e.g., interviews) to fully assess the suitability of BIA investigator candidates

b.    has the final authority to recommend and approve a candidate for assignment as a BIA investigator.

E.    At any time, the Chief of BIA may remove any BIA investigator from his or her assignment or accountability sergeant from his or her selection.

F.    Review of BIA Investigator and Accountability Sergeant Selection Qualification Criteria

1.    Upon the implementation of this directive, and at minimum on an annual basis, BIA will conduct a review of data contained within the CMS to assess the final disciplinary decisions of Log Number investigations for sergeants Department-wide, including any disciplinary action resulting in suspension. Based on this review, the Chief of BIA will consider if any adjustments are necessary to the minimum disciplinary history criteria of BIA investigators or accountability sergeants.

2.    Upon the implementation of this directive, and at minimum every two years thereafter, the Department will conduct an analysis to review the selection qualification criteria established in Item VI-B of this directive.

a.    This analysis will include a review of:

(1)    the disciplinary histories of current BIA investigators and accountability sergeants, including their disciplinary histories at the time of placement in their current roles, and

(2)    the disciplinary histories of sergeants Department-wide to assess the availability of potential eligible candidates for BIA investigator or accountability sergeant.

b.    The final report will not include any personally identifiable information of BIA investigators or accountability sergeants.

c.    The Chief of BIA will review:

(1)    the final report and determine if any of the minimum selection qualification criteria established in Item VI-B of this directive for BIA investigator or accountability sergeant should be maintained or modified.

(2)    the underlying data of the analysis to determine whether any BIA investigator or accountability sergeant needs to be removed from their position.

## VII.    LOG NUMBER INVESTIGATION ASSIGNMENT

A.    When COPA refers a Log Number to the Department, the Chief of BIA, or designee, will ensure the Log Number investigation is assigned to a BIA investigator or accountability sergeant assigned to the accused member's district or unit for investigation.

B.    The Chief of BIA, or designee, will determine the assignment of Log Number investigations to BIA investigators or accountability sergeants based on the seriousness of the allegations and the investigation's complexity.

C.    BIA Intake and Analytical Section will assign a Log Number investigation to either a BIA investigator or accountability sergeant by evaluating the following factors:

1.    The seriousness of the allegation(s),

2.    The number of involved units,

3.    The number of accused members,

4.    The rank(s) of an accused member(s), and

5.    The accused member(s) complaint and disciplinary history.

D.    Examples of allegations that may be assigned to and investigated by accountability sergeants include, but are not limited to:

1.    Arrest/lockup incidents,

2.    Prisoner's property (money, failed to inventory; money, failed to issue receipt; property, failed to inventory, failed to issue receipt),

3.    Traffic violations (not bribery/excessive force),

4.    Misconduct during the issuance of a citation,

5.    Improper processing/reporting/procedures,

6.    Operation/Personnel violations (On-Duty),

7.    Reports (inadequate/failure to provide service; inventory procedures (non- arrestee); failure to identify),

8.    Seat belts,

9.    Slow/no response,

10.    Neglect of duty,

11.    Misuse of Department equipment/supplies,

12.    Conduct unbecoming violations,

13.    Equipment irregularity, or

14.    Abuse of authority.

> **EXAMPLE:**    A community member was the victim of a fraud and called the police for a report. The responding officer told her that it was not a police matter and refused to make a report. The community member then made a complaint, which became a Log Number investigation. The officer who refused to make the report has no previous sustained complaints for failure to provide service. BIA's Intake and Analytical Section assigns the investigation to an accountability sergeant in the accused officer's district.

E.    BIA investigators investigate the following types of allegations, and BIA's Intake and Analytical Section will not assign them to an accountability sergeant.

1.    Criminal conduct,

2.    False reports, written or oral (Rule 14),

3.    Drug or alcohol abuse,

4.    Allegations involving the serious injury or death of any person,

5.    Allegations made by any Department members of workplace discrimination or harassment,

6.    Allegations against a supervisor the rank of sergeant or above,

7.    Allegations against members not assigned to the accountability sergeant's district or unit, or

8.    Allegations that, if sustained, would result in a recommendation for separation.

> **NOTE:**    Accountability sergeants will not serve allegations on accused members for any allegation listed above in Item VII-E. A BIA investigator will serve the allegations.

F.    If an accountability sergeant identifies any evidence of an allegation listed in Item VII-E above, the accountability sergeant will promptly notify the BIA supervising lieutenant and request re-evaluation of the assignment of the Log Number investigation.

G.    Consistent with the Department directive titled "Conflict of Interest," Department members with a conflict of interest with a Log Number will not investigate or review that Log Number.

H.    Accountability sergeants will not investigate allegations specifically assigned to the Civilian Office of Police Accountability (COPA), BIA, or the Office of the Inspector General (OIG).

