**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| James Hunt, | |
| Plaintiff, | No. 1:23-CV-00522 |
| v. | Judge Edmond E. Chang |
| City of Chicago, David Brown, and Larry Snelling, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

James Hunt sued the City of Chicago, David Brown (the former Superintendent of the Chicago Police Department), and Larry Snelling (the current Superintendent) after he was allegedly reassigned from his role as a patrol officer to desk duty. R. 66, Second Am. Compl.[1] Hunt brings a First Amendment retaliation claim, 42 U.S.C. § 1983, and a breach of contract claim for alleged violations of the Chicago Police Department's collective bargaining agreement. Second Am. Compl. ¶¶ 50–71.[2] The Defendants move to dismiss both claims. R. 67, Defs.' Mot. For the reasons explained below, the motion is denied as to the First Amendment retaliation claim, but the state law claim is dismissed with prejudice.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]This Court has subject matter jurisdiction over the federal law claim under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367(a).

## I. Background

In evaluating the motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). Hunt has been a police officer with the Chicago Police Department (which the parties call CPD) since 2013. Second Am. Compl. ¶ 14. Until 2018, Hunt worked as a beat patrol officer and then as a tactical officer in the Tactical Unit. *Id.* ¶¶ 15–16. Hunt alleges that in July 2018, he got into an altercation while arresting a citizen and during which they exchanged coarse language. *Id.* ¶ 17. Bystanders captured the incident on video, and the arrested individual's mother sent a complaint to the Civilian Office of Police Accountability (commonly referred to as COPA). *Id.* ¶ 18. Brown—who was Superintendent of CPD at the time—told Hunt that he had received a one-year suspension from COPA. *Id.* ¶ 19. Hunt alleges that COPA implements and approves disciplinary actions with the explicit or implicit approval of the Superintendent. *Id.* ¶ 20. Hunt filed a grievance based on his suspension. *Id.* ¶ 21. His superiors denied the grievance, which led to arbitration. *Id.* Hunt was successful at arbitration and received a reduced suspension. *Id.*

After his suspension was over, CPD assigned Hunt to the Community Safety Unit (formerly known as the Gang Unit). Second Am. Compl. ¶ 22. Hunt then got into another incident with a citizen during a riot in May 2020. *Id.* ¶¶ 23–25. In March 2021, Hunt was reassigned from the Community Safety Unit to the Equipment and Supply Section (which Hunt says is essentially desk duty). *Id* ¶ 26. He does not know who gave the order to reassign him. *Id.* Someone later informed Hunt that he was

reassigned for his own protection. *Id.* ¶¶ 27–28. But Hunt alleges that he had never previously been informed of a threat, and the Commander of Labor Relations later testified that they kept Hunt off the street even after the threat expired. *Id.* Once on desk duty, Hunt was also denied overtime and disqualified from promotions for which he claims he was otherwise qualified. *Id.* ¶ 29.

In April 2021, Brown acknowledged in a media press conference that CPD had removed Hunt from the Community Safety Unit. Second Am. Compl. ¶ 31. Later that month and into May 2021, Hunt alleges that he was the only one in his unit (one of 10 officers) denied the opportunity for street deployment, and that CPD placed him on a "non-deployable" list without a hearing or adjudication. *Id.* ¶ 32. In August 2021, COPA issued paperwork about Hunt's second civilian incident and proceedings ensued. *Id.* ¶ 33.

In February 2022, Hunt was promoted to a Field Training Officer, but was then stripped from the position two days later pending the outcome of the COPA proceedings on his second incident. Second Am. Compl. ¶ 34. Hunt then became eligible for detective status in July 2022, which entails an automatic promotion with a sufficient test score. *Id.* ¶ 38. But again, CPD did not promote Hunt because of the second civilian incident. *Id.* In December 2022, Hunt was placed on "no-pay" status based on that incident. *Id.* ¶ 35. He filed for unemployment with the Illinois Department of Employment Security. *Id.* The Department granted unemployment benefits to Hunt, but the City appealed the decision. *Id.* In an administrative hearing on the matter, Hunt

"aired his grievances" with the CPD and successfully received unemployment bene-fits. *Id.* ¶¶ 36–37.