**VIII.    RESPONSIBILITIES OF INVESTIGATORS IN LOG NUMBER INVESTIGATIONS**

A.    The duties and responsibilities of accountability sergeants in Log Number investigations include, but are not limited to:

1.    completing the required initial on-boarding and annual in-service training as directed;

2.    conducting all investigations in accordance with the requirements of law, Department directives, and BIA policies;

3.    conducting objective, comprehensive, and timely investigations of complaints;

4.    remaining consistent, fair, and impartial when conducting investigations;

5.    ensuring compliance with the applicable collective bargaining agreement(s) throughout the completion of the investigation;

6.    taking all reasonable steps to promptly identify, collect, and consider relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices;

7.    determining if there may have been additional misconduct beyond that initially alleged and take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated;

8.    determining whether there are any other open Log Number investigations involving the same accused member and monitor or combine the investigation(s), as appropriate;

9.    taking all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD-member witnesses, and attempt to interview any reporting party/subject or witness in person at a time and place that is convenient and accessible for the reporting party/subject or witness, when feasible;

10.   taking all reasonable steps to identify the involved and witness CPD member(s) if the reporting party/subject was unable do so;

11.   communicating with reporting party/subjects and accused Department members in a professional and respectful manner;

12.   initiating and making reasonable attempts to secure a sworn affidavit, including in-person visits, phone calls, and other methods within 30 days of receiving a Log Number investigation;

13.   making reasonable arrangements to accommodate the disability status, language proficiency, and incarceration status of a reporting party/subject, victim, or witness;

14.   making personal contact with a reporting party/subject, victim, or witness at the earliest possible date upon receiving the Log Number investigation;

15.   ensuring that the identity of a reporting party/subject is not revealed to the accused member until the accused member is formally served with allegations and ordered to submit a written response to questions presented;

16.   assessing whether the evidence collected in the preliminary investigation is sufficient to continue the investigation when unable to obtain a sworn affidavit despite having made reasonable attempts to do so;

17.   submitting a written request to the BIA supervising lieutenant seeking approval for a sworn affidavit override if a sworn affidavit is required and has not been obtained and the preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue;

18.   canvassing the area of the alleged incident when such an action will assist the accountability sergeant in coming to a complete and accurate finding;

19.   attempting contact periodically, but not less than once every 60 days, with the reporting party/subject (or representative) to provide status updates if investigative findings and recommendations have not been reached within 180 days and documenting such contacts or unsuccessful attempts in the investigative file;

20.   taking into consideration the nature of the allegation, as well as the accused member's complimentary and disciplinary history in cases with sustained findings;

21.   ensuring that completed investigations are submitted with all available evidence and documentation supporting the findings to the BIA supervising lieutenant or BIA case management supervisor for review; and

22.   any other duty as directed by the accountability sergeant's supervisor or the Chief of BIA.

B.     BIA investigators will conduct Log Number investigations consistent with the guidelines outlined above in addition to the appropriate BIA unit-level directives, under the direction of the Chief of BIA.

## IX.    RESPONSIBILITIES FOR SUPERVISING INVESTIGATORS IN LOG NUMBER INVESTIGATIONS

A.     District commanders and unit commanding officers with designated accountability sergeants will:

1.     ensure that accountability sergeants receive, process, and investigate complaints against members assigned to the district or unit.

2.     ensure accountability sergeants are making investigative findings and recommendations within 90 days of the initiation of an investigation.

3.     ensure all accountability sergeants have access to the appropriate officer support and performance metrics applications, including but not limited to the Performance Recognition System (PRS).

4.     notify the Chief of BIA when an accountability sergeant has been reassigned or will be unavailable to conduct investigations.

5.     review case-related and overall performance feedback submitted by the BIA supervising lieutenant concerning the accountability sergeant's investigations.

6.     review approved investigations submitted by accountability sergeants subject to command channel review consistent with the Department directive titled "Command Channel Review."

7.     approve, via Department email, requests for extensions of time from accountability sergeants if investigative findings and recommendations are not reached within 90 days of the initiation of an investigation.

B.     The BIA supervising lieutenants responsible for the management of the accountability sergeant investigations will:

1.     provide their contact information, including Department email address, office telephone number, and work cell phone number to all accountability sergeants whose investigations are assigned for their supervision and review;

2.     have access to the appropriate officer support and performance metrics applications, including but not limited to the Performance Recognition System (PRS);

3.     provide the name and contact information for the BIA case management supervisors assisting in the review of investigations conducted by accountability sergeants;

4.     communicate with accountability sergeants to evaluate progress of investigations;

5.     ensure accountability sergeants have access to BIA policies, directives, protocols, and training materials;

6.     ensure accountability sergeants receive the initial on-boarding and annual in-service training as outlined in Item X of this directive;

7.     review and, if warranted, approve the accountability sergeant's proposed investigative findings to ensure that they are accurate, thorough, and complete and that the proposed recommendations are supported by the facts.