In October 2023, the police board found Hunt not guilty in the second incident. Second Am. Compl. ¶ 40. Snelling—who became Superintendent the month prior—appealed the decision despite testimony from the victim of the incident suggesting that Hunt was not involved. *Id.* ¶¶ 39–41. Hunt won on appeal again, but was de-tailed to "call-back" duty instead of reinstated to the field. *Id.* ¶ 42. "Call-back" detail is typically reserved for police who are under investigation, stripped of police powers, or restricted due to medical issues—none of which applied to Hunt. *Id.* ¶ 43. Hunt alleges that the Defendants sought to keep him on call-back duty indefinitely despite him becoming eligible for multiple promotions in that time. *Id.* ¶ 44.

Hunt says that he repeatedly complained to Snelling about the alleged retali-atory actions taken against him, but Snelling continued to approve each action. Sec-ond Am. Compl. ¶ 39. Hunt also made repeated complaints to the Human Resources sergeant, Anthony Rubens, and to his other supervisors. *Id.* ¶ 45. He also complained to his call-back sergeants and got no response. *Id.* ¶ 46. He submitted a form to the Acting Commander of call-back requesting an end to his call-back detail. *Id.* ¶ 47. Hunt's request was granted, but he never heard about it again after it was sent up the chain of command. *Id.* He tried moving to other police districts, but his superiors continuously placed him on call-back. *Id.* ¶ 48.

Based on these events, Hunt sued the Defendants, alleging that they violated his procedural due process and equal protection rights, and breached CPD's collective

bargaining agreement. R. 1, Compl. ¶¶ 28–46. Earlier in the case, the Court dismissed Hunt's constitutional claims without prejudice and declined to reach the state law claim. R. 39, Op. at 1–2. Hunt now brings claims for First Amendment retaliation and breach of contract. Second Am. Compl. ¶¶ 50–71.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). At the same time, the Supreme Court instructs that "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task ...." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Seventh Circuit has drawn a context-dependent distinction between relatively straightforward employment discrimination claims versus more complex claims. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010).

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. First Amendment Retaliation

To state a First Amendment retaliation claim, Hunt must adequately allege that "(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in [Defendants'] actions." *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012) (cleaned up). The Defendants argue that Hunt fails to plausibly allege the first and third factors. R. 68, Defs.' Br. at 2, 5–9. They also contend that Hunt does not allege facts supporting Brown and Snelling's personal liability, nor a *Monell* claim against the City of Chicago. *Id.* at 9–11. The Court addresses each argument in turn.

### 1. Protected Speech

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "For a public employee's speech to be protected under

6

the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (cleaned up). The Defendants argue that Hunt's speech did not address a matter of public concern because he complained only about his personal employment and financial compensation. Defs.' Br. at 6–9.

Speech deals with a matter of public concern when it can fairly be "considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Whether a statement rises to the level of public concern is a question of law, and in answering this question [the Court] look[s] to the content, form, and context of the statement." *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009) (cleaned up). "[T]he 'public concern' test … looks to the overall *objective* or *point* of the speech, as ascertained by *all three* factors of content, form, and context." *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 985 (7th Cir. 2013) (emphasis in original) (cleaned up). The motive of the speaker is relevant as part of the context in which the speech was made, but "content remains the most important factor in determining whether speech addresses a matter of public concern." *Chaklos*, 560 F.3d at 714. Thus, "motive alone does not conclusively determine whether a public employee's speech involves a matter of public concern." *Kristofek*, 712 F.3d at 985.

Here, Hunt's speech largely consisted of employee grievances and internal administrative appeals related to his employment and compensation. Second Am.