8.     ensure all investigations completed by accountability sergeants are held to the same investigative standards as those completed by BIA;

9.     ensure all investigations conducted by accountability sergeants meet the requirements of law, Department policy, and the City of Chicago Consent Decree, 17-CV-6260;

10.    ensure that investigation findings are supported by the appropriate standard of proof established by Department policy;

11. order an additional investigation when it appears there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings;

12. document in writing any orders for additional investigation;

13. approve requests for extensions of time in Case Management System (CMS) when investigative findings and recommendations are not reached within 90 days of the initiation of an investigation; and

14. provide case-related and overall performance feedback to each assigned accountability sergeant and his or her district commander or unit commanding officer.

C. The duties and responsibilities of a BIA case management supervisor, as they relate to investigations conducted by accountability sergeants, include but are not limited to:

1. assisting in the management of the accountability sergeants as directed by the BIA supervising lieutenant;

2. reviewing investigations submitted by accountability sergeants to ensure thoroughness before submission to the BIA supervising lieutenant;

3. ensuring that accountability sergeants have access to the case management system and are trained in its use;

4. facilitating the submission of Affidavit Override requests by the accountability sergeants;

5. serving as a liaison between the BIA supervising lieutenant and the accountability sergeants;

6. requesting the reassignment of open investigations when an accountability sergeant leaves his or her unit of detail/assignment or is absent for more than 30 days, pending the BIA supervising lieutenant's approval; and

7. being available to consult on or trouble-shoot investigative steps with an accountability sergeant.

## X. TRAINING

A. BIA investigators and accountability sergeants will receive initial on-boarding and eight hours of annual in-service training, provided and facilitated by the BIA Instructional Group, that will include BIA and Department policies, directives, protocols, and training materials. Outside experts and guest speakers may be included in this training.

B. BIA investigators and accountability sergeant initial on-boarding and annual in-service training will include, but not be limited to, the following subject matters:

1. Complaint intake and the consequences for failing to take complaints;

2. Best practices in procedural justice, including techniques for communicating with reporting parties, victims, and witnesses;

3. Collection of objective verifiable evidence;

4. Process for seeking an affidavit override in the absence of a signed sworn affidavit;

5. Techniques for conducting impartial investigations involving sexual misconduct;

6. Investigative skills, including proper interview techniques (such as disability- and trauma-informed interview techniques), gathering and objectively analyzing evidence, and data and case management;

7. Challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that become apparent during the investigation;

8.     The credibility of all involved parties (e.g., victims, witnesses, accused members, and reporting parties), including weighing the credibility of the involved parties;

9.     Using objective verifiable evidence to identify and resolve inconsistent statements;

10.    Implicit bias;

11.    Ethics and conducting impartial investigations;

12.    Proper application of the relevant standards of proof;

13.    BIA directives and procedures for proper applications of findings, rule violations, and recommended penalties;

14.    BIA Standard Operating Procedure, as appropriate;

15.    Relevant COPA and Department rules, directives, and materials;

16.    City of Chicago Consent Decree, 17-CV-6260;

17.    Relevant State and Federal Statutes that impact investigations;

18.    Arbitration findings;

19.    Rules and Regulations of the Chicago Police Department;

20.    Utilizing the Case Management System;

21.    Applicable collective bargaining agreements and their impact upon investigations; and

22.    Utilization of the appropriate officer support and performance metrics applications, including but not limited to the PRS.

**XI.    CONDUCT OF LOG NUMBER INVESTIGATIONS**

A.     BIA investigators and accountability sergeants will conduct objective, comprehensive, and timely Log Number investigations in a fair and impartial manner pursuant to their authority and the procedures established by the Department.

B.     The following Department directives set forth rights, responsibilities, and procedures for conducting Log Number investigations relative to the complaint and disciplinary system:

1.     "Conduct of Log Number Investigations";

2.     "Special Situations Involving Allegations of Misconduct";

3.     "Command Channel Review;" and

4.     "Post-Investigation Log Number Procedures."

**XII.   CONFLICT RESOLUTION**

If this directive conflicts with a provision in any other Department directive relative to duties and responsibilities of accountability sergeants, members will seek guidance from the Chief of BIA.

Authenticated by KC                                                    David O. Brown
                                                                       Superintendent of Police

21-103 MWK/JJR/GJD

**ADDENDA:**

1.     S08-01-01 - Conduct of Complaint Investigations

2.     S08-01-02 - Special Situations Involving Allegations of Misconduct

3. S08-01-03 - Command Channel Review
4. S08-01-04 - Post-Investigation Log Number Procedures
5. S08-01-05 - Summary Punishment
6. S08-01-08 - Nondisciplinary Intervention Program
7. S08-01-09 - Medical Integrity Section