7

Compl. ¶¶ 21, 36. This context could suggest that he did not intend to speak about matters of public concern. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011). Similarly, some of the facts alleged in the Second Amended Complaint may raise an inference that Hunt's motivations were—at least in part—self-interested (that is, his desire to overturn disciplinary measures taken against him, receive unemployment benefits, and return to the field). Second Am. Compl. ¶¶ 21, 32, 35–36.

But the *content* of Hunt's complaints ultimately suggests that he was addressing a matter of public concern: his belief that CPD engages in a practice of reassigning qualified police officers from their positions when the department wishes to discipline them but is unable to sanction them through official channels. Second Am. Compl. ¶ 53. Because that practice could deprive the public of competent officers needed to do critically important jobs, this issue is a matter of public concern. *See Kristofek*, 712 F.3d at 986 ("But if an objective of the speech was … to bring about change with public ramifications … then the speech does involve a matter of public concern."). What's more, the public ramifications of this issue raise a plausible inference that Hunt was not entirely self-motivated, but also spoke up to inform and help the public. *Id.* at 984 ("The mere fact that Kristofek was motivated by his self-interest does not make it implausible that he was *also* motivated to help the public." (emphasis in original)).

The content of Hunt's speech thus distinguishes it from the cases cited by the Defendants. *See Bivens v. Trent*, 591 F.3d 555, 561–62 (7th Cir. 2010) (describing how the content of plaintiff's speech related only to police conditions at firing range, not matters directly affecting public); *Hagan v. Quinn*, 84 F. Supp. 3d 826, 831 (C.D. Ill.

8

2015) (finding that plaintiffs made no allegations of government malfeasance and only discussed how the law applied to them, which is not a matter of public concern). Because Hunt complained about more than a mere change in his personal duties, but also spoke about a purported broader practice that allegedly harms the public, he plausibly alleges that he spoke about a matter of public concern. Hunt thus adequately pleads that his speech was constitutionally protected.

## 2. Motivating Factor

Hunt also adequately alleges that his speech was a motivating factor in the Defendants' actions. Hunt says that he first engaged in protected speech when he filed a grievance for his suspension in 2019. Second Am. Compl. ¶ 21. Then, after he successfully appealed that grievance, Hunt was reassigned from his unit to desk duty. *Id.* ¶¶ 26–27. This raises an inference that the Defendants retaliated against Hunt because he engaged in protected activity and CPD was unable to sanction him through formal channels. Hunt alleges that he was similarly transferred and denied promotions after he engaged in protected speech through the adjudication of his second incident, his application for unemployment benefits, and various informal complaints to different CPD supervisors. *Id.* ¶¶ 35–36, 39. Taking all of Hunt's allegations as true, they plausibly suggest that his speech was a motivating factor for Defendants' actions. *See Gustafson v. Jones*, 117 F.3d 1015, 1018 (7th Cir. 1997) (holding that plaintiff adequately alleged that speech was a motivating factor "based on the timing" between plaintiff's speech and defendant's retaliatory conduct). Because

9

Hunt also adequately alleges this element of the claim, he has adequately stated a First Amendment retaliation claim.

### 3. Individual-Capacity Claims

The Defendants also argue that Hunt "fails to sufficiently allege that either Brown or Snelling personally retaliated against" him. Defs.' Br. at 9–10. To successfully plead a constitutional claim against Brown and Snelling in their individual capacities, Hunt must adequately allege "personal involvement in the alleged constitutional deprivation …." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). In other words, Hunt must sufficiently plead that "the conduct causing the constitutional deprivation occur[ed] at [the individual's] direction or with his knowledge and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (cleaned up).

First, Hunt alleges that Brown was Superintendent of CPD and explained the reason for Hunt's reassignment from the Community Safety Team in a press conference. Second Am. Compl. ¶¶ 10, 31. As the Court noted in its previous Opinion, the fact that a Superintendent personally knew the status of Hunt's reassignment gives rise to a plausible and reasonable inference that the Superintendent was involved in the decision. Op. at 9–10. Thus, giving Hunt the benefit of reasonable inferences at the pleading stage, he has adequately pled Brown's personal involvement in his First Amendment retaliation claim.

So, too, with Snelling. Hunt alleges that he personally told Snelling about the actions taken against him, yet Snelling continued to approve of the retaliatory conduct. Second Am. Compl. ¶ 39. The Defendants argue that these allegations are too

conclusory to adequately allege Snelling's personal involvement. Defs.' Br. at 9–10. To be sure, later in the case, at the summary judgment stage, Hunt will have to offer enough admissible evidence of knowledge that a jury could find for him. But taking Hunt's allegations as true at the pleading stage, given his personal interactions with Snelling and Snelling's position as Superintendent, it is plausible that CPD retaliated against Hunt with Snelling's knowledge and consent. Hunt thus states an individual-capacity claim against Snelling.

### 4. *Monell* Claim

To adequately plead municipal liability against the City of Chicago, Hunt must allege that the City itself was involved in his constitutional deprivation. *Kujawksi v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999). To do so, he must allege that there was "an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Id.*

The Court recognized that Hunt adequately pled that Brown has final policy-making authority in its previous Opinion. Op. at 10–11. But in this round of dismissal-motion briefing, Hunt failed to raise this argument in his response brief. *See generally* R. 73, Pl.'s Resp. Br.; *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."). And although Hunt says that the alleged retaliation occurred under an express CPD policy, *see* Pl.'s Resp. Br. at 6–7, he alleges no facts to suggest that CPD had a policy like that.

11

Hunt does, however, adequately state a *Monell* claim by alleging that a widespread practice constituting custom or usage caused his constitutional deprivation. Hunt says that CPD has a "practice of constructively stripping unfavored police personnel of their police power; isolating them in non-public facing roles; and forcing them into retirement through a campaign of attrition, when the proper procedural avenues are exhausted." Second Am. Compl. ¶ 53. Although Hunt failed to provide detailed factual allegations of CPD using this "practice" frequently against other officers, he does allege that two successive CPD Superintendents—high-ranking officials with final policymaking authority—engaged in the practice against him on numerous occasions. *Id.* ¶¶ 31, 39. Though the "widespread practice" element of *Monell* liability is distinct from "final policymaking authority," the fact that two final policymakers allegedly engaged in the same practice suggests that the practice is widespread. For instance, it might not have been enough to state a claim if Hunt merely alleged that two sergeants—or some other lower-ranking officials—took retaliatory actions against him. But because Hunt alleges that two *Superintendents* were involved in repeated retaliatory conduct, it is plausible that the CPD had a widespread practice that caused Hunt's constitutional deprivation. He thus states a claim for municipal liability under *Monell*.

### B. Breach of Contract

### 1. Illinois Public Labor Relations Act

The Illinois Public Labor Relations Act confers exclusive jurisdiction over labor disputes brought by public employees to the Illinois State Labor Relations Board.

*Flowers v. City of Chicago*, 2019 WL 1932587, at *8 (N.D. Ill. May 1, 2019) ("Federal and Illinois state courts have been clear that the Board has exclusive jurisdiction to hear unfair labor practice grievances …."). As a result, Hunt's claim for a breach of contract must be brought before the Board, not this Court.[4]

Hunt argues that the Labor Management Relations Act (commonly called the LMRA) preempts the Illinois Public Labor Relations Act. Not so. The LMRA grants federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). "That is, the provision grants federal courts jurisdiction over controversies surrounding labor organizations and, by extension, the violation of collective bargaining agreements." *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 841 (7th Cir. 2015). But the LMRA's definition of "employer" expressly *excludes* "any State or political subdivision thereof." 29 U.S.C. § 152(2). "So, even though a state or political subdivision may sign and be a party to a collective bargaining agreement, it remains immune from federal lawsuits arising under the collective bargaining agreement and relevant federal law." *Healy*, 804 F.3d at 841. Because Hunt is a City employee, the LMRA does not apply. Thus, the state Labor Relations Act continues to

---

[4]The Court has supplemental jurisdiction over Hunt's breach-of-contract claim under 28 U.S.C. § 1367. The Defendants argue that the Labor Relations Act removes the Court's subject matter jurisdiction. Defs.' Br. at 13. The Court need not decide whether the Labor Relations Act strictly divests the Court of subject matter jurisdiction because, whatever label one applies, the statute clearly vests authority over Hunt's claim with the Board.

vest Hunt's exclusive remedy in the Illinois State Labor Relations Board instead of this Court. The claim must be dismissed.

## 2. Failure to State a Claim

Even if Hunt were able to bring his breach-of-contract claim before this Court, it would fail on the merits. To state a breach-of-contract claim under Illinois law, a plaintiff must allege that there was a valid contract, performance by the plaintiff, breach by the defendant, and damages. *See Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984 N.E.2d 1171, 1175 (Ill. App. Ct. 2013). Hunt claims that the Defendants breached the collective bargaining agreement between the Fraternal Order of Police and the City of Chicago. Second Am. Compl. ¶ 32. The Defendants argue that Hunt fails to state a claim for two reasons. Defs.' Br. at 11–12. First, Hunt is not a party to the collective bargaining agreement, and therefore cannot sue under it. *Id.* And second, the individual Defendants are not parties to the contract, and therefore cannot be sued under it. *Id.* at 12.

Under Illinois law, a nonparty to a contract normally cannot be held liable for breach of contract. *See Meeker v. Gray*, 492 N.E.2d 508, 515 (Ill. App. Ct. 1986) (holding that nonparties to the contract were not liable). More specifically, the Illinois Supreme Court has held that "only parties to a collective-bargaining agreement, such as bargaining representatives and employers may bring suit" or be sued under the agreement. *Casanova v. City of Chicago*, 793 N.E.2d 907, 915 (Ill. App. Ct. 2016). In other words, although collective bargaining agreements benefit employees by enabling them to improve their employment conditions as a group, those employees give

14

up their individual rights to bargain under the contract in exchange for the pooled benefits. *Stahulak v. City of Chicago*, 703 N.E.2d 44, 48 (Ill. 1998).

Here, neither Hunt nor the individual Defendants are parties to the collective bargaining agreement because they are not bargaining representatives or employers. *See Casanova*, 793 N.E.2d at 915. Hunt cites cases establishing in other contexts that third-party beneficiaries to a contract may bring breach-of-contract claims against contracting parties. *See, e.g.*, Pl.'s Resp. Br. at 9 (citing *Olson v. Etheridge*, 686 N.E.2d 563 (1997)). But none of these cases involve collective bargaining agreements, let alone support the premise that a union employee is a party to a collective-bargaining agreement under Illinois law. *See Olson*, 686 N.E.2d 563; *see also Joslyn v. Joslyn*, 54 N.E.2d 475 (Ill. 1944); *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498 (Ill. 1931). Hunt thus cannot bring a breach-of-contract claim against any of the Defendants. And because the individual Defendants are not parties to the agreement, they cannot be sued for breach of contract, either. For these reasons, Hunt fails to state a breach-of-contract claim.

### 3. Dismissal

In general, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend [his] complaint" before his claim is dismissed. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). But the Court must only grant leave to amend a complaint if "the underlying facts or circumstances

15

relied upon by a plaintiff may be a proper subject of relief ….” *Foman v. Davis*, 371 U.S. 178, 182 (1962). If further amendment would be futile, the Court may dismiss a claim with prejudice. *Id.*

This is Hunt’s Second Amended Complaint. And it would be futile for Hunt to amend his breach-of-contract claim because, for the reasons just discussed, there is no theory under which he can enforce this claim in this Court. The breach-of-contract claim is thus dismissed without leave to amend.

## IV. Conclusion

The Defendants’ motion to dismiss, R. 67, is granted in part and denied in part. Hunt’s breach-of-contract claim is dismissed without leave to amend. But the First Amendment retaliation claim survives. The parties shall confer and propose a discovery schedule in a status report filed by April 13, 2026.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 30, 2026

